*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 09-CF-1438, 10-CF-54, 09-CF-1439, 10-CF-55, 09-CF-1450, 09-CF-1469, 09-CF-1482, 09-CF-1483, & 10-CF-120

MICHAEL D. TANN, LANNELL COOPER, ANTONIO ARNETTE, JAMES RUSHING, SAQUAWN HARRIS, and DAJUAN D. BEAVER, APPELLANTS,

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-22807-07, CF1-22940-07, CF1-22893-07,
CF1-3359-08, CF1-22962-07, & CF1-22967-07)

(Hon. Henry F. Greene, Trial Judge)

(Argued March 25, 2014                    Decided November 19, 2015)

*Judith A. Lovelace* for appellant Tann.

*Thomas T. Heslep* for appellant Cooper.

*Deborah A. Persico* for appellant Arnette.

*Steven R. Kiersh* for appellant Rushing.

*Christopher Kemmitt*, Public Defender Service, with whom *James Klein*, Public Defender Service, was on the brief, for appellant Harris.

*Stephen W. Riddell* for appellant Beaver.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Laura Bach*, and *John Giovanelli*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, BLACKBURNE-RIGSBY, and THOMPSON, *Associate Judges*.

Opinion for the court per curiam.

Opinion by *Associate Judge* GLICKMAN, concurring in part and dissenting in part, at page 213.

PER CURIAM:   After a nine-month jury trial, the six appellants in this case were convicted of conspiracy and a string of violent crimes, including homicides, that were committed in connection with their membership in a gang known as the 22nd Street Crew.  They raise numerous challenges to their convictions in these consolidated appeals.  With a few exceptions, however, we affirm the judgments of the Superior Court.

In view of the length of this opinion, before commencing our discussion of the proceedings below and appellants' claims, we set forth the following table of contents as an aid to the reader.

**Table of Contents**

I.      The Leslie Jones Murder........................................................................7
II.     The Terrence Jones Murder and Richard Queen Assault .........................8
III.    The James Taylor Murder and Bernard Mackey Assault .........................10
IV.     The Laquanda Johnson Murder and Keisha Frost Assault .......................12
V.      Obstruction of Justice – Witness Intimidation and Manipulation ............15

VI.    Procedural Developments ................................................................16
VII.   Claims Concerning the Sufficiency of the Evidence .........................19
    A.    Conspiracy ...........................................................................19
        1.   Antonio Arnette ........................................................25
        2.   Dajuan Beaver...........................................................27
        3.   Lannell Cooper.........................................................28
        4.   Saquawn Harris ........................................................29
        5.   James Rushing ..........................................................30
        6.   Michael Tann ............................................................31
    B.    Terrence Jones-Richard Queen Incident.................................35
        1.   Tann's Convictions: Second-Degree Murder While
            Armed of Terrence Jones, Armed Robbery of Richard
            Queen, and Possession of a Firearm During the
            Commission of a Crime of Violence ("PFCV") ..................35
        2.   Arnette's Convictions: Second-Degree Murder While
            Armed of Terrence Jones, Armed Robbery of
            Richard Queen, and PFCV ........................................42
    C.    James Taylor-Bernard Mackey Incident ................................50
        1.   The Government's Argument .............................56
        2.   Appellant's Argument................................................58
        3.   Analysis....................................................................60
    D.    Beaver's Conviction: Obstruction of Justice .........................87
    E.    Beaver's Conviction:  Carrying a Pistol Without a License ("CPWL")........94
    F.    Cooper's Conviction: Laquanda Johnson Murder Under *Pinkerton* .............98
VIII.  Procedural and Evidentiary Issues Related to the Conspiracy
And Appellants' Joint Trial .............................................................103
    A.    Cooper's Prior Convictions...................................................103
        1.   Error in Admitting Cooper's Convictions Against
            Tann and Arnette......................................................106
        2.   Harmlessness...........................................................110
        3.   Admission Against Cooper .......................................114
    B.    Tann's Severance Argument Unrelated to Cooper's
        Prior Conviction...................................................................115
    C.    Laquanda Johnson's Statements Admitted Under a
        Forfeiture-by-Wrongdoing Theory ........................................117
    D.    The Trial Court's Finding of a Predicate Conspiracy ...........121
    E.    Rap Lyrics and Beaver's Webpage.......................................125
        1.   Authorship of the Rap Lyrics on the CD .................127
        2.   Whether Michael Smith was a Co-conspirator ........129
        3.   Statements in Furtherance of Conspiracy .................130
        4.   Unfair Prejudice .....................................................133
    F.    Tann's Outburst ..................................................................135

IX. Pretrial and Trial Issues Unrelated to the Conspiracy or Joint Trial ...........................143
    A. Evidentiary Issues ........................................................................143
        1. Search of Beaver's Jail Cell ...............................................143
        2. Evidence of Uncharged Misconduct, Incarceration, and Fear
          Testimony ........................................................................149
           a. Testimony of Andre McDuffie .......................................149
           b. Testimony of Darryl Travers .........................................155
        3. Evidentiary Rulings During Cooper's Case-in-Chief ...........157
           a. Statements by Tamika Bradshaw .................................157
           b. Statements by Laquanda Johnson .................................159
           c. Statements by Cooper to Brandon Elzie .........................160
        4. Admission of Tann's Videotaped Statement .......................162
    B. Instructional Issues .......................................................................163
        1. Obstruction of Justice Instruction .....................................163
        2. Lesser-Included Offense Instruction: Relationship
          Between Felony and Second-Degree Murder .......................173
        3. Attitude and Conduct Instruction .....................................175
    C. Closing and Rebuttal Argument ......................................................176
        1. Government's Closing Argument .......................................176
        2. Government's Rebuttal Argument ......................................179
        3. Analysis .........................................................................182
    D. Discovery ...................................................................................186
        1. Loss of Cooper's Jail Phone Calls .....................................186
        2. Dewey Chappel ...............................................................191
        3. Kyara Johnson ................................................................196
    E. Grand Jury Claims ........................................................................199
        1. Pre-Indictment ...............................................................203
        2. Post-Indictment ..............................................................206
X. Merger ...........................................................................................208
XI. Conclusion ......................................................................................212

The government presented evidence at appellants' trial showing that there was a criminal street gang operating in the area of 22nd Street, Southeast, Washington, D.C. The investigation of this gang revealed a violent, drug-trafficking organization functioning in the blocks of 22nd Street that sat between Southern Avenue and Savannah Street, and influencing areas around the gang's base of operations. The

goals of the organization were centered on the purchase, storage, packaging, and resale for profit, of illegal drugs within the community.

Members of the gang committed numerous criminal acts in an effort to protect the territory of the gang and integrity of its operations. This misconduct took the form of acts of violence designed to safeguard the organization. Often, the violence was directed at perceived rivals who might threaten the gang's territory and drug trade or witnesses who might undermine its operations through cooperation with law enforcement.

The gang was called various names, including the "22nd Street Crew," "The Deuce," "Deuce-Deuce," "Shipley Market," "Young Gunz," and "Deuce Squad Mafia." For simplicity, it will be referred to in this opinion as the "22nd Street Crew." The 22nd Street Crew had a loose rank structure wherein members would play different roles according to the level of authority and respect they had gained over time through demonstrations of loyalty to the gang. Members that had achieved a sufficient level of respect would be referred to as "OGs" or "original gangsters." More junior members were labeled "baby gangsters" or "little locs."

The government's evidence tended to demonstrate the involvement of all six appellants in the 22nd Street Crew. Lannell Cooper had been part of the 22nd Street Crew since the 1990s and achieved an unmatched level of authority within the gang.  Michael Tann was part of the gang for a similar period and was close behind Cooper in the hierarchy. James Rushing, Dajuan Beaver, and Antonio Arnette carried less weight in the organization; however, evidence was presented showing their long-standing involvement in the 22nd Street Crew and its operation. Saquawn Harris was a newer member, having been introduced by another high-ranking gang member.

The indictment in this case charged the six appellants with conspiracy and with committing serious acts of violence as part of their participation in the 22nd Street Crew.  Specifically, the indictment articulated that each appellant entered into a conspiracy to "knowingly and willfully . . . agree together to obstruct justice and to assault and kill anyone whose interests were contrary to those of [appellants] and their associates."   In a nine-month joint trial of appellants from November 2008  to July 2009, the government endeavored also to show that four murders were committed, as part of the charged conspiracy, at or near 22nd Street between 2003 and 2006. The government contended that these murders were

directed toward maintaining the turf and authority of the 22nd Street Crew, either by eliminating perceived rivals or killing government witnesses. Each appellant was involved in at least one of these murders; appellant Tann was alleged to have played a role in three of the four. The essential facts of each major incident are briefly recited here.

## I. The Leslie Jones Murder

Leslie Jones was a drug dealer who sold his product near 22nd Street, specifically in the Shipley Market area. He had a long-running feud with Tann that revolved around competition for drug sales and a prior incident in which one of his relatives assaulted Tann and had stolen his weapon.

On the evening of April 11, 2003, Tann attended a small party with his future wife Tracey at his cousin's house in Southeast, Washington, D.C. At some point during the evening, Tann told Tracey that he was going to 22nd Street and left the party. Tann found Leslie Jones at a pay phone near Shipley Market and shot him from behind. 22nd Street Crew member Alphonce Little was an eyewitness to the murder. Another witness, Tyrone Curry, heard the gunfire and saw Tann running away from the scene of the crime. Tann later confessed to

Tracey, and another 22nd Street Crew member named Donald Matthews, that he had committed the murder.

## II. The Terrence Jones Murder and Richard Queen Assault

The murder of Terrence Jones on April 17, 2004, began with an argument on 22nd Street between gang member Donald Matthews and a 22nd Street resident, Kyara Johnson, apparently about the type of liquor that was to be served at Kyara's birthday party. The verbal quarrel threatened to become violent before it was broken up by Kyara's sister, Shaunta Armstrong. Shaunta called her close friend Terrence Jones and asked him to come to 22nd Street to make sure that the situation was under control. Terrence Jones went to 22nd Street with his friend, Richard Queen. Terrence Jones approached Matthews and had a brief conversation with him. Matthews explained that he "just had an argument [with Kyara] but it wasn't nothing." Witnesses reported that their interaction ended peacefully and without incident.

According to Kyara Johnson, appellant Arnette learned of the exchange between Donald Matthews and Terrence Jones and yelled, "Doe" [referring to appellant Cooper] Kyara heard Cooper respond, "Where at?" Shaunta Armstrong

then heard someone (believed to be Cooper) ask, "Squirt [appellant Arnette's nickname], who's faking?" Arnette nodded in the direction of Terrence Jones and Richard Queen and told Cooper to go up the street with his "hammer," which was the street name for a gun. Cooper approached Terrence Jones and pointed a gun at him while Arnette hit Terrence Jones with his hands. Then, according to several witnesses, Cooper said words to the effect of "Pat them niggers' pockets." Arnette proceeded to pat Terrence Jones's pockets and hit him in the face. Witnesses stated that at some point Terrence Jones resisted by hitting Cooper, and Cooper shot him in response. When Terrence Jones tried to crawl away, Cooper shot him again.

Witnesses further testified that at approximately the same time as Terrence Jones was under attack, appellant Tann and other unidentified males appeared, pinned Richard Queen against a car, and began beating him and going through his pockets. According to Donald Matthews, Tann picked up a gun off the ground in the midst of the fight with Queen and shot him in the back as he tried to run away, wounding Queen but not badly enough to prevent his escape. Several days later, Tann told Matthews that he had shot Queen. At trial, Queen testified that his assailants had stolen cash and cigars that he was carrying that night.

### III. The James Taylor Murder and Bernard Mackey Assault

A third murder occurred on 22nd Street a little over two years later, in the early evening of May 4, 2006. Again, the events were precipitated by an argument. This time it was a disagreement between Omar Harrison and Ashley Tyndle during which Harrison may have struck Tyndle. Harrison was an outsider to 22nd Street, and Tyndle was the girlfriend of gang member Alphonce Little.

As the dispute climaxed, Harrison made reference to his lack of fear of Little by telling Tyndle to "go get your baby['s] father" or words to that effect. At the time of the argument between Harrison and Tyndle, various members of the 22nd Street Crew were dispersed in different places on 22nd Street; one witness testified that one "little crew," including appellants Tann and Harris, as well as Little and several other gang members, was gathered near a basketball court. When word of the Harrison-Tyndle dispute, and Harrison's challenge to Little, spread by word of mouth to the gang, Little, Harris, Tann, and other gang members raced toward Harrison from different directions on 22nd Street.

Then, multiple witnesses saw Harris and Tann open fire at Omar Harrison. Seven witnesses testified that they saw Harris shooting. Four witnesses saw Tann shooting. One witness testified that between five and ten gang members were shooting en masse with Tann and Harris although this testimony was conflicting. Two witnesses testified to seeing gang member Antonio Blaylock with a gun drawn during the incident. According to another witness, "a lot of people" in addition to Tann and Harris were shooting.

Alphonce Little, who denied firing a weapon, stated that immediately after the first waves of gunfire ended, he heard a separate set of gunshots coming from another location "across the street." These shots were fired by Robert Foreman, who Little testified was a very junior member of the 22nd Street Crew. Foreman saw and heard Tann and Harris firing at Harrison, felt compelled to join in the attack, and started shooting as well.

Once the firing started, Omar Harrison jumped into his truck and drove away safely. However, James Taylor, a 22nd Street resident who had been standing near Harrison's truck, was hit by a bullet in the head and died. Bernard Mackey,

another innocent bystander, was also standing nearby and was grazed by a bullet in the back.

Alphonce Little ran with appellant Harris to the house of Harris's girlfriend and watched him pack his bags in preparation to go into hiding. Robert Foreman found Harris and Little at Harris's girlfriend's house. Little testified that Foreman told Harris and Little that he believed he had fired the shot that killed James Taylor. There was no evidence to show that either Harris or Tann, although aware of each other's role in the shooting and the presence of other gang members during the event, knew of Foreman's involvement in the murder. Following the incident, Harris fled the area and lived in disguise for several weeks until his arrest.

**IV. The Laquanda Johnson Murder and Keisha Frost Assault**

Notably for purposes of this appeal, appellant Cooper was tried for and convicted of the murder of Terrence Jones in 2006. At the time of the instant 2008-2009 trial of the appellants in this case, Cooper was serving a lengthy prison sentence for that crime. At Cooper's 2006 trial, the government listed Kyara Johnson and her older sister, Laquanda Johnson, as potential witnesses. Kyara testified about Cooper's shooting of Terrence Jones following her argument with

Matthews. Laquanda was not an eyewitness to the Terrence Jones murder; however, Cooper had made several incriminating statements to her in the aftermath of that incident. Ultimately, Laquanda did not testify at the 2006 trial, but she could be seen at the courthouse during the trial supporting her sister. Laquanda was protective of her younger sister and was known by reputation to be a "gatekeeper" for those seeking access to Kyara.

Cooper was convicted at the end of June 2006. Approximately two weeks later, in the early morning of July 11, 2006, the sisters (who had been relocated from 22nd Street because of Cooper's trial) returned to 22nd Street to visit friends. Appellant Beaver saw the sisters and told Alphonce Little that they were back. Little investigated their presence and confirmed that the sisters were hanging out at a 22nd Street house with Keisha Frost, Laquanda Johnson's friend. Beaver and Little met with Dwayne Wright, another 22nd Street Crew member. The three men discussed the sisters and agreed that they "got to go" – meaning that they should be killed – because of their cooperation with the government. Beaver and Little further discussed which one of them was going to do the killing. Beaver, arguing that he had already done his duty to the gang by testifying in Cooper's defense at his 2006 trial, persuaded Little that he had an obligation to eliminate the

Johnson sisters. Wright retrieved a gun for Little, and Beaver gave Little a pair of sunglasses as a partial disguise. Preparations were completed when Little secured a "hoodie" from Robert Foreman, and an escape route from appellant Rushing, who agreed to drive Little and Beaver away from the scene of the anticipated shooting.

Alphonce Little walked up to the house where he had seen the Johnson sisters. Kyara Johnson was inside, but Laquanda was on the porch with Keisha Frost. Little opened fire and shot both women, believing that Keisha was Kyara. Laquanda died, but Keisha lived. Kyara, looking out of an upstairs window, witnessed the shooting. Little ran away from the scene toward 23rd Street and Southern Avenue. Rushing collected Little and Beaver in his car and instructed Little to get rid of the hoodie. Beaver directed the gang members to his mother's house in Maryland where he hid the gun that Dwayne Wright had given Little to commit the murder.

## V.  Obstruction of Justice – Witness Intimidation and Manipulation

In the aftermath of these incidents, several appellants, and other gang members, approached witnesses in efforts to prevent their cooperation with law enforcement.  Karen Bolling, the mother of Laquanda and Kyara Johnson, testified that while appellant Cooper was still on the street, he approached Laquanda and offered her drugs and money if she would keep Kyara off the stand during his 2006 trial for the murder of Terrence Jones.

After his arrest, Cooper sent out overtures from prison to numerous individuals in an effort to have them persuade (by force if necessary) the Johnson sisters and others not to testify against him.  Cooper reached out to members of an allied street gang on 17th Street, including Brian Gilliam and Tyrell Hargraves, to have them search 22nd Street for Kyara.  Gang member Travis Honesty and gang ally Dewey Chappell also testified that Cooper, from jail, instructed them and others (including appellants Tann, Beaver, Harris, Rushing, and gang member Alphonce Little) to find the sisters at various points.   Karen Bolling also testified that after Cooper was arrested, Laquanda implored her not to let Kyara testify against Cooper, explaining that Tann had "talked to [Cooper]" and that "[Cooper] wanted to know was [Laquanda] going to help him by not letting her sister testify."

Tann approached other witnesses after the James Taylor-Bernard Mackey incident. He threatened Zartia Anderson, the sister of witnesses to the James Taylor murder, and stated that he was going to "straighten things out" regarding their cooperation with the government. Tann also confronted Donnise Harris, another James Taylor murder witness, and urged her to testify falsely that appellant Harris (no relation to Donnise Harris) had not been involved in the incident.

## VI. Procedural Developments

A grand jury investigating these criminal activities in the area of 22nd Street handed down its original indictment in September 2007. A second grand jury followed with a superseding indictment in February 2008. The superseding indictment charged appellants with conspiring "to obstruct justice and to assault and kill anyone whose interests were contrary to those of [appellants] and their associates," and numerous crimes related to that overall conspiracy, including involvement in the four murders described above. The jury returned general

verdicts against all six appellants, finding each guilty of conspiracy.[1]   In addition,

each appellant was convicted on multiple other counts, as follows:

Tann was convicted of first-degree premeditated murder while armed[2] of

both Leslie Jones and James Taylor, second-degree murder while armed[3] of

Terrence Jones, armed robbery[4] and assault with intent to kill while armed[5]

("AWIKWA") of Richard Queen, AWIKWA of Bernard Mackey, two counts of

obstruction of justice,[6] one count of threatening a person,[7] and a host of weapons

offenses[8] related to these underlying crimes.  Harris was convicted of first-degree

premeditated murder while armed of James Taylor, AWIKWA of Bernard

Mackey, and several related weapons offenses.  Beaver was convicted of first-

---

[1]  D.C. Code § 22-1805a (2012 Repl.).

[2]  D.C. Code §§ 22-2101, -4502 (2012 Repl.).

[3]  D.C. Code §§ 22-2103, -4502 (2012 Repl.).

[4]  D.C. Code §§ 22-2801, -4502 (2012 Repl.).

[5]  D.C. Code §§ 22-401, -4502 (2012 Repl.).

[6]  D.C. Code § 22-722 (2012 Repl.).

[7]  D.C. Code § 22-1810 (2012 Repl.).

[8]  D.C. Code § 22-4504 (a), (b) (2012 Repl.).

degree premeditated murder while armed of Laquanda Johnson, assault with a dangerous weapon[9] ("ADW") of Keisha Frost, and obstruction of justice, carrying a pistol without a license, unlawful possession of a firearm in connection with that event. He was also convicted of an additional count of obstruction of justice related to his prior attempts to influence the testimony of the Johnson sisters. Cooper was convicted of first-degree premeditated murder while armed of Laquanda Johnson and ADW of Keisha Frost on a conspiracy theory of liability pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946). He was also convicted on two counts of obstruction of justice related to the Johnson sisters and several weapons offenses. Rushing was convicted of first-degree premeditated murder while armed of Laquanda Johnson, ADW of Keisha Frost, and obstruction of justice and weapons offenses related to that shooting. Finally, Arnette was convicted of second-degree murder while armed of Terrence Jones, armed robbery of Richard Queen, and weapons offenses related to that incident.

Appellants followed with these appeals. In our discussion of their manifold claims of error, we first analyze the claims relating to the sufficiency of the government's evidence. Next, we deal with procedural and evidentiary issues

---

[9] D.C. Code § 22-402 (2012 Repl.).

affected by the alleged conspiracy and flowing from appellants' joint trial. Then, we address pretrial and trial matters not directly tied into the conspiracy or appellants' joinder. We conclude with our merger analysis and instructions to the trial court upon remand.

## VII. Claims Concerning the Sufficiency of the Evidence

### A. Conspiracy

Appellants argue that the evidence failed to establish their membership in the single conspiracy charged by the superseding indictment.[10] Instead, they contend, the evidence merely established, at best, only several short-term and discrete conspiracies, and the trial judge erred in failing to grant their motions for judgment of acquittal ("MJOA") as to the conspiracy count. "The standard by which we review a denial of a MJOA is *de novo*, and we, like the trial court, determine whether the evidence, viewed in the light most favorable to the government, was such that a reasonable juror could find guilt beyond a reasonable

---

[10] All appellants challenge the sufficiency of the evidence showing a single conspiracy. Only Tann and Arnette make specific arguments about their membership in the conspiracy. In order to ensure a comprehensive review of appellants' claims, we will consider the sufficiency of the evidence as to the membership of each defendant in the single conspiracy charged by the indictment.

doubt." (*Vashon*) *Howard v. United States*, 867 A.2d 967, 972 (D.C. 2005) (internal quotation marks and alterations omitted).

"To prove conspiracy, the government must establish that an agreement existed between two or more people to commit a criminal offense; that the defendant[s] knowingly and voluntarily participated in the agreement, intending to commit a criminal objective; and that, in furtherance of and during the conspiracy, a co-conspirator committed at least one overt act." *Hairston v. United States*, 905 A.2d 765, 784 (D.C. 2006) (internal quotation marks omitted). "A conspiratorial agreement may be inferred from circumstances that include the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties and the interests of the alleged conspirators." *Castillo-Campos v. United States*, 987 A.2d 476, 483 (D.C. 2010) (internal quotation marks and alterations omitted). Gang membership may be circumstantial evidence probative of the offense of conspiracy. *Id*. (citing *Perez v. United States*, 968 A.2d 39, 82-83 (D.C. 2009)).

"In determining whether the evidence supports a finding of a single conspiracy, the court looks at whether the defendants shared a common goal, any

interdependence between the alleged participants and any overlap among the alleged participants." *McCullough v. United States*, 827 A.2d 48, 60 (D.C. 2003). "The existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury." *Hairston*, 905 A.2d at 784 (quoting *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C. Cir. 1988)).

The superseding indictment charged that between April 2003 and July 2006, appellants and others conspired as follows:

> [D]efendants Lannell N. Cooper . . . Stephen R. Gray . . . Michael D. Tann . . . Antonio D. Arnette . . . Saquawn L. Harris . . . Robert J. Foreman . . . Brian K. Gilliam . . . Dwayne A. Wright . . . James E. Rushing . . . [and Dajuan D. Beaver],[11] and other persons whose identities are both known and unknown to the grand jury, did knowingly and willfully combine, conspire, confederate, and agree together to obstruct justice and to assault and kill anyone whose interests were contrary to those of the defendants and their associates, in violation of 22 D.C. Code Sections 401, 402, 722, 2101.

_____

[11] The charges against appellant Beaver were included in the original September 2007 indictment, but were not included in the superseding indictment issued in February 2008. Prior to trial in this case, the government moved to rejoin Beaver with the other appellants and the motion was granted by the trial court. The cases against Dwayne Wright, Robert Foreman, Brian Gilliam, and Stephen Gray, all alleged coconspirators and 22nd Street Crew members or allies, were voluntarily severed from appellants' joint trial by the government.

The indictment proceeded to list thirty-three discrete overt acts, twenty-seven of which went to the jury, alleged to have been committed by at least one charged or uncharged coconspirator.

Because of the way that the indictment alleged the conspiracy, we review the sufficiency of the evidence to examine whether it properly established that each appellant knowingly participated in an agreement to obstruct justice, or to assault or kill anyone whose interests were contrary to those of the defendants and their coconspirators,[12] and whether at least one overt act was committed by a coconspirator. At trial, the government offered testimony about the structure and operations of the 22nd Street Crew through several gang "insiders" who testified as cooperating witnesses: former gang members Andre McDuffie, Devin Evans, Donald Matthews, and Alphonce Little. Their testimony tended to demonstrate that the gang had a geographical territory around 22nd Street where only authorized members were permitted to sell illegal drugs. In order be part of the 22nd Street Crew and enjoy the privileges associated with that membership, such

---

[12] *See White v. United States*, 714 A.2d 115, 119 n.5 (D.C. 1998) ("Since the jury returned a general verdict of guilty on the charge . . ., the conviction may be affirmed if the evidence was sufficient to support either theory.").

as the right to partake in the profits of the gang's drug trafficking business, members had to be willing to further the common goals of the gang through the use of violence. McDuffie testified that to sell drugs as a member of the 22nd Street Crew:

> You have to commit acts of violence; you have to stay loyal to one another; you got to help each other, if you need anything [like] guns or if you need more drugs. It's a commitment. It's like a way of life.

Appellants and other gang members used violence to protect their territory and to silence or retaliate against those who were believed to threaten the business and security of the gang and its operations. Devin Evans testified that an "outsider" was "considered somebody that's not from your neighborhood, somebody that's not welcomed" who would be "dealt with [by] acts of violence" if caught acting in a way adverse to the business interests of the crew. Andre McDuffie further explained: "[W]e had to enforce that no one can come into our area and try to take over our territory; no one can come in there and sell drugs [because] we wasn't having it." If an outsider tried to move in on the gang's drug market, McDuffie stated, "[The outsider] would have a problem [and] may end up losing [his life.]" Donald Matthews testified similarly. When asked what would happen if people from another part of the city "decided to set up shop and sell

drugs" on 22nd Street, Matthews replied "[t]hey wouldn't last long" because gang members would "[r]un them away" using "[v]iolence."

The gang members treated "snitches," meaning those "cooperating, telling authorities . . . about the activities of our organization," in the same way. McDuffie testified that if someone was to cooperate with the government, "there would be violence inflicted."

The gang members played different roles in the operation according to the "different rank[s] and level[s] of respect" that members had earned over time through demonstrations of loyalty to the gang. Donald Matthews testified that the different roles assigned to gang members included selling drugs, storing money, stealing cars, and "committ[ing] acts of violence in order to protect the neighborhood." However, Andre McDuffie also testified that "everyone was an enforcer," willing to handle a "beef" with "rival[s] in the street. The cooperating witnesses also revealed how 22nd Street Crew members shared weapons, warned each other about police activity in the gang's, and provided assistance to gang members who were in jail.

Such testimony sufficiently showed that no matter what role was played by a particular gang member at a given time, the 22nd Street Crew members were required to support the use of violence in order to advance the overall goals of maintaining the stability and reputation of the organization, its territory, and its illegal drug business. This testimony also established that the gang operated as a cohesive unit (albeit loosely coordinated), with a rank and leadership configuration that bound the gang together.

This testimony was the backdrop with which the jury examined the participation of appellants in the charged conspiracy and the facts of the murders in this case. The following subsections detail the evidence that more specifically demonstrated the knowing participation of appellants in the conspiracy alleged.

### 1. Antonio Arnette

Donald Matthews testified that appellant Antonio Arnette was a member of the 22nd Street Crew. According to Matthews, Arnette spent considerable time with appellants Cooper, Rushing, and fellow gang member Alphonce Little, on 22nd Street. Matthews testified that Arnette was also involved with other 22nd Street Crew members in packaging and selling illegal drugs in areas commonly used by the gang. Two other gang "insiders," Devin Evans and Alphonce Little, also testified that Arnette was a member of the 22nd Street Crew. Little testified

that Arnette sold drugs on 22nd Street and sometimes carried a gun. Several police officers also testified that they observed Arnette trafficking illegal drugs in the presence of other gang members and in areas known to belong to the 22nd Street Crew.

Arnette also played a leading role in the attack on Terrence Jones and Richard Queen. The evidence about this incident reasonably showed that Arnette perceived that Terrence Jones and Queen affronted the territory of the 22nd Street Crew by confronting fellow gang member Donald Matthews on the gang's turf. Arnette then called out Terrence Jones and Richard Queen for "faking" on 22nd Street, identified the two outsiders to Cooper (who Arnette knew was a leading member of the gang), and recommended that Cooper "bring his hammer" to deal with the situation. And the facts showed that Cooper (and Tann) responded accordingly, in reliance on Arnette's representations, resulting in a chain of events that led to Terrence Jones's death and Queen's shooting.

Although Arnette and Cooper may have been mistaken about whether Terrence Jones or Richard Queen was a true threat to the interests of the 22nd Street Crew, the evidence was sufficient to show that Arnette and Cooper believed

that the outsiders, who they thought were "faking" by challenging Donald Matthews, had territorial aspirations adverse to the interests of appellants and their 22nd Street Crew associates. The evidence surrounding this incident, especially in the context of Arnette's active membership in the 22nd Street Crew and its illegal activities, was sufficient to demonstrate his knowing participation in an agreement with Cooper and other gang members "to assault and kill" those whose goals were contrary to those of the gang.

## 2. Dajuan Beaver

Appellant Beaver was identified by Devin Evans, Donald Matthews, and Alphonce Little as a member of the 22nd Street Crew who sold illegal substances with other gang members on 22nd Street. Alphonce Little also testified that he shared weapons with Beaver and that Beaver carried a gun.

Beaver also played a role in the crimes against the Johnson sisters, who were known by the gang members to be government cooperators. Beaver was involved in assisting Cooper with his attempt to alter Kyara's testimony in the period leading up to his trial. Moreover, Beaver was a key player in Laquanda Johnson's murder. Beaver found the Johnson sisters on 22nd Street the evening of the murder, convinced Alphonce Little to murder them in retaliation for their

cooperation with the government in Cooper's 2006 trial, and then assisted Little by helping him put together a disguise before the shooting and covering up the crime afterward. The evidence was clear that Beaver was motivated to aid in this crime because of his membership in the 22nd Street Crew and his belief that the objectives of the membership were contrary to those of "snitches." Thus, the evidence was sufficient to show Beaver's knowing participation with other gang members in a conspiracy to "obstruct justice and to assault and kill" persons with aims contrary to those of his codefendants.

### 3. Lannell Cooper

Government witnesses testified that appellant Cooper was a long-standing and high-ranking member of the organization who by 2004 "could tell everybody [in the gang] what to do." He was also deeply involved in the illegal drug trade on 22nd Street. Cooper was a principal in the murder of Terrence Jones for perceived threats to the gang's reputation and territory on 22nd Street. And he was the instigator of a series of attempts to obstruct justice with regard to the cooperation of the Johnson sisters with the government in his 2006 prosecution – attempts which were ultimately connected to Laquanda Johnson's murder by Alphonce Little. Clearly, the evidence was sufficient to show his knowing participation in an agreement with other members of the 22nd Street crew to commit obstruction of

justice and murder of individuals possessing interests conflicting with those of the gang.

### 4. Saquawn Harris

Alphonce Little testified that appellant Harris was a member of the 22nd Street Crew, although he was a newer member of the gang who had been introduced to the gang and encouraged to sell drugs on 22nd Street by influential gang member Eric Dreher. Little further stated that he sold illegal drugs with Harris and shared weapons with him. The testimony of several police officers bolstered Little's testimony about Harris's connection to the 22nd Street Crew by establishing that Harris was seen regularly with Tann, Beaver, Arnette, Rushing and other gang members on 22nd Street.

In light of these relationships, the James Taylor-Bernard Mackey incident was probative evidence of Harris's participation in the conspiracy. The facts of that incident showed that Harris, Tann, and many other gang members, responded to an insult by an outsider, Omar Harrison, to Alphonce Little's girlfriend on 22nd Street – in the heart of the gang's territory – and to Harrison's instruction to Little's girlfriend to "go get your baby['s] father." Harris and Tann opened fire in the direction of Omar Harrison in a sequence of events that resulted in the death of

James Taylor and the wounding of Bernard Mackey. Like the Terrence Jones-Richard Queen incident, Harris's active participation in an event where he violently reacted to a perceived threat to the reputation of the gang (and to the girlfriend of a fellow gang member) was sufficient evidence of his knowing participation in an agreement "to assault and to kill" those whose interests ran contrary to those of his gang associates.

### 5. James Rushing

Andre McDuffie testified that appellant Rushing had been a member of the 22nd Street Crew since the early 1990's; McDuffie was a senior gang member at the time of Rushing's entry into the gang, and McDuffie was responsible for teaching Rushing gang-related skills. McDuffie also testified that he saw Rushing sell crack cocaine on a regular basis on 22nd Street. Matthews's testimony additionally provided supporting evidence of Rushing's drug trafficking activities with other members of the gang.

Like Beaver, Rushing played a critical role in the Laquanda Johnson murder, which was evidence of his involvement in the conspiracy. Knowing that Little intended to murder the Johnson sisters because of their cooperation with the government, Rushing agreed to act as Little's getaway driver. Rushing drove

Little and Beaver from the scene of the crime after Little killed Laquanda and wounded Keisha Frost. He also helped Little cover up the crime by instructing him to discard his clothing, and by driving Little to Beaver's mother's house in Maryland where Beaver stashed the murder weapon. Given Rushing's participation in the Laquanda Johnson murder, the killing of a known government cooperator, in light of Rushing's relationship with the 22nd Street Crew and its members, the evidence was sufficient to show his knowing participation in the conspiracy "to kill or assault" persons (such as Laquanda) whose interests were not aligned with those of Rushing or his associates.

### 6. Michael Tann

All of the government's "insider" witnesses (McDuffie, Evans, Matthews, and Little), as well as Tracey Tann (appellant Tann's wife), testified that Tann was a well-known and high-ranking member of the 22nd Street Crew. Matthews and Little also provided testimony about Tann's participation with other gang members in the gang's drug trade.

More than any other appellant, Tann was also closely involved in the acts of violence against outsiders who challenged the 22nd Street Crew's territory and reputation. Tann was a key player in the Leslie Jones, Terrence Jones, and James

Taylor murders. Moreover, the facts point to Tann's repeated use of threats of violence against potential witnesses, who might testify against his coconspirators, in order to obstruct justice. These circumstances were sufficient to establish that Tann – sometimes acting alongside other gang members to commit acts of violence against perceived rivals (including Terrence Jones and Omar Harrison) – knowingly joined and participated in an agreement "to obstruct justice or assault or kill" persons whose interests ran counter to those of the gang.

\*\*\*

In sum, the evidence was sufficient to show that appellants, all members of the 22nd Street Crew, entered into an agreement to obstruct justice by threatening or manipulating witnesses, or to assault or kill persons whose interests were at odds with theirs, such as rivals or cooperating witnesses, and knowingly and voluntarily participated in that agreement. *Hairston*, 905 A.2d at 784. Moreover, of the twenty-seven overt acts of the conspiracy that went to the jury, many were supported by sufficient evidence, and at least some were supported by overwhelming evidence.[13] *See Lumpkin v. United States*, 586 A.2d 701, 703 (D.C. 1991).

---

[13] For example, the facts that went to Overt Acts 28-30, which described Little's murder of Laquanda Johnson and assault of Keisha Frost, were not in dispute.

As to appellant's arguments that the proof at trial did not show a single conspiracy, but instead showed that appellants merely engaged in "discrete projects, which happened within a general community ethos," and that the "indictment was so broad and unlimited as to be meaningless in a criminal context", we find them unavailing. First, the evidence was sufficient to show that appellants were engaged in actions demonstrating a core common purpose, namely to inflict or threaten violence on rivals (real or perceived) and government cooperators. *See United States v. Graham*, 83 F.3d 1466, 1471-72 (D.C. Cir. 1996) (concluding that there was a single conspiracy where the court had "no doubt that [the] evidence was sufficient for a reasonable juror to conclude that appellants and others shared the common goal of distributing crack cocaine for profit" despite evidence of multiple drug-dealing "cliques" operating in a particular territory).

Moreover, it is clear that the appellants and other gang members acted together, relied on each other, and often coordinated their efforts, in order to more effectively achieve their common goal of inflicting (or threatening) violence on those opposed to the interests of the gang. *See United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996) (finding "interdependence" existing for purposes of a

single conspiracy even when assistance provided by coconspirators to each other is "fairly minimal"); *see also United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987) ("Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy."). The events of the Terrence Jones murder-Richard Queen assault (involving Tann, Cooper and Arnette), the James Taylor murder-Bernard Mackey assault (involving Tann, Harris, and other gang members), and Laquanda Johnson murder-Keisha Frost assault (involving Beaver and Rushing), are examples of such coordinated actions by all appellants to achieve the goals of the conspiracy.

Finally, we agree with the United States Court of Appeals for the District of Columbia Circuit that "a conspiracy's purpose should not be defined in too narrow or specific terms." *Gatling*, 96 F.3d at 1520. Our case law demonstrates the same principle. *See Hairston*, 905 A.2d at 784 (conspirators' aim was to "seek[] revenge against the 1400 block faction [of rival gang members]"); *Castillo-Campos*, 987 A.2d at 483 (conspiracy's objective was "to kill or otherwise 'get' the rival gang members"). Here, although the conspiracy to "obstruct justice and to assault and kill anyone whose interests were contrary" to the gang was indeed a broadly stated criminal objective, appellants have not cited any authority demonstrating that the

conspiracy count as charged was legally deficient. *Cf. United States v. Romero*, 897 F.2d 47, 51-52 (2d Cir. 1990) (affirming conviction for conspiring to kill a federal officer where defendants' conspiracy "was the result of a plan agreed to by all the defendants to kill anyone posing a threat to them or [their narcotics] business").

Instead, the conspiracy count adequately apprised appellants of the elements of the offense and the time frame within which the conspiracy existed, such that appellants could properly prepare their defenses and were protected against double jeopardy. *See United States v. Roman*, 728 F.2d 846, 853-54 (7th Cir. 1984) (indictment properly charged conspiracy where it alleged a conspiracy, the criminal statute violated, and the time frame of the conspiracy). Therefore, we grant no relief to appellants on the basis of their claims regarding the sufficiency of the evidence on, or the legality of, their conspiracy charges.

**B. Terrence Jones-Richard Queen Incident**

**1. Tann's Convictions: Second-Degree Murder While Armed of Terrence Jones, Armed Robbery and AWIKWA of Richard Queen, and Possession of a Firearm During the Commission of a Crime of Violence ("PFCV")**

Appellant Tann makes several sufficiency claims regarding his Terrence Jones-Richard Queen related convictions. Emphasizing heavily the testimony of Richard Queen and the lack of credibility of Donald Matthews, Tann challenges the identification evidence that the jury relied on for his involvement in the entire incident. Furthermore, he argues that, even if found to have been involved in the event, he did not possess the state of mind required for the jury to convict him under an aiding-and-abetting theory of liability for the second-degree murder while armed of Terrence Jones and related counts of PFCV.

Tann's argument concerning the offenses in which he was the principal (the armed robbery of Richard Queen, AWIKWA of Queen, and related weapons offenses) is that the government's evidence was insufficient because it rested solely on a single, incredible witness: Donald Matthews. However, the testimony of a single witness is sufficient to sustain a conviction, even where contradicted by other witnesses or evidence. *Gibson v. United States*, 792 A.2d 1059, 1066 (D.C. 2002). Although Matthews was not a perfect witness, the jurors credited his testimony and it was permissible for them to do so.[14] We afford the jury's

_____

[14] Tann's best evidence to counter Matthews was the testimony of the surviving victim, Richard Queen, who testified that Tann was not among his attackers. While powerful counterevidence, the jury could have reasonably

(continued…)

credibility determination substantial deference on appellate review. (*Steven*) *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007).

Tann's other claims involve those crimes of which he was convicted on an aiding-and-abetting theory of liability (second-degree murder of Terrence Jones and related PFCV offenses). Because he was convicted of second-degree murder for aiding and abetting Cooper's shooting of Terrence Jones, the government was required to prove that Tann had, at a minimum, a "depraved heart" with regard to Terrence Jones's death. *Perez*, 968 A.2d at 102 ("For second-degree murder, the intent required is malice, which can be proven by evidence of a specific intent to kill, specific intent to inflict serious bodily harm, or wanton and willful disregard of an unreasonable human risk – also known as 'depraved heart' murder."). "[W]here a specific *mens rea* is an element of a criminal offense, a defendant must have had that *mens rea* himself to be guilty of that offense, whether he is charged as the principal actor or as an aider and abettor." *Kitt v. United States*, 904 A.2d 348, 356 (D.C. 2006); *see also Coleman v. United States*, 948 A.2d 534, 552-53

_____

(…continued)
concluded that Queen, who was attacked from behind during an extremely chaotic situation, simply was unable to view and identify all of the men who were involved in the attack.

(D.C. 2008) (extending the doctrine that the aider and abettor must share in the *mens rea* of the principal to second-degree murder).

Tann portrays his attack on Richard Queen as separate and distinct from Cooper's and Arnette's attack on Terrence Jones; further, Tann claims that there was no evidence that he knew Cooper was going to shoot Terrence Jones or that he helped Cooper with the shooting. To be sure, there was no evidence of any pre-attack discussion or coordination between Tann, Cooper, and Arnette in which the gang members explicitly identified Terrence Jones's death as a goal.

However, the government had powerful evidence of a joint and coordinated effort, and of Tann's "depraved heart," through testimony that as the attack was escalating, Cooper ordered Arnette, Tann, and others, to rob Terrence Jones and Richard Queen – an order which was carried out by its recipients. This was done when Cooper directed his cohorts to "Pat them niggers' pockets." The evidence was not perfectly clear to whom this order was issued and precisely when Cooper said it in the course of events; however, a fair interpretation of the evidence suggests that it was made by Cooper to both Arnette (who was covering Terrence Jones) and the men (including Tann) who were attacking Queen.

This understanding of the evidence was bolstered by testimony that Cooper's instructions were immediately carried out by Tann, Arnette, and others, with regard to both Terrence Jones and Richard Queen. The close proximity of the attack on Terrence Jones and the attack on Queen, a matter of approximately ten feet according to witnesses, in conjunction with these robbery instructions, sufficiently proved that the attacks were a knowingly organized (if not verbally articulated) venture designed to allow Tann and his fellow gang members tactically to divide their victims in order to better subdue, rob, and eventually shoot both of them. Moreover, the jury could have easily inferred from the close proximity of the assaults that as Tann attacked Queen, he saw Cooper (a man by reputation known to have a history of violence) striking Terrence Jones and pointing a gun at him.

Given these circumstances, it was reasonable for the jury to have found that Tann displayed a "wanton and willful disregard of an unreasonable human risk" to the life of Terrence Jones when he isolated, neutralized, robbed, and ultimately shot the man who he knew was in a position to come to Terrence Jones's aid:

Richard Queen. *See* (*Darion*) *Ingram v. United States*, 40 A.3d 887, 900-01 (D.C. 2012); *Perez*, 968 A.2d at 102.

Analyzing Tann's PFCV offenses associated with Cooper's murder of Terrence Jones, our case law instructs that "[w]hen the government relies on an aiding and abetting theory to prove PFCV, it is not enough to show that the defendant participated 'in the "larger scheme" of the [crime].'" *Fox v. United States*, 11 A.3d 1282, 1287 (D.C. 2011) (quoting *Lancaster v. United States*, 975 A.2d 168, 175 (D.C. 2009)). "Rather, the government must prove some act on the defendant's part that assisted the [principals] in their possession of firearms . . . ." *Fox*, 11 A.3d at 1287 (internal quotation marks and emphasis omitted). Tann's case is distinguishable from cases such as *Fox* and *Lancaster* where we found PFCV offenses insufficient in the aiding-and-abetting context.

By complying with Cooper's directive to rob Richard Queen, the jury could have found that Tann assisted Cooper in maintaining possession (by preventing Queen from coming to the aid of his friend) of the firearm that he was using in the course of the murder of Terrence Jones. The facts show that Tann took affirmative steps to help Cooper keep possession of his firearm by subduing Queen in a

number of ways: (1) patting Queen's pockets – at Cooper's direction; (2) striking Queen; (3) robbing Queen; (4) and ultimately shooting Queen as he ran for safety where he could have called for help for Terrence Jones. Furthermore, the fact that Terrence Jones resisted Cooper by hitting him suggested that Tann's actions toward Queen were helpful in ensuring that Queen could not aid Jones in further interfering with Cooper's possession of the weapon. *Dang v. United States*, 741 A.2d 1039, 1043 (D.C. 1999).

The facts of *Dang*, where we found that the evidence was sufficient to show that appellant aided and abetted his codefendants in the possession of their firearms, are very similar to the facts here. In *Dang*, although the defendant did not possess a weapon, the evidence demonstrated that he "worked in concert with [his codefendants] by, among other things, blocking the door, guarding [one victim] and pointing a knife at [a second victim]." *Id*. Here, like in *Dang*, Tann helped Cooper maintain possession of his weapons through his actions, working in concert with those of Cooper, to neutralize Richard Queen.

Therefore, we reject in their entirety Tann's arguments challenging the sufficiency of the evidence for his convictions related to the Terrence Jones-Richard Queen incident.

**2. Arnette's Convictions: Second-Degree Murder While Armed of Terrence Jones, Armed Robbery of Richard Queen, and PFCV**

Like Tann, appellant Arnette argues that the evidence was insufficient as to the *mens rea* elements required for his Terrence Jones murder-Richard Queen assault related convictions. The government pursued each of the counts in the indictment against Arnette related to this incident under an aiding-and-abetting theory of liability.

Kyara Johnson testified that Arnette initiated the attack by calling for Cooper and telling him to confront Terrence Jones and Richard Queen while armed, i.e., with his "hammer." Kyara also testified that Arnette patted Terrence Jones's pockets, at Cooper's command, and struck him with his hands while Cooper had his gun drawn. Certainly, if believed, this would amount to active participation in the assault on Terrence Jones. However, as Tann does, Arnette argues that his involvement in the offense did not demonstrate the necessary state of mind for second-degree murder because he had no reason to believe that Cooper would shoot Terrence Jones. Also like Tann, Arnette relies on the fact that there was no previous conversation with Cooper about intending to kill Terrence Jones or any evidence that Arnette did anything to encourage Cooper to do so. Instead,

he argues that the shooting was a "spontaneous reaction by Cooper" to Terrence Jones's unexpected resistance to the attack.

Arnette further argues that the evidence is even more attenuated, and therefore also insufficient, regarding his convictions for aiding and abetting Tann in the armed robbery of Richard Queen. He claims that there is no reasonable inference to be drawn from his actions toward Terrence Jones (patting his pockets and/or hitting him) that supports the notion that he shared in Tann's intent to rob Queen.

The government witnesses against appellant Arnette were often inconsistent and sometimes exculpatory in their testimony. However, the question here is whether, viewing the evidence in the light most favorable to the government, Arnette's conduct demonstrated the "depraved heart" (if not a more criminally culpable) state of mind required for the second-degree murder of Terrence Jones, the specific intent to commit armed robbery of Queen, and knowledge of Cooper's and Tann's use of firearms, as well as assistance to Cooper and Tann in maintaining possession of those firearms, as required by the associated PFCV offenses. The key facts, as to the offenses involving both victims, were: (1)

Arnette instigated the entire event by identifying Terrence Jones and Richard Queen to Cooper and telling him that the two men were on 22nd Street "faking"; (2) Arnette instructed Cooper to "bring his hammer," meaning Cooper's gun, thereby anticipating and inciting violence; (3) Arnette complied with Cooper's order to pat Terrence Jones's pockets; (4) Arnette hit Terrence Jones in the course of the attack; (5) Tann violently assaulted Queen less than ten feet away from Arnette's and Cooper's attack on Terrence Jones; and (6) Cooper phrased his "robbery" instruction in the plural, so Arnette would have known that there were two victims to be jointly controlled and subdued by the attackers.

As to the offenses in which Arnette aided and abetted Cooper (second-degree murder and associated PFCV offenses), the evidence against Arnette was clearly sufficient. *See* (*Darion*) *Ingram*, 40 A.3d at 900-01; *Perez*, 968 A.2d at 102. Arnette's instigation of the violent attack on Terrence Jones and his active assistance during its undertaking demonstrated, at a minimum, a "wanton and willful disregard of an unreasonable human risk." *Perez*, 968 A.2d at 102. Moreover, the PFCV convictions underlying the Terrence Jones offenses were also based on sufficient evidence given that Arnette himself instructed Cooper to bring his gun to confront Terrence Jones and Richard Queen – obviously demonstrating

the requisite awareness and knowledge of Cooper's use of a firearm. Then, Arnette took steps to assist Cooper in maintaining possession of the firearm during Cooper's attack on Terrence Jones. *See Fox*, 11 A.3d at 1287; *Lancaster*, 975 A.2d at 175; *Dang*, 741 A.2d at 1043.

For the robbery conviction of which Arnette was an accomplice to Tann, the government was required to show that Arnette had the specific intent to aid and abet Tann in the robbery of Richard Queen. *Lattimore v. United States*, 684 A.2d 357, 359-60 (D.C. 1996). Certainly, there was no evidence of a pre-attack discussion outlining robbery as a goal of the attack which would have made the government's case clear-cut. Arnette relies on a Virginia case, *McMorris v. Commonwealth*, 666 S.E.2d 348, 352 (Va. 2008), for the proposition that "[r]obbery is not an incidental, probable consequence of an assault; robbery requires a completely different type of wrongdoing: stealing." Indeed, a joint assault plus close proximity to a codefendant's robbery may be insufficient to show specific intent to commit robbery under an aiding-and-abetting theory of liability. But the facts here are not so limited.

As we have already discussed, between the first stages of the attack and Tann's subsequent robbery of Richard Queen, Cooper issued his robbery instructions. And Cooper phrased his instructions in the plural: "Pat them niggers' pockets." These instructions were followed by Arnette's patting of Terrence Jones's pockets, which could have been reasonably interpreted as a robbery attempt by Arnette on Jones. The fact that Arnette heard and executed Cooper's instructions strongly implied that Arnette knew exactly what Tann (one of the other recipients of Cooper's instructions) was similarly doing to Queen, and Arnette was intentionally aiding and abetting the robbery of Queen through his actions containing and subduing Terrence Jones. Again, it was reasonable for the jury to have viewed the entire attack (including the robbery) as a coordinated venture among Cooper, Tann, Arnette, and others, in which the gang members worked together, at Cooper's direction, to make their attack on both victims more successful through combined efforts. *See Downing v. United States*, 929 A.2d 848, 862 (D.C. 2007) (defendant's presence at the scene of a crime plus conduct which facilitates a crime supports an inference of guilt as an aider and abettor). So viewed, the evidence was legally sufficient for the jury to find that Arnette possessed the state of mind necessary for the second-degree murder of Terrence

Jones, the robbery of Richard Queen, and the PFCV offenses associated with Cooper's murder of Jones.

However, the analysis is different as to Arnette for the "armed" component of the robbery of Richard Queen and the related PFCV offense. Unlike Cooper's robbery instructions, which put Arnette on notice that Queen was about to be robbed, there was no similar mechanism by which Arnette was put on notice that Queen was about to be robbed by the use of a firearm. There is no evidence that Tann was in possession of a weapon prior to the point when Donald Matthews saw Tann pick up a gun from the ground during the melee and immediately use it to shoot Queen. Although arguably Arnette should have anticipated or foreseen that Tann would use a weapon, especially in light of Arnette's statement to Cooper that Cooper should bring his weapon, recent case law from the Supreme Court, as well as this court, teaches that foreseeability alone is insufficient to support such a judgment of conviction under an aiding-and-abetting theory of liability.

In order to convict of an offense requiring the use of a firearm by a principal, the government must prove that the aider and abettor *knew in advance* that his associate was armed with a gun – enabling the defendant to "make the relevant

(and indeed, moral) choice" to aid and abet an armed offense. *Rosemond v. United States*, 134 S. Ct. 1240, 1249 (2014) ("[A]n unarmed accomplice cannot aid and abet a [PFCV-type] violation unless he has foreknowledge that his confederate will commit the offense with a firearm.") (internal quotation marks omitted); (*Leon*) *Robinson v. United States*, No. 11-CF-1443, slip op. at 21 (D.C. Sept. 25, 2014) ("A person cannot intend to aid an armed offense if she is unaware a weapon will be involved."). Here, there was insufficient evidence that Arnette had advance knowledge that Tann was armed during the robbery of Richard Queen.

Under these circumstances, the mere proximity of Arnette to Tann was not enough to infer such knowledge. The evidence showed that Tann picked up a firearm and used it to rob and shoot Richard Queen quite late in the timeline of the incident, giving Arnette no meaningful notice (if any at all) that Tann was going to use the gun to effectuate his attack on Queen. *Cf. Rosemond*, 134 S. Ct. at 1250 n.9 ("Of course, if a defendant continues to participate in a crime after a gun was displayed or used by a confederate, the jury can permissibly infer from his failure to object or withdraw that he had such knowledge.").

Had there been some evidence from which the inference could be drawn that Arnette had advance knowledge that Tann was using a gun to carry out the robbery, as well as evidence that Arnette assisted Tann in maintaining possession of the firearm, and decided to proceed with his involvement in the attack on Terrence Jones and Queen, our conclusion would be different. However, we see insufficient evidence based on this record. *See Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc) ("[I]f the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime, then the evidence is insufficient and we must say so.") (internal quotation marks omitted).

Therefore, we vacate the judgment as to the "armed" component of Arnette's robbery conviction and his PFCV conviction associated with the robbery. The lesser-included offense of unarmed robbery, and all of Arnette's other convictions related to this incident are affirmed.[15]

---

[15] *See* (*Leon*) *Robinson*, No. 11-CF-1443, slip op. at 37-38 (permitting the government to "accept[] the entry of judgment for [the] lesser-included unarmed offense" of unarmed robbery after holding that the trial court committed instructional error, but concluding that the error did not affect the jury's findings on the elements of the lesser-included offense). Here, there has been no claim of instructional error with regard to the jury instruction concerning the state of mind required for conviction of PFCV under an aiding-and-abetting theory of liability.

(continued…)

### C. James Taylor-Bernard Mackey Incident

Appellants Tann and Harris challenge the sufficiency of the evidence for their convictions based on the James Taylor and Bernard Mackey incident. Fundamentally, their claims turn on how the law of aiding and abetting is to be applied to the facts of this event. In addition to their sufficiency arguments, appellants raise two related claims, one regarding the aiding-and-abetting instruction given to the jury, and another regarding the trial court's "curtailment" of their closing arguments. Since all of these arguments turn on whether the court properly decided the legal issue related to the theory of liability, they are all addressed here.

---

(…continued)
Therefore, despite the insufficiency of the evidence on the armed component of Arnette's robbery conviction and the associated PFCV offense, there was no reasonable possibility that the jury's permissible finding of the elements of Arnette's lesser-included offense of unarmed robbery of Richard Queen, or of his Terrence Jones murder-related offenses (resulting in three convictions for second-degree murder and associated PFCV offenses based on Cooper's use of a weapon), was affected. *Cf. id.* at 37-42. As we did in (*Leon*) *Robinson*, we conclude that there is "no unfairness that we can discern in reducing [Arnette's] conviction to [the] lesser included offense[]" because Arnette "had full notice of [his] potential liability for the lesser crime[] and there is no indication that defense presentation would have been altered if the armed charges had been dismissed at the end of the government's case or if the trial court had instructed the jury on the lesser-included offense[]." *Id.* at 38 (internal quotation marks omitted) (quoting *Allison v. United States*, 409 F.2d 445, 451 (D.C. 1969)). *See also Jackson v. United States*, 940 A.2d 981, 996 (D.C. 2008) (remanding the case to the trial court with instructions to enter judgment of conviction on a lesser-included offense).

The government argued that there were three shooters within the group of gang members who raced toward Omar Harrison after his dispute with Alphonce Little's girlfriend, Ashley Tyndle, from different directions on 22nd Street: appellants Tann and Harris, as well as a third shooter, junior gang member Robert Foreman. But the government presented evidence that additional gang members were shooting as well. Latina Anderson testified that she saw between five and ten men, including gang members Tann, Harris, Little, and Blaylock, emerge from nearby "cuts" and shoot at Harrison.[16] Christina Anderson told the grand jury that she saw Tann and Blaylock shooting. Donnise Harris saw Tann, Harris, and "a lot of people" running and shooting. Thus, if credited, the testimony of several witnesses established that there were a number of 22nd Street Crew members at the scene of the crime moving toward Omar Harrison in a hostile manner and shooting.

---

[16] Little and government witness Travis Honesty denied that Little was shooting, but Little testified that he would have been shooting if he had had a gun at the time. Firearms examiner Robert Harvey testified that there were "three firearms that [he] kn[e]w of for sure[,]" but agreed that "[t]here could have been more[.]"

Furthermore, there was testimonial evidence – not really disputed on appeal – tending to show that Harris and Tann opened fire on 22nd Street with the intent to shoot Harrison and that they were each aware of each other's presence at the time of the shooting. Anderson testified that some other shooters were standing within a few steps of Tann and Harris while they all were shooting, thus permitting an additional inference that Harris and Tann were aware of the presence and participation of other gang-member shooters. However, there appears to have been no evidence to suggest that either Harris or Tann was aware of the specific presence and participation of Foreman until after the incident was complete. Foreman was shooting from a different position on 22nd Street than either Harris or Tann. The testimony was that Foreman saw and heard Tann and Harris firing at Harrison, felt compelled to join in the attack, and started shooting as well. The evidence was ambiguous as to which of the shooters, Harris, Tann, Foreman, or someone else, actually fired the shot or shots that hit James Taylor and Bernard Mackey.

There was at least some evidence to show, primarily through the testimony of Alphonce Little, that James Taylor was not killed until after Harris's gun ran out of bullets and he stopped firing at Omar Harrison. Based on his statements to his

fellow gang members, Robert Foreman appeared to believe, or want others to believe, that his shot hit Taylor.

The forensic evidence was of limited value. Although it was clear that James Taylor had been killed by a gunshot wound to the head, the fatal bullet passed through him and was not identified during the investigation. Therefore, there was no link between the fatal bullet and a particular gun or shooter; additional forensic evidence was of minimal weight in identifying the actual killer, and the government essentially conceded this at trial. The evidence was even less clear with regard to Bernard Mackey. No evidence was presented linking the bullet that grazed Mackey with any particular shooter.

The government charged Harris and Tann with the premeditated murder of James Taylor and AWIKWA of Bernard Mackey. It told the jury they could convict Harris and Tann of Taylor's murder and (using transferred intent) of Mackey's assault either as principals or based on an aiding-and-abetting theory of liability.

Because the government did not know who fired the fatal shot, and also did not contend that Harris and Tann knowingly or intentionally associated themselves with Robert Foreman in particular at the time of the shooting,[17] it argued that, regardless, aiding-and-abetting liability rendered each one criminally responsible for the others' actions if they all aided in the commission of the offense by firing at Omar Harrison.

Harris and Tann contended that accomplice liability requires proof that the defendant was "consciously helping the person that was the principal" (whom, they argue, the jury could have found to be Robert Foreman). According to appellants' brief on appeal, to convict Harris and Tann of aiding and abetting Foreman's crime, the jury was required to find "beyond a reasonable doubt that [appellants] were] aware of Mr. Foreman's presence and aware that by firing first, they would cause Mr. Foreman to commit the acts that would result in the decedent's death."

After litigating the issue, the trial court agreed with the government that if "you can show that the person aided and abetted the crime itself[,] you've solved

---

[17] The government did, however, remind the court of evidence that showed that "this is not a situation where Mr. Harris didn't know Mr. Foreman. There is evidence that these two men shared guns together, and that Mr. Foreman was a member of the conspiracy."

the intent problem." Accordingly, the judge gave the pattern instruction for aiding and abetting, which does not reference intentional association with the principal. In relevant part, the instruction reads: "To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed." Criminal Jury Instructions for the District of Columbia, No. 3.2 (5th ed. rev. 2013). During closing arguments, the trial judge further informed the jury that there are two "types" of aiding and abetting: "if you knowingly aid and assist the [principal] . . . [or] if you knowingly aid and abet the crime." In addition, the trial court instructed the jury that it is "not the law" that "'[i]f you don't know who the shooter is or that they are present, you can't possibly be working together in a coordinated effort' and 'can't be an aider and abettor.'" [18]

On this issue, we find ourselves confronted with a very unusual fact pattern. There is no case in this jurisdiction that has addressed the legal viability of an aiding-and-abetting theory of liability as applied to a defendant whose actions

---

[18] Nevertheless, Harris's counsel argued to the jury that, "you can't help a crime that is occurring because some unknown person is committing that crime if you're unaware that that person is there."

actually aided the principal, and who possessed the same criminal intent as the principal, but who was unaware of the presence and participation of the principal at the time the criminal offense occurred. Because of the challenging nature of this issue, we pause to flesh out the arguments of the parties – neither of which we fully accept.

### 1. The Government's Argument

The government's argument is that there are two manners in which a defendant in this jurisdiction can be guilty of aiding and abetting. One way is to aid and abet the principal offender in his or her commission of a crime. The other way is to "advise," "incite," or "connive" at the offense itself, regardless of "intentional association" between the principal and the aider and abettor. The government emphasizes the plain language of the aiding-and-abetting statute, D.C. Code § 22-1805 (2012 Repl.), which reads:

> In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, *or* aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall

apply to all crimes, whatever the punishment may be. [Emphasis added.][19]

The government argues that the "or" in the statute makes it disjunctive, and therefore creates these two categories of aiders and abettors. The government's position is that Tann and Harris were guilty of the "first" form of aiding and abetting, which holds accomplices liable if they advise, incite, or connive "at the offense," regardless of the relationship, if any, between the accomplice and the principal. Therefore, the government contends, because Tann and Harris incited the crime by shooting at Omar Harrison, causing Foreman also to open fire, Tann and Harris need not have "intentionally associated" with Foreman in order to be guilty of his crimes (assuming Foreman was the principal).

___

[19] The purpose of D.C. Code § 22-1805 was to "abolish the distinction between principals and accessories and render them all principals." *Perez*, 968 A.2d at 93 (alterations omitted); *see also Standefer v. United States*, 447 U.S. 10, 19-20 (1980) (interpreting the similarly-worded federal aiding-and-abetting statute, 18 U.S.C. § 2 (a) (2014): "all participants in conduct violating a federal criminal statute are 'principals'"); ).(*Edward*) *Thompson v. United States*, 30 App. D.C. 352, 364 (D.C. Cir. 1908) ("By the common law, all persons who command, advise, instigate, or incite the commission of an offense, though not personally present at its commission, are accessories before the fact, and the object of the aforesaid section was to make all such persons principal offenders."). The statute "merely extended [the] doctrine of vicarious responsibility to additional classes of offenders by treating them as principals." *Hazel v. United States*, 353 A.2d 280, 283 n.9 (D.C. 1976). That narrow purpose notwithstanding, "it is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy -- even assuming that it is possible to identify that evil from something other than the text of the statute itself." *Brogan v. United States*, 522 U.S. 398, 403 (1998).

The government attempts to bolster this argument by citing to a series of cases, particularly from this court, in which the aiding-and-abetting standard is articulated with reference to the offense, without dependence on a relationship between the accomplice and the principal. *See, e.g., English v. United States*, 25 A.3d 46, 52 (D.C. 2011) ("To be guilty as an aider and abettor of a charged offense . . . the defendant must be shown to have assisted or participated in that crime with guilty knowledge.") (internal quotation marks and emphasis omitted); *Tyree v. United States*, 942 A.2d 629, 637 (D.C. 2008) ("[T]he jury may [] convict of aiding and abetting in cases where the evidence is disputed as to who, as between the defendant and someone else, was the principal, so long as there is evidence that the defendant participated – in one capacity or the other – in the events that led to commission of the crime."); *see also Rosemond*, 134 S. Ct. at 1249 ("So for purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission.").

## 2. Appellants' Argument

Appellants' argument is that aiding and abetting has historically required the aider and abettor to "intentionally associate" himself or herself with a particular

individual who was the principal, with liability attaching only if the accomplice "know[s] of the principal's presence and criminal intentions." Appellants cite authorities articulating aiding-and-abetting standards that specifically reference the principal in their formulations. *See, e.g., Kitt*, 904 A.2d at 356 n.10 ("[T]he basic requirement . . . now almost universally accepted [is that] the accomplice be shown to have intended that the principal succeed in committing the charged offense.") (citation and internal quotations omitted) (quoting *Wilson-Bey v. United States*, 903 A.2d 818, 831 (D.C. 2006) (en banc)); *United States v. (Dwayne) Washington*, 106 F.3d 983, 1004 (D.C. Cir. 1997) (elements of aiding and abetting include "the specific intent to facilitate the commission of a crime by another"); *see also* WAYNE R. LAFAVE, CRIMINAL LAW § 13.2 (b) (5th ed. 2010) ("Generally, it may be said that accomplice liability exists when the accomplice intentionally encourages or assists, in the sense that his purpose is to encourage or assist another in the commission of a crime as to which the accomplice has the requisite mental state."). Appellants extrapolate that "intentional association" with the principal is, and has always been, required for aiding-and-abetting liability.

Appellants argue that based on the government's evidence, the jury could have found that Robert Foreman was the principal in the James Taylor murder.

Because, appellants argue, they had no knowledge of Foreman's involvement in the incident and no intent to help or encourage Foreman to commit criminal activities, they could not have aided and abetted him in his crimes. Although the evidence was ambiguous as to who was actually the principal in both the murder and the AWIKWA, appellants argue that the court's instruction ensured that they would be convicted, even if the jury found that Foreman was the principal and that appellants had no knowledge of his presence or participation at the time of the crime (which would certainly have been reasonable for the jury to do).

### 3. Analysis

Fundamentally, the elements of aiding and abetting are that "(a) a crime was committed by someone; (b) the accused assisted or participated in its commission; and (c) his participation was with guilty knowledge." *Hawthorne v. United States*, 829 A.2d 948, 952 (D.C. 2003).[20] "A culpable aider and abett[o]r need not

---

[20] *See also United States v. (Matthew) Moore*, 708 F.3d 639, 649 (5th Cir. 2013) (elements of aiding and abetting are: (1) the substantive offense occurred (2) the defendant associated with the criminal venture; (3) the defendant purposely participated in the criminal venture; and (4) the defendant sought by his actions to make the venture successful); *United States v. Staten*, 581 F.2d 878, 886-87 (D.C. Cir. 1978) ("the elements of the offense of aiding and abetting are: (1) guilty knowledge on the part of the accused; (2) that an offense was committed by someone; (3) that the defendant assisted or participated in the commission of the offense") (alterations omitted).

perform the substantive offense, need not know its details, and need not even be present, so long as the offense committed by the principal was in furtherance of the common design." *United States v. Sampol*, 636 F.2d 621, 676 (D.C. Cir. 1980) (citations omitted). "[I]t is not essential that the principal in the operation be identified so long as someone has that status." *Gayden v. United States*, 584 A.2d 578, 582 (D.C. 1990) (internal quotation marks and alteration omitted).

In *Wilson-Bey*, we dealt with a first-degree premeditated murder prosecution under D.C. Code § 22-1805 and held that "whether the defendant is charged as a principal or as an aider or abettor, the government must prove all of the elements of the offense, including premeditation, deliberation, and intent to kill." 903 A.2d at 822. In doing so, we adopted the rule of *United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938), and rejected the "natural and probable consequences" approach to accomplice liability because it "impermissibly relieved the government of the burden of showing that the accomplice had the *mens rea* required to be guilty of the offense." *In re D.N.*, 65 A.3d 88, 95 n.8 (D.C. 2013); *see also Nye & Nissen v. United States*, 336 U.S. 613, 618-19 (1949) ("In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about,

that he seek by his action to make it succeed.'" (quoting *Peoni*, 100 F.2d at 402)). We held that an aider and abettor must act with the *mens rea* required by the specific crime with which the principal is charged and "be an associate in guilt of that crime."[21] *Wilson-Bey*, 903 A.2d at 831 (emphasis omitted) (quoting *Roy v. United States*, 652 A.2d 1098, 1104 (D.C. 1995)). We explained in *Wilson-Bey*, however, that, nothing in the opinion "casts doubt on the propriety of [an] instruction . . . to the effect that a jury may . . . infer that a person intends the natural and probable consequences of his or her acts knowingly done or knowingly omitted." 903 A.2d at 839 n. 38 (original brackets omitted). Such a presumption, we observed, "does not distinguish between principals and accomplices, nor does it expand the liability of one but not of the other." *Id.*

What we must do in this case, which we did not do in *Wilson-Bey* because the question was not presented, is determine whether the aider and abettor who acts, as *Wilson-Bey* requires, with the same purpose and intent as the principal must also "intentionally associate" with that specific principal. More pointedly,

---

[21] *Wilson-Bey*'s holding was extended to the offense of AWIKWA, also a specific intent crime, and to offenses not requiring specific intent. *See McCrae v. United States*, 980 A.2d 1082, 1090 (D.C. 2009); *see also Perry v. United States*, 36 A.3d 799, 808 (D.C. 2011) ("We have by now made clear that *Wilson-Bey* is not limited to specific intent crimes.") (internal quotation marks omitted).

the question here is whether the aider and abettor must know of the presence and conduct of the specific principal and form the intent to help *him or her* with the commission of his or her crime, as opposed to share simply (with whoever shared the aider and abettor's purpose) in the *mens rea* required to commit the crime itself.[22] Although the evidence was disputed at trial, we assume for the purposes of this opinion that it was Robert Foreman who fired the bullets that hit James Taylor and Bernard Mackey, and therefore, was the principal in the crimes committed against them. We also assume, because here it appears from the record that the evidence was undisputed, that Tann and Harris were unaware of Foreman's presence during the attack.

---

[22] Both parties attempt to use the language of *Wilson-Bey* and *Peoni* to support their argument. Indeed, there is language that cuts both ways in those opinions. *Compare Wilson-Bey*, 903 A.2d at 840 ("[T]he government must prove, in conformity with *Peoni*, that the accomplice in some sort associated himself with the *venture*, that he participated in *it* as in something he wished to bring about, and that he sought by his action to make *it* succeed.") (emphasis added and internal quotation marks and alterations omitted) *with id.* at 831 ("Every United States Circuit Court of Appeals has adopted *Peoni*'s requirement that the accomplice be shown to have intended that the *principal* succeed in committing the charged offense . . . .") (emphasis added). The same could be said for other opinions of this court. *Compare English*, 25 A.3d at 52 ("To be guilty as an aider and abettor of a charged offense . . . the defendant must be shown to have assisted or participated *in that crime* with guilty knowledge.") (internal quotation marks omitted) *with id.* at 53 ("The key question is whether . . . [the accomplice] intentionally participated in [the principal's offense] and that he not only wanted [him] to succeed . . . but that he also took concrete action to make his hope a reality."). It seems fair to say that, in all these cases, the judicial mind was not focused on the issue we now confront.

The language of D.C. Code § 22-1805 is silent on whether its terms that describe the accomplice's advising, inciting, conniving, or aiding and abetting the principal offender in the criminal venture are to be infused with the "intentional association with a principal of whom the defendant is aware" requirement advanced by appellants. Our case law is also silent on this specific point. In the normal case, unlike here, there is little question about the alleged accomplice's awareness of the role of the principal – if not aware of every detail about the principal's involvement in the crime at issue, the accomplice is at least aware of his or her presence and participation.

Because our statute, like its federal counterpart, incorporates the common law,[23] we must look to cases with analogous facts interpreting the common law in order to test appellant's theory that the possibility of recognizing aiding and abetting on unusual facts such as those presented in this case was unknown to the common law, and that recognizing such liability in this case would create liability where it did not exist before. *See Outlaw v. United States*, 632 A.2d 408, 411 (D.C. 1993) (interpreting the elements of D.C. Code § 22-1806, the District of

---

[23] *See* (*Edward*) *Thompson*, 30 App. D.C. at 364; *see also Rosemond*, 134 S. Ct. at 1245-46.

Columbia accessory-after-the-fact statute, in light of the common law in the absence of statutory definitions).

We begin with *Whitt v. Commonwealth*, 298 S.W. 1101 (Ky. 1927). In that case, while appellant Whitt was firing at Scott (a law enforcement officer who was attempting to arrest him), a third-party, Stanley, appeared and fatally shot Officer Scott. The court observed:

> It is clear that appellant in resisting arrest, and in firing at Scott, was attempting to do so to evade arrest, and *not only is there nothing to show that Stanley was interested in appellant's successful evasion of arrest but there is no evidence to show what prompted Stanley in firing the shot at Scott*. Whether he had any other and different reason for firing at him is not disclosed, and there is no evidence that appellant advised, counseled, or incited him to fire that shot in any way, or that a word had been spoken between them in any way just prior to, during, or at the time of the difficulty.
>
> The intent or purpose of appellant in firing at Scott is apparent, *but there is a lack of evidence from which it may be surmised that Stanley in firing his shot shared the intent or purpose with which appellant had fired his, or in fact what his purpose was*.

*Id.* at 1102 (italics added). In concluding that Whitt could not be properly be convicted as an aider and abettor, the court reasoned:

> In this case we have the intent which prompted appellant to commit the offenses committed by him, but *there is a lack of evidence to show that he shared in any criminal intent or purpose which prompted Stanley to fire the fatal shot. So far as this record discloses, Stanley may have had some criminal intent totally foreign to and disconnected from the intent which prompted appellant*; in other words, Stanley may have seized upon the opportunity thus presented to him to even up an old score with Scott with which appellant was totally disconnected, and with which criminal intent he had no connection and no sympathy.

*Id.* at 1103 (italics added).[24]  The court's reasoning strongly implies that had there been evidence that Stanley  "was interested in appellant's successful evasion of arrest," that Stanley thus "shared the intent or purpose" with which [Whitt] had fired his" shot, and that Whitt shared in the purpose which "prompted Stanley in firing the shot at Scott," the court would not have reversed Whitt's aiding and abetting conviction.

The reasoning of *Landrum v. Commonwealth*, 96 S.W. 587 (Ky. 1906), is similar to that of *Whitt.*   There, a group of men, "more or less drunk" and

---

[24]  *Cf. State v. Ochoa*, 72 P.2d 609, 616 (N.M. 1937) ("The accused may not be held for the independent act of another even though the same person be the victim of an assault by both.  In such circumstances there is wanting that sharing of criminal intent essential to proof of aiding and abetting.").

motivated by an inter-family quarrel, involved themselves in "a shooting affray" near the defendant's house. *Id*. at 587-88. The defendant, roused from sleep by the shooting and also "more or less drunk" while apparently unaware of the motivations of the warring families, saw a third-party unassociated with the feuding groups "staggering about" and opened fire. *Id*. at 587. The defendant's bullets struck the third-party but merely wounded him superficially. Meanwhile, a bullet fired by someone other than the defendant also hit the third-party, killing him. *Id*. at 587-88. There was no evidence that the defendant was acquainted with the man who was charged as the principal in the killing. *Id.* at 588. The court, in concluding that the defendant could not be guilty of aiding and abetting the actual killer, found that "whatever may have been the purpose or motive of the [other shooters] . . . there was not a scintilla of proof that appellant knew of it or shared it to any extent." *Id*. at 588.

The type of evidence that was missing in *Whitt and Landrum* is present here. Here, according to Little's testimony, which the government highlighted in closing argument,

> [Foreman] said he seen Ashley [Tyndle] arguing with
> some dude [Harrison] . . . So he said he got out his car

> and start walking towards there and he seen [appellant Harris] and somebody else coming around the corner. So he said, man, they got it. So he went back towards his house . . . . [but then] heard a gunshot . . . [so then he] turn[ed] around and start shooting.

In other words (in conjunction with testimony by other witnesses about Harris's and Tann's actions after hearing about the argument between Harrison and Tyndle), Little's testimony established (1) that Foreman shot at Harrison for the same reason Harris and Tann shot at Harrison, and (2) that Foreman, Harris, and Tann shared the purpose that prompted Foreman to fire the fatal shot: to avenge Harrison's hostile conduct toward the woman (Tyndle) who was the girlfriend of 22nd Street crew member Little.

Regarding what constitutes a shared or common "criminal intent or purpose" in situations where the accomplice may be unaware of the particular presence of the principal, we have identified three cases of note. In *State v. Ochoa*, 72 P.2d 609, two defendants were part of a crowd of over 100 people that attacked the county sheriff in an attempt to free a prisoner in the sheriff's custody. Shots were exchanged between the mob and the police. *Id*. at 617. None of the shots were fired by the defendants, but one of the shots killed the sheriff. The defendants

assaulted several of the sheriff's deputies, preventing them from coming to the sheriff's aid. The *Ochoa* court held that "[t]he fact that [the defendants] were thus engaged in a vicious assault upon [the deputy], . . . left it within the jury's province to infer, if it saw fit, not alone that these defendants shared in the intent of the slayer, but also that they aided and abetted him in his unlawful undertaking." *Id.* (citing *Woolweaver v. State*, 34 N.E. 352, 353 (Ohio 1893)). Pertinent here, the court so held even though it appears there was no evidence that the defendants (or anyone else) knew with particularity of the presence and participation of the sheriff's actual killer or took particular notice of everyone who populated the mob.

In *State v. Kukis*, 237 P. 476 (Utah 1925), an armed mob of 65 to 100 striking laborers, including the defendant, fired on a railroad car containing management representatives. One of the bullets, fired by an unknown member of the mob, struck a railcar worker and killed him. The court held that there was:

> [A] just inference that every one of the crowd . . . was there for a common and unlawful purpose, and participated or aided and abetted in the assault. . . . There thus is evidence to justify a finding of combination or confederacy or concert of action of this armed crowd or mob . . . that all who were members or part of such crowd or mob . . . aided or abetted therein; and though the evidence does not show whether it was or was not the bullet shot by the defendant or by another member of the

> mob which killed the deceased . . . the jury was justified
> in finding him guilty. . . .

*Id.* at 479.

In *People v. Cooks*, 625 N.E.2d 365 (Ill. Ct. App. 1993), the murder victim and defendant belonged to enemy gangs. Following an argument between members of the two gangs, the defendant followed the victim as he entered a tavern vestibule. The defendant "ran up to the front of the tavern and fired [his] gun through the [tavern] window, striking [the victim] in the leg." *Id*. at 367. "The arm of an unidentified individual then stuck a shotgun through the tavern door, and fired it once, striking [the victim] in the stomach and killing him." *Id*. at 367-68. The person to whom "the arm" belonged was never identified. *Id*. at 368.

Cooks argued on appeal that "the State failed to prove that he solicited, aided, abetted or agreed or attempted to aid the unknown, unidentified person who shot and killed [the victim]." *Id*. The Illinois court stated that the "intent to promote or facilitate the commission of a crime can be shown by evidence that the defendant shared the criminal intent of the principal or that there was a common design or community of unlawful purpose." *Id.* at 368. The court concluded that "the evidence . . . sufficiently demonstrate[d] a common design and a community of unlawful purpose between the defendant and the second unidentified

individual," *id.* at 370, and that it was logical to conclude that the defendant aided the second unidentified shooter "by virtue of his shooting the victim first, thereby making [the victim] more vulnerable and prone to a second attack." *Id.* at 369. The court held that the "[d]efendant's first shot facilitated the second [shot by the "arm"] and, therefore, the offense." *Id.*

The reasoning in *Ochoa, Kukis* and *Cooks* is relevant here, because there was evidence from which the jury could infer that Harris and Tann were aware that other gang members, too, were shooting at Harrison, prompted by the altercation between Harrison and Tyndle. Under the rationale of these cases, even if Tann and Harris were not aware of the presence and participation of each one of the 22nd Street crew-member shooters and did not know who fired the fatal shot, they could be held liable as aiders and abettors of whichever other crew-member shooter — including Foreman — was the principal (whose action was facilitated and encouraged by Harris's and Tann's own actions).

*Haynes v. Commonwealth*, 515 S.W.2d 240 (Ky. 1974), a case discussed by our dissenting colleague, is also helpful to our analysis. The question addressed in that case was, "under what circumstances does a person engaged in an affray

become an aider and abettor of another who intervenes uninvited, even assuming that they share the criminal intent or purpose'" (quoting *Whitt*). The facts were that "appellants John Robert and Tounsel Haynes[] were engaged in . . . a 'shoot-out' with William Caudill" when their father, "appellant Joe Haynes[,] armed himself with a rifle, went to the scene of the affray, and shot and killed Caudill." 515 S.W.2d at 240-241. All three Hayneses were indicted for murder and found guilty of voluntary manslaughter. *Id.* at 241. The Court of Appeals of Kentucky held that the evidence did not justify the sons' conviction of the father's act, reasoning that there was "no evidence from which it may be reasonably inferred . . . that either of the sons sent for the father" and "no evidence even that John Robert knew he had arrived until after the killing." *Id.* Further, the court reasoned, "the fact that Tounsel may have provoked the encounter" "would not itself amount to assistance or encouragement." *Id.* Here, by contrast, the evidence was not merely that Harris and Tann provoked Foreman's encounter with Taylor and Mackey. Rather, there was evidence from which it could be inferred (1) that Harris's and Tann's action in shooting at Harrison was an invitation to (i.e., a "sending for") 22nd Street crew members (who, as discussed above, were participants in an overall conspiracy "to assault and kill anyone whose interests were contrary to those of [appellants] and their associates") to come and support Harris's and

Tann's efforts; and (2) that Harris and Tann knew before the fatal shot was fired that other 22nd Street crew members were in fact joining the affray (even though there was no evidence that they knew that Foreman in particular was one of the participants).

In other words, contrary to our dissenting colleague's argument, the Kentucky court's decision in *Haynes* does not undercut our argument that Tann and Harris could be found guilty of aiding and abetting Foreman's shooting of James Taylor. Given that all three individuals shared the same *mens rea* to shoot Harrison *and* the evidence demonstrated that Tann and Harris reasonably knew that their actions would incite other 22nd Street crew members to come to their aid, we think the situation here is more analogous to those in *Ochoa* and *Kukis*, where courts concluded that an individual participating in a criminal mob could be found guilty of aiding and abetting the commission of a murder by a member of the mob, even if the aider did not know who exactly from the mob did the actual killing. In fact, even our dissenting colleague agrees that, in instances of a criminal mob, a person who "knowingly attaches himself to a large group" may be considered to have aided and abetted other members of the group to commit illegal acts even

though "he may not know who is in the group or who the principal offenders in it are."

We believe that the case law supports the following propositions rooted in the common law and incorporated in our aiding-and-abetting statute: (1) the aider and abettor must have the *mens rea* of the principal actor, *see Wilson-Bey*, 903 A.2d at 822, and must have the "purposive attitude towards" the criminal venture described in *Peoni*, 100 F.2d at 402; (2) a defendant is not responsible for the actions of a third-party who, wholly unassociated with and independent of the defendant, enters into a crime when there is no community of purpose between the defendant and the third-party, *Landrum,* 96 S.W. at 588;[25] however, (3) the defendant need not know of the presence of every participant in a group crime (including the principal) in order to be found guilty under an aiding-and-abetting theory of liability, *Ochoa*, 72 P.2d at 617; and (4) where the criteria in (1) above are met and the evidence at trial proves that the defendants by their action,

---

[25] *See also Hopewell v. State*, 712 A.2d 88, 92 (Md. Ct. Spec. App. 1998) (relying on authority that for a defendant to be liable as an accomplice, there must be "concert of action or *community of purpose* existing at the time of the commission of an offense" (emphasis added)) (*overruled on other grounds*, *Fleming v. State*, 818 A.2d 1117, 1123 n. 4 (Md. 2003)).

foreseeably (and thus, the factfinder may conclude, intentionally)[26] incited action by a third party who shared in their community of purpose, aiding-and-abetting liability may be found. *Cooks*, 625 N.E.2d at 369-70; *Kukis*, 237 P. at 479. These principles satisfy the criminal intent element required by aiding-and-abetting liability and do not run afoul of *Wilson-Bey* or *Peoni*.[27]

Applying these principles to the facts of this case, we think it is clear that appellant Tann, appellant Harris, and Robert Foreman all possessed the same criminal state of mind: the premeditated intent to kill Omar Harrison. This intent shifted to the killing of James Taylor, and the assault of Bernard Mackey, under

---

[26] "A man is held to intend the foreseeable consequences of his conduct." *In re Dory*, 552 A.2d 518, 522 (D.C. 1989) (Schwelb, J., concurring) (quoting *Radio Officers Union v. N.L.R.B.*, 347 U.S. 17, 45 (1954)).

[27] Because our holding rests in part on foreseeability (and the inference of intentionality that may be drawn from it), it is not accurate to say, as our dissenting colleague complains, that our holding is that one can be an aider/abettor by being an "inadvertent accomplice." One cannot "inadvertently" aid or abet a principal when he or she shares the *mens rea* of the principal and it is reasonably certain that his or her actions will incite the principal to action because of their shared membership in a group (e.g., a gang or mob) that has a communal purpose. Our dissenting colleague also states that our "community of purpose" formulation "may exist in the absence of any agreement, understanding, or cooperation between [the principal and 'putative' accomplice] with respect to the crime in question." We emphasize that a "community of purpose" necessarily implies that there exists some tacit, if not always explicit, agreement or understanding between all involved (such as a code of conduct), even if there is no agreement to commit a *specific* crime. *See infra* n.28.

the theory of transferred intent as recognized in our case law and not in dispute here. (*Wesley*) *Williams v. United States*, 881 A.2d 557, 567 (D.C. 2005); *O'Connor v. United States*, 399 A.2d 21, 25 (D.C. 1979).

The evidence also established a "community of purpose" between Tann, Harris, and Robert Foreman, reflecting a uniform and common design among the three shooters. When word of the confrontation between Alphonce Little's girlfriend and Omar Harrison spread through 22nd Street, Tann, Harris, and Little rushed with other gang members toward Harrison in anticipation of a confrontation. The evidence supported a finding that appellants were well aware that other gang members were in the area and part of the crowd that was involved in the general attack. Both appellants knew from past experience while in the 22nd Street Crew that once they began committing acts of violence, other coconspirators would join them. In fact, the conspiracy among members of the 22nd Street Crew included the agreement to commit violence against outsiders, like Harrison, who failed to afford the proper respect to the gang and its territory, and whose "interests" were contrary to that of the gang. Not surprisingly, this is exactly what happened when Foreman (who we assume was the principal in this incident)

opened fire in response to seeing his fellow coconspirators engaged in an attack on Harrison as their response to Harrison's hostility toward Tyndle. [28]

We cannot agree with Judge Glickman that, by looking to the foreseeability to the defendant that his criminal conduct will incite participation by a third party acting pursuant to a community of purpose, we have expanded the doctrine of aiding and abetting liability "without affording the parties the opportunity to address" the "expan[sion]," and that we have thereby been "unfair to the parties." Both the factor that we refer to as "community of purpose" and foreseeability are factors whose relevance the parties debated in the trial court from the outset. For example, Harris's counsel argued that the aider and abettor must have "a connection with the principal" and that there must be "an association between the

---

[28] We need not find an actual agreement here to commit the specific crime between the various gang members in the way that we would if the finding of guilt were predicated on *Pinkerton* conspiracy liability. "Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement. Those terms have a broader application, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy." *Pereira v. United States*, 347 U.S. 1, 11 (1954) (citing *Nye & Nissen*, 336 U.S at 620). Nevertheless, the fact that there was a broader conspiracy to kill "outsiders" among the 22nd Street Crew members informs the community of purpose that, as a factual matter, was shared between Tann, Harris, and Foreman at the time of the shooting. The existence of the conspiracy was what made it foreseeable to Harris and Tann that other 22nd Street crew members in the area — including, unbeknownst to them, Foreman — would respond by joining in the effort to shoot Omar Harrison.

people helping each other." Counsel also discussed with the trial court whether the principal and the aider/abettor could have "totally different motives for killing Mr. Harrison." And, in Harris's brief on appeal, he decries the absence of a "relational limiting factor" for aiding and abetting liability.

The parties also argued in the trial court about the relevance of the foreseeability of the principal's actions. For example, in the course of a colloquy with the trial court about accomplice liability instructions, Harris's counsel, joined by Tann's counsel, argued that for such liability, "it would have to be reasonable and foreseeable that, "if you're doing something," "an unknown person . . . would respond by shooting." Further, while Harris's counsel argued that the evidence did not support an aiding and abetting instruction because "[t]here's no way Mr. Harris could have known that somebody across the street who[m] he didn't know was there . . . would have suddenly joined in on this shooting," he explicitly understood that the government "keeps trying to say well, yeah, because he's on 22nd Street." In other words, counsel understood that one argument being advanced by the government was that because the shooting took place on 22nd-Street-crew turf — where the ethos was for crew members to work together "to assault and kill anyone whose interests were contrary to those of [crew members]

and their associates" — Harris and Tann had every reason to expect that when they started shooting, other crew members who happened to be in the area would start shooting as well. Defense counsel argued that Foreman made "a completely independent decision to start shooting" and that there was no way Harris and Tann "could anticipate that someone he didn't know was even present would do anything, much less start shooting. They made this argument while anticipating that "the government may argue that [the defendants] should have know[n] that [their] act of shooting at a person who had been assaulting a pregnant woman [Tyndle] would have incited others to shoot as well. And, in fact, the government did argue, in opposing Harris's motion for judgment of acquittal (1) that because Harris, Tann, and Foreman were "all members of the charged conspiracy," there was "no legitimate argument to make that [they] were acting independently of one another";[29] (2) that because there was an "over-arching conspiracy,"[30] crew

---

[29] Contrary to Judge Glickman's suggestion, the evidence did not support a finding that Foreman's decision to join in the shooting was an "independent criminal act of another that the defendant[s] did not intentionally encourage or assist in some way." According to the evidence, Foreman, Harris, Tann, and the other 22nd Street crew members who joined in the shooting did not act "independently" of each other.

[30] As Judge Glickman notes, the government did not rely on the doctrine of *Pinkerton* liability in prosecuting Harris and Tann for the Taylor and Mackey incident, but, as the material quoted in the text shows, it did rely on the existence of the charged conspiracy to establish why it was foreseeable to Harris and Tann

(continued…)

members "immediately knew what to do[31] and reacted in a way to protect the girlfriend of their co-conspirator"; (3) that Foreman "did exactly what [defendants] had every reason to believe [he] would do"; and (4) that, in light of Foreman's membership in a conspiracy that "will protect . . . their members at all costs," "[i]t was certainly foreseeable that when Harris [and Tann] began shooting . . ., other co-conspirators, [they] may not have known exactly who, would assist in [their] efforts." Thus, is fair to say that one express theory of the prosecution was that

---

(…continued)

that Foreman and other 22nd Street crew members would respond as they did, by joining in the shooting. This did not amount (and our analysis does not amount) to conflating *Pinkerton* liability and aiding-and-abetting liability (which requires a *mens rea* that *Pinkerton* does not). *See Wilson-Bey*, 903 A.2d at 840-41. Rather than conflation of theories of liability, our analysis reflects a recognition that "[t]ypically, the same evidence will support both a conspiracy and an aiding and abetting conviction." *United States v. Vasquez*, 677 F.3d 685, 695 (5th Cir. 2012) (internal quotation marks omitted).

[31] In closing argument, the prosecutor continued that theme:

> Now, what does Robert Foreman tell you? . . . I hear shots. So what do I do? These are my boys. I turn around, and I start shooting." . . . I hear the shots. *I don't even have to think.* I turn around; I start shooting.

Harris and Tann foreseeably (and thus intentionally, the jury could find) encouraged an attack on Omar Harrison by a group that included Foreman.[32]

Moreover, in a memorandum regarding proposed jury instructions, Harris's counsel told the court that the defense had looked for but had been "unable to find a fact pattern matching the one in this case," but found cases "across jurisdictions" (purportedly) requiring, for joint liability, "that the defendant had knowledge of the other principal involved in the event." Having undertaken such a search, appellants cannot be surprised that this court, too, has scoured common-law cases on accomplice liability and has relied on factors that these cases recognized as relevant. The case law discussed herein was equally available to the parties as part of their research.

All the foregoing examples show that the parties had ample opportunity to debate, and did debate, the relevance of the factors on which we rely for our holding.

---

[32] Again, we rely on the principle that Harris and Tann could be found to have intended the reasonably foreseeable consequences of their acts. See *supra* note 26.

Judge Glickman's analysis suggests that after *Peoni* and *Wilson-Bey*, Harris and Tann may not be found liable for the foreseeable shooting their actions inspired. But what *Peoni* established is that "the probability that the forbidden result would follow upon the accessory's conduct" does not suffice; rather, to incur aiding and abetting liability, the defendant must "in some sort associate himself with the venture, . . . participate in it as in something that he wishes to bring about, . . . seek by his action to make it succeed[,]" and have a "purposive attitude towards it." 100 F.2d at 402.[33] The evidence at trial amply supported a finding that Harris and Tann each associated himself with the vendetta against Harrison, participated in it as in something that he wished to bring about, sought by his action to make it succeed, and displayed a purposive attitude towards it, as *Peoni* requires for aiding and abetting liability. What *Wilson-Bey* and its progeny require is that the aider and abettor share the *mens rea* of the principal; it is not enough for

---

[33] Judge Glickman also observes that, of the five cases that we cite to, four were decided before *Peoni*, and one was decided under a statute that has no counterpart in this jurisdiction. With regard to the four pre-*Peoni* cases, it does not matter that the Kentucky, New Mexico, and Utah cases were decided beforehand because those cases do not conflict with *Peoni*'s principal holding. In none of the four cited cases is there any dispute that the aider/abettor shared the same *mens rea* as that of the unknown or inadvertent principle. With regard to the Illinois case *Cooks*, the "common design or community of unlawful purpose" doctrine of proving an intention "to promote or facilitate a crime" is rooted in the common law, and not found in the statute. *See Cooks*, 625 N.E.2d at 368-69; *see also People v. Foster*, 556 N.E.2d 1214, 1219 (Ill. Ct. App. 1990).

aiding and abetting liability that a defendant could reasonably have foreseen what the principal would do.  Here, there is no dispute that the evidence sufficed to show that Harris and Tann shared Foreman's intent to kill Harrison.  The question is whether, sharing that intent, they may be held liable under an aiding and abetting theory for initiating a shooting incident that they had reason to foresee would cause (and did cause) other gang members to join in the shooting.  Neither *Peoni* nor *Wilson-Bey* requires us to answer that question in the negative.[34]

We would reach a different conclusion had there been no evidence establishing community of purpose between Tann, Harris, and Robert Foreman, and if the evidence had not supported an inference that Harris and Tann knew that fellow 22nd Street crew members were joining in the assault and that it was

---

[34] Judge Glickman notes that this court "declared in *Wilson-Bey* that it is a 'requirement [for aiding and abetting liability] that the accomplice be shown to have intended that the principal succeed in committing the charged offense'" and further stated in *Little v. United States*, 989 A.2d 1096, 1102 (D.C. 2010), that the "aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime."  It is consistent with *Wilson-Bey* and *Little* for us to hold more specifically here that the aider/abettor must "have intended that the principal (*whoever, among his associates who could reasonably be expected to participate pursuant to a common purpose if present on the scene, that principal might turn out to be*) succeed in committing the charged offense" and "must have knowingly aided the other person (*whoever, among his associates who could reasonably be expected to participate pursuant to a common purpose if present on the scene, that person might turn out to be*), with the intent that the other person commit the charged crime."

foreseeable to Harris and Tann that any fellow crew members who were in the area would do so. If the facts were such as those in *Landrum*, where there was no evidence of a community of purpose between the defendant aider and abettor and the principal, then the evidence would be insufficient. But the evidence was that Foreman, a gang member who lived around 22nd Street and was acquainted with Harris and shared guns with him, was about to step in to respond to the Harrison-Tyndle altercation until he perceived that Harris and others "got it," and then joined in the shooting when "getting it" — the common purpose and design — escalated to that level. And, as in *Cooks*, Tann's and Harris's actions of initiating the shooting, and rendering the target more vulnerable, facilitated and encouraged Foreman's joining in the gunfire to help his 22nd Street Crew cohorts. 625 N.E.2d at 369-70. The fact that Tann and Harris were unaware of Foreman's presence until after Foreman (presumably) fired the fatal shot does not make the government's evidence legally insufficient.

The dissent derides our reasoning as a "novel theory of [our] own devising." We think the cases discussed above, decided decades (and, in one instance, a century) ago, show that our theory is not at all novel. Rather than of our own devising, it is authorized as an incremental development of the common law, from

reasoning that is implicit in the decades-old cases we have cited.[35] The fact that there seems to be no reported case that has articulated the theory precisely as we have is hardly surprising because, as the trial court and the parties all agreed, the facts of this case are "very odd" and "rare." And, however imprecise the rule we announce may be, it is anchored to, and limited in application by, the detailed and unusual facts of this case.

Accordingly, for the foregoing reasons, we deny appellants' claims related to the sufficiency of the evidence. We also deny appellants' claims related to the curtailment of their closing arguments when the trial judge prevented them from arguing that aiding-and-abetting liability required the government to prove that the accomplice intended to help a known and particular principal commit the charged offense. In this respect, the trial judge acted correctly because he prevented a

---

[35] As the highest court of this jurisdiction, we of course have the "power[] [and the responsibility] to develop the common law for the District of Columbia," *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965), "as new circumstances and fact patterns present themselves." *Rogers v. Tennessee*, 532 U.S. 451, 461 (2001). As far as we can tell, no other reported opinion has considered whether there can aiding and abetting liability on facts such as those presented here: a principal whose particular presence was not known to the defendants, but who, because of his membership in an over-arching conspiracy with the defendants, was foreseeably incited to join in the defendants' criminal conduct. We must answer the question on our own, and we do so in a way that we believe is consistent with the pronouncements in aiding-and-abetting case law, in all their variations.

misstatement of the law. *See United States v. Gaines*, 690 F.2d 849, 858 (11th Cir. 1982) (no error where the trial "court properly prevented defense counsel from arguing to the jury a false legal proposition"); *see also Hager v. United States*, 791 A.2d 911, 913 (D.C. 2002) (trial court acts properly where it "exclude[s] . . . those statements that misrepresent the evidence or the law").

However, we conclude that the trial judge committed instructional error when he told the jury that a defendant can be found liable as an aider and abettor "if [he] knowingly aid[s] and abet[s] the crime without knowing who else is doing it," without requiring that the jury also find a community of purpose between the principal and the accomplice. Nevertheless, using any test for error, we conclude that appellants were not harmed. The jury convicted both Tann and Harris of Count 1 of the indictment, which alleged that appellants were involved in a criminal conspiracy with other members of the 22nd Street Crew to kill persons, such as Omar Harrison, whose "interests" were contrary to that of the coconspirators. Count 1 included Foreman as a named coconspirator. Given the jury's finding on the conspiracy count, and given the other evidence presented regarding the behavior of Robert Foreman, Harris, Tann, and other gang members at the time of the shooting of James Taylor and Bernard Mackey, we find that there

is no reasonable possibility, even had the jury found that Foreman was the principal in the James Taylor-Bernard Mackey incident, that it would have failed to find that Tann, Harris, and Foreman were part of a group that shared the common purpose and design to murder Omar Harrison and that Harris and Tann intended to aid any of their fellow crew members who were present and participating in doing so.[36] *See Fortson v. United States*, 979 A.2d 643, 661 (D.C. 2009); *Tyree*, 942 A.2d at 638-40; *cf. Wilson-Bey*, 903 A.2d at 844-45. Therefore, appellants are entitled to no relief.

### D. Beaver's Conviction: Obstruction of Justice

Count 25 of the superseding indictment in this case read as follows:

> Between on or about April 30, 2004, and on or about July 11, 2006, within the District of Columbia, Lannell N. Cooper . . . Michael D. Tann . . . Dajuan D. Beaver . . . and Brian K. Gilliam . . . corruptly persuaded, and endeavored to cause or induce, Laquanda Johnson, with the intent to persuade her to influence, delay, and prevent the truthful testimony of her sister, Kyara Johnson, a witness in an official proceeding, to wit, *United States v. Lannell Cooper* . . . then pending in the Superior Court for the District of Columbia.

---

[36] We respectfully disagree with our dissenting colleague's suggestion that appellants Harris and Tann "did not intend to aid or abet anyone (other than themselves)[.]"

On appeal, appellant Beaver makes the argument that although there was testimony at trial that he was involved in the search for both Johnson sisters in the run-up to appellant Cooper's 2006 trial in an effort unlawfully to influence their testimony *separately*, there was insufficient evidence admitted to prove that he committed the particular actions alleged by Count 25, i.e., that he attempted to use Laquanda as an instrument to influence Kyara's testimony against Cooper. In substance, Beaver alleges that what was charged was at variance with the evidence elicited at trial.

Alphonce Little testified that, shortly after Cooper was confined on April 30, 2004, for the Terrence Jones murder, Beaver told Little that Kyara Johnson was cooperating with the government. Moreover, Little stated that Beaver also told him 17th Street gang members Brian Gilliam and Tyrell Hargraves, close friends of Cooper and allies of the 22nd Street Crew, would be "handling the situation" with regard to Kyara. Little also testified that he saw Beaver meet with Gilliam and Hargraves multiple times on 22nd Street after Cooper was arrested. Around this time, Beaver also expressed to Little his opinion that the witnesses who were snitching on Cooper "[s]hould be dead." While in jail, Cooper told Little over the phone that a friend of his was coming to 22nd Street and Little should identify

Kyara for him. On the same day as Alphonce Little's conversation with Cooper, Gilliam came to the neighborhood and met Little in a parking lot. Gilliam was seated in a car with a gun in his lap and asked Little "Where that bitch at[?]" and to "point [Kyara Johnson] out."

Furthermore, gang ally Dewey Chappell testified that Beaver told him that both of the Johnson sisters were "supposed to be testifying for the government." Chappell then traveled to 22nd Street ten to twenty times in an attempt to find the sisters with the intent to offer them marijuana and money "to not testify" or to "change their statement." Because Chappell did not know what the sisters looked like, Beaver tried to help him find them.

There was also testimony at trial about the nature of the relationship between the sisters. Laquanda Johnson, as the older sister, was known to be "a sort of middleman" or "gatekeeper" between Kyara and persons seeking access to her, at least for members of the 22nd Street Crew who were looking for Kyara in the aftermath of the Terrence Jones murder. An investigator assigned to Cooper's defense team for his 2006 trial for the murder of Terrence Jones testified during the instant case that his "best chance to speak to [Kyara] was through [Laquanda]."

Although Beaver styles his claim as one attacking the sufficiency of the evidence, it is better cast as an argument alleging a fatal variance between the proof and the pleadings. *See* (*Royce*) *Robinson v. United States*, 697 A.2d 787, 788-89 (D.C. 1997). Beaver does not dispute that the government presented sufficient evidence that Beaver was looking for both sisters in order to prevent the truthful testimony of at least one of them. Beaver's complaint is that the criminal offense did not happen in the way alleged in the indictment – that he did not attempt to persuade Laquanda to influence Kyara's testimony.

> Two kinds of problems arise when there is a deviation from an indictment. An amendment of the indictment occurs when the charging terms of the indictment are altered . . . . A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.

(*Terrence*) *Ingram v. United States*, 592 A.2d 992, 1005 (D.C. 1991) (emphasis omitted). A "constructive amendment of the indictment can occur if, and only if, the prosecution relies at the trial on a complex of facts distinctly different from that which the grand jury set forth in the indictment." *Baker v. United States*, 867 A.2d 988, 999 (D.C. 2005) (emphasis omitted) (quoting *Carter v. United States*, 826 A.2d 300, 306 (D.C. 2003)). In a variance, the proof at trial does not show such a distinctly different "complex of facts," nor does the proof differ from the "essential

elements" of the offense charged in the indictment. *Marshall v. United States*, 15 A.3d 699, 710 (D.C. 2011). "In contrast with an amendment, a variance will not warrant dismissal except upon a showing of prejudice." (*Terrence*) *Ingram*, 592 A.2d at 1006 (internal quotation marks omitted). "A variance is prejudicial if it either deprives the defendant of an adequate opportunity to prepare a defense . . . or exposes him to the risk of another prosecution." *Zacarias v. United States*, 884 A.2d 83, 87 (D.C. 2005).

Here, because the purported discrepancy between the proof elicited at trial and the language of Count 25 did not show a "complex of facts distinctly different from that which the grand jury set forth in the indictment," the issue is one of a potential prejudicial variance. A constructive amendment is not found where the proof at trial reflects the same facts as those alleged in the indictment regarding time, place, individuals, and core criminal behavior. *See Carter*, 826 A.2d at 306-07.

Both the evidence at trial and the indictment reflected events that occurred at the same time (between the date of Cooper's arrest for the Terrence Jones murder and Cooper's 2006 conviction), in the same general location, by the same

individuals (22nd Street Crew members, including Beaver, and other gang allies), and targeting the same ultimate victim, Kyara Johnson. *See id.* at 306. Additionally, both the indictment and the evidence at trial showed the same overall substantive criminal behavior: an attempt by Beaver and others to commit the offense alleged by the grand jury – to intimidate Kyara Johnson for purposes of affecting her testimony and the outcome of Cooper's 2006 trial. *See Baker*, 867 A.2d at 999. The possible disparity between the indictment and the evidence was in manner of the offense only.

Moreover, as Beaver did not raise the issue of either constructive amendment or prejudicial variance at trial, we must review his claim under the plain error standard.[37] "Under the plain error doctrine, appellant must establish (1) that the trial court committed error; (2) that the error was plain, i.e., clear or obvious; (3) that the error affected substantial rights; and (4) that a failure to correct the error would seriously affect the fairness, integrity, or public reputation

---

[37] Even if we were to find a constructive amendment here, our review would still be for plain error. *O'Brien v. United States*, 962 A.2d 282, 321 (D.C. 2008) ("Since appellant did not raise her claim of constructive amendment in the trial court, our review . . . is for plain error."); *cf. Peay v. United States*, 924 A.2d 1023, 1027 (D.C. 2007) ("If there has been a constructive amendment to an indictment, and the issue has been properly preserved for appeal, *per se* reversal is required.").

of judicial proceedings." *Marshall*, 15 A.3d at 710 (internal quotation marks and emphasis omitted) (citing *United States v. Olano*, 507 U.S. 725, 732-36 (1993)).

We find no plain error. First, we are not convinced that the trial court committed "clear" or "obvious" error by failing to identify, *sua sponte*, that the variance between the government's proof and the indictment was material. The evidence was that Beaver repeatedly attempted, on behalf of Cooper, to identify Kyara and Laquanda Johnson for gang members and allies who were looking to obstruct justice. Considering this evidence in the context of Laquanda's reputation in the community as the "gatekeeper" for persons seeking to access Kyara, the court (and the jury) could have reasonably inferred: that Kyara was Beaver's primary focus, that his interest in finding Laquanda was fueled by his concern that Kyara would give testimony unfavorable to Cooper, and that Beaver wanted to use Laquanda to influence Kyara's testimony. *See Marshall*, 15 A.3d at 711 (variance not plain error where the factual theory pursued by the government at trial "was not entirely divergent from that proffered by the government before trial").

Moreover, even assuming that any error was clear or obvious, Beaver has not identified how the variance resulted in surprise, lack of notice, risk of double

jeopardy, or some other way in which his substantial rights were impacted. *Carter*, 826 A.2d at 307 ("A variance may be prejudicial if . . . the accused . . . was so surprised by the proof that he was unable to prepare his defense adequately.") (internal quotation marks omitted); *Pace v. United States*, 705 A.2d 673, 677 (D.C. 1998) ("A variance may prejudice a defendant such as by (1) depriving him of adequate pretrial notice of the details of the charge against which he must defend, and/or (2) depriving him of protection against reprosecution."). Nor does he contend that his defense, which was that the testimony of Alphonce Little and Dewey Chappell was untrue, would have been different if there had been no variance. *Zacarias*, 884 A.2d at 89. Finally, we are confident that there was no error that seriously affected the fairness, integrity, or public reputation of judicial proceedings, especially given that Beaver now concedes that the evidence was sufficient that he did, in fact, obstruct justice with regard to both of the Johnson sisters. *See Marshall*, 15 A.3d at 711.

**E. Beaver's Conviction: Carrying a Pistol Without a License ("CPWL")**

Count 47 of the superseding indictment charged that on or about July 11, 2006, the day of Laquanda Johnson's murder, Beaver carried a pistol without a license. Alphonce Little testified that shortly before he killed Laquanda, he saw

Beaver with "a nine" (the parties agree that this referred to a 9mm semi-automatic pistol) in his possession. Little further testified that he and Beaver initially planned that Beaver would shoot Laquanda and Kyara Johnson, and that Beaver declared that "he was going to do it[;] he was going to kill them" because "they [the Johnson sisters] got to go."

However, Beaver eventually persuaded Alphonce Little to carry out the shootings instead. Little obtained a different weapon, a ".45,"[38] which he used to kill Laquanda Johnson and shoot Keisha Frost. Following the shooting, Little, Beaver, and Rushing, traveled to Maryland where Beaver took the murder weapon, and the hoodie that Little had been wearing, and hid these items near the porch of his mother's house.[39] The 9mm pistol that Beaver was carrying earlier in the evening was never recovered by investigators.

---

[38] Although not clearly articulated in testimony, the only reasonable inference was that the term ".45" referred to a .45 handgun.

[39] The government does not argue that the CPWL conviction can be supported based on Beaver's possession of the .45 handgun because there was no evidence that Beaver possessed the weapon in the District of Columbia. *See Joiner-Die v. United States*, 899 A.2d 762, 765-66 *(*D.C. 2006) (Superior Court jurisdiction limited to acts which occur within the boundaries of the District of Columbia).

Beaver argues that his CPWL conviction was based on insufficient evidence because there was no evidence, direct or circumstantial, that his 9mm pistol was operable as required by the law at the time of trial.[40]  *In re R.S.*, 6 A.3d 854, 859 (D.C. 2010).  Beaver specifically contends that there was no demonstration by the government of his "active reliance" on the weapon which might constitute circumstantial evidence of operability.

In cases such as this one, where there is no evidence that the defendant fired the firearm, its operability may be established by circumstantial evidence, including evidence that "affirmatively demonstrated [the defendant's] belief that it was operable."  *Id*. at 860.  This court held in *In re R.S.* that evidence that the defendant displayed a firearm for the purpose of threatening a victim – conduct that was accompanied by verbal threats to the effect that "if you step out here, you see what I got" – was sufficient to demonstrate the defendant's reliance on the operability of the firearm.  *Id*.  Similarly, this court has held in other cases that evidence of operability was sufficient where:  one defendant was "waving his gun" while a second defendant "stuck a gun into [the victim's] back"; a defendant was seen "displaying a gun to back up his demands"; and a defendant was identified

---

[40]  Operability is no longer an element of CPWL.  *See Snell v. United States*, 68 A.3d 689, 692 n.4 (D.C. 2013).

"wield[ing a] sawed-off shotgun in a menacing manner, knocking on the car window and waving it at [the victims]." *Peterson v. United States*, 657 A.2d 756, 763 (D.C. 1995); *Bartley v. United States*, 530 A.2d 692, 693-94 (D.C. 1987); *Morrison v. United States*, 417 A.2d 409, 413 (D.C. 1980).

In those cases, the inference of the assailants' reliance on their weapons' operability rested on reasoning that, through their display of the weapons, the assailants "intended that their victims believe[] that the weapons were capable of being discharged." *Bartley*, 530 A.2d at 698. There is no such evidence in this case. During the period of time when Beaver was supposed to commit the murders personally, he never indicated that he would use his 9mm. And once Beaver persuaded Alphonce Little to carry out the shootings, Beaver did not offer Little the use of his 9mm; instead, Beaver stood by while Little and Dwayne Wright retrieved a different gun from inside Wright's house.

This set of circumstances does not support an inference of operability. *Price v. United States*, 813 A.2d 169, 173 (D.C. 2002) (evidence was insufficient to support CPWL conviction where defendant held a weapon at his side while his companions shot and killed their victim because "(1) the witnesses testified that

Price never pointed his weapon at anyone; and (2) he was never left on his own to control the victim without the assistance of his cohorts, who clearly had operable weapons."). In this case, like in *Price*, "[t]he government simply failed to present evidence establishing either that [Beaver] fired his weapon, pointed it, or otherwise affirmatively displayed a belief that his weapon was operable[, and] the evidence here tends to dispel the notion that [Beaver's] weapon could fire." *Id*. Therefore, we vacate Beaver's CPWL judgment of conviction.

## F. Cooper's Conviction: Laquanda Johnson Murder Under *Pinkerton*

Cooper makes a multi-pronged attack on his conviction for the premeditated murder of Laquanda Johnson under a *Pinkerton* theory of liability. First, he argues that the murder occurred while he was in prison and that he had no control or influence over the actions of those directly involved. Therefore, the murder was not reasonably foreseeable to him as required for *Pinkerton* liability. Second, he argues that the application of this form of liability was unfair to him, and violated his due process rights on the facts of this case, because "it [was] based on a charged 'conspiracy' that [was] far too broad to support the application of a

vicarious liability theory."[41]    Finally, his brief implicitly argues that he suffered from selective prosecution with regard to this particular charge.[42]

In determining whether a coconspirator may be held liable for commission of a substantive offense that the defendant did not directly commit, the government must prove "that an agreement existed, that a substantive crime was committed by a co-conspirator in furtherance of that agreement, and that the substantive crime was a reasonably foreseeable consequence of the agreement between the conspirators." *Collins v. United States*, 73 A.3d 974, 982 (D.C. 2013). The government is not "required to establish that the co-conspirator actually aided the perpetrator in the commission of the substantive crime, but only that the crime was committed in furtherance of the conspiracy." *Wilson-Bey*, 903 A.2d at 840 (citing *Pinkerton*, 328 U.S. at 646-47).

---

[41] Cooper connects this claim to his arguments that the evidence of a single conspiracy as charged was legally insufficient and the conspiracy charge itself was overbroad, arguments which we rejected *supra*.

[42] Considering his selective prosecution argument, we conclude that Cooper has not met his "heavy burden" to establish that "(1) others similarly situated were not prosecuted, and (2) the selective prosecution being complained of was improperly motivated, i.e., it was based on an impermissible consideration such as race or on a desire to prevent the exercise of constitutional rights." *Fedorov v. United States*, 600 A.2d 370, 377 (D.C. 1991) (emphasis omitted).

Here, the conspiracy among Cooper and other members of the 22nd Street Crew between 2003 and 2006 included the agreement to obstruct justice, and the evidence showed that the coconspirators pursued that goal during the period of time leading up to Cooper's 2006 trial. The record shows that Cooper personally approached Laquanda Johnson and unsuccessfully bribed her with drugs and money in an attempt to influence Kyara Johnson's testimony at that trial. The evidence also revealed that Cooper contacted multiple gang members in order to persuade the sisters (particularly Kyara) to change their statements and some of these efforts contemplated the use of force.

Moreover, there was evidence to show that the conspiracy to obstruct justice and prevent the Johnson sisters from doing further damage to the 22nd Street Crew did not end after Cooper's 2006 conviction. Alphonce Little testified that he murdered Laquanda, and intended to murder Kyara, because they might testify in the future against "[a]nybody around 22nd Street, it could [be] me." Little stated that because the sisters "told on a murder[, t]hey could have told on me selling drugs [or] whatever." Because appellants in this case had yet to be charged with conspiracy, and appellants other than Cooper had yet to be charged for the Terrence Jones murder-Richard Queen assault, it was foreseeable that the Johnson

sisters would continue, notwithstanding Cooper's conviction, to have the potential to harm the gang.[43]

Furthermore, the conspiracy charged in this case also encompassed the goal of killing "snitches" whose actions demonstrated "interests [that] were contrary to those of the defendants and their associates." In accordance with the overarching "rule" enforced by the 22nd Street Crew that violence was to be inflicted on "snitches,"[44] it was foreseeable that the Johnson sisters, by cooperating with the government, would be subject to retaliation by the members of the 22nd Street Crew who had entered into the charged conspiracy. When Little, Beaver, and fellow 22nd Street Crew member Dwyane Wright discovered that the sisters had returned to 22nd Street, they determined, in accordance with the retaliatory goal of the conspiracy, that the sisters should be killed because of their cooperation with the government.

---

[43] For example, Kyara's testimony in the instant case about appellant Tann's and appellant Arnette's involvement in the Terrence Jones murder demonstrated the continuing threat that Kyara, helped by her sister's support, posed to members of the 22nd Street Crew and the coconspirators in this case.

[44] Former gang member Andre McDuffie testified that "[i]f someone was to cooperate [with the government]" that "there would be violence inflicted." Alphonce Little testified that an "automatic" rule of the crew was "[d]on't snitch," which "[came] with the territory of the game," and that nobody who the gang knew to be a snitch ever came back to 22nd Street.

The fact that Cooper was in jail at the time of Laquanda Johnson's murder does not relieve him of liability under *Pinkerton*. *Gatlin v. United States*, 925 A.2d 594 (D.C. 2007) provides a useful framework for analyzing Cooper's claim. In *Gatlin*, the defendant, who was incarcerated at the time of the murder of a government witness by his coconspirator, challenged the admissibility of the murdered witness's grand jury testimony under the forfeiture-by-wrongdoing doctrine.[45] We held that "[i]t was reasonably foreseeable that intimidation of and threats to witnesses could result in the murder of a witness." *Id.* at 600. The facts of *Gatlin* showed that the defendant, while in prison, communicated with his associates about disposing of witnesses and, much like the facts of this case, pressuring government cooperators "to change their story." *Id.* at 598.

Taken together, the evidence pertaining to the coconspirator's goals of obstructing justice and inflicting violence upon snitches – persons with interests contrary to those of the 22nd Street Crew members – demonstrated that Laquanda Johnson's murder was reasonably foreseeable to Cooper, despite the fact that he

---

[45] The same forfeiture-by-wrongdoing issue as applied to statements by Laquanda Johnson is analyzed *infra*.

was in jail at the time. Little's act of murdering Laquanda was within the scope of the conspiracy to obstruct justice by preventing government cooperators, such as Laquanda and Kyara, from testifying against the 22nd Street Crew, and by retaliating with violence against persons who collaborated with the government against the gang. *Collins*, 73 A.3d at 982-84; *Roberson v. United States*, 961 A.2d 1092, 1095 (D.C. 2008); *Gatlin*, 925 A.2d at 600. We further conclude that there was nothing about the breadth or nature of the conspiracy charged that made *Pinkerton* liability unfair to Cooper.

## VIII. Procedural and Evidentiary Issues Related to the Conspiracy and Appellants' Joint Trial

### A. Cooper's Prior Convictions

Appellants make several arguments involving the admission of Cooper's 2006 convictions for the Terrence Jones murder-Richard Queen assault. First, Tann and Arnette contend that the trial court erred when it refused to sever their trials from Cooper's after it became apparent that both the government and Cooper intended to put evidence of Cooper's prior convictions in front of the jury. Second, Tann, Arnette, and Cooper make the evidentiary argument that the prior convictions should not have been admitted against each of them. The government admits evidentiary error as to Tann and Arnette.

Before trial, the government indicated its intent to admit the convictions because they would provide evidence as to the conspiracy count of (1) the Terrence Jones murder and Richard Queen assault, which were represented in a series of overt acts listed in the indictment, and (2) partial motive for the murder of Laquanda Johnson by appellants' coconspirator, Alphonce Little, who sought revenge against the Johnson sisters for their cooperation with the government in Cooper's 2006 trial that led to his conviction and imprisonment.   Cooper wanted the convictions in evidence because, as we have explained *supra*, a significant part of his defense against the Laquanda Johnson murder charge was based on the fact that he had been convicted of and sentenced for the Terrence Jones murder in 2006 and was in jail at the time of her killing.   Therefore, he intended to argue to the jury that he had known nothing about, and had no involvement with, her death.

Tann and Arnette pointed out in pretrial hearings that this trial was to feature testimony from some of the same witnesses that had testified at Cooper's 2006 trial.   They argued that when the jury found out about Cooper's convictions, it would necessarily conclude that the government's witnesses in this case were credible because a previous jury had found them so.   The trial court disagreed with

appellants' contention and found that an instruction would be sufficient to ensure the jury made proper use of the convictions.

The government, Cooper, and Arnette, mentioned Cooper's 2006 conviction for the Terrence Jones murder during opening statements. The government informed the jury of the conviction in the context of explaining why Arnette and Tann were charged with crimes related to the Terrence Jones murder-Richard Queen assault, but Cooper was not. Cooper mentioned the conviction, but indicated that the prior verdict was "incorrect." Arnette stated that another person – obviously referencing Cooper – had already been convicted of the murder and that there were witnesses in Cooper's trial who had testified that Arnette "didn't do anything" during the incident. No further mention was made of the convictions until Cooper took the stand in his defense approximately six months later.

During Cooper's testimony, the government impeached him with his prior convictions, including those related to the Terrence Jones murder-Richard Queen assault. The court gave the jury a standard instruction that prior convictions were to be considered for credibility purposes only.

In final jury instructions, after consultation with the parties, the court further instructed the jury that:

> In addition to considering [Cooper's Terrence Jones murder conviction] when assessing Mr. Cooper's credibility as a witness, you may also properly consider it in determining whether the government has met its burden of proof with respect to [the overt act charged in the indictment pertaining to the Terrence Jones murder] . . . . You are not required to accept the fact that Mr. Cooper's prior conviction for this offense is conclusive evidence that the government has met its burden of proof, but, instead, you may give it[,] like every other piece of evidence, whatever weight you feel it's entitled to receive. Moreover, you may not consider the prior conviction as establishing the truthfulness of any of the witnesses who testified in the prior trial.

The trial court did not distinguish between appellants when describing how this evidence could be used by the jury. During closing arguments, the government briefly talked about the prior convictions, again as a reminder to the jury why Cooper was not charged with Terrence Jones's murder, but did not use the convictions to argue guilt.

**1. Error in Admitting Cooper's Convictions Against Tann and Arnette**

The admission of Cooper's conviction against appellants other than Cooper for the truth of the matters asserted, as proof of an overt act of the conspiracy with

which they were charged, was constitutional error as long recognized by case law and the commentary to Federal Rules of Evidence 803 (22), the federal hearsay exception for prior judgments of conviction.[46]  In *Kirby*, 174 U.S. at 59, over a century ago, the Supreme Court held that one defendant's prior conviction may not be admitted as evidence against his codefendants.  Numerous cases followed recognizing that holding.  *See*, *e.g.*, *United States v. Vandetti*, 623 F.2d 1144, 1148 (6th Cir. 1980) (finding a Confrontation Clause violation); *State v. Tollardo*, 275 P.3d 110, 116 (N.M. 2012) (same); *cf. Bisaccia v. Attorney Gen. of N.J.*, 623 F.2d 307, 311-12 (3d Cir. 1980) (finding a due process violation).  Although there is conflicting authority as to whether this type of error offends the Confrontation Clause,[47] or whether the error affronts fundamental notions of due process,[48] or whether it is a violation of both,[49] the error is clearly of constitutional dimension.

---

[46]  Fed. R. Evid. 803 (22) advisory committee's note:  "[T]he exception does not include evidence of the conviction of a third person, offered against the accused in a criminal prosecution to prove any fact essential to sustain the judgment of conviction.  A contrary position would seem clearly to violate the right of confrontation." (citing *Kirby v. United States*, 174 U.S. 47 (1899)).

[47]  *See Bisaccia*, 623 F.2d at 314 (Seitz, J., concurring).

[48]  *See id*., 623 F.2d at 311-12.

[49]  *See United States v. Crispin*, 757 F.2d 611, 613 n.1 (5th Cir. 1985) ("Violation of 803 (22) threatens two important constitutional interests.  First, to the extent that the judgment of conviction reflects another jury's verdict . . . it
(continued…)

Therefore, the evidentiary error must be analyzed under the constitutional harmless error standard as articulated in *Chapman v. California*, 386 U.S. 18 (1967). We may affirm only if we find that "the government presented overwhelming evidence of guilt," or more importantly here, if "it is clear beyond a reasonable doubt that a rational jury would have found the defendant[s] guilty absent the error." (*Eric*) *Gardner v. United States*, 999 A.2d 55, 58 (D.C. 2010) (quoting (*Edwin*) *Smith v. United States*, 966 A.2d 367, 391 (D.C. 2009)).

We also note that the error had a potential effect on appellants' severance claims. While plausible, Tann and Arnette's argument that the prior convictions would enhance the credibility of the government's witnesses had little practical force, at least at the outset of trial. The government's witnesses called to give evidence about Tann's and Arnette's participation in Terrence Jones's murder and Richard Queen's assault gave often inconsistent and occasionally exculpatory testimony about Tann and Arnette at both trials. Queen testified in both trials that

---

(…continued)
trenches upon a defendant's due process right to have the government prove every element of the offense with which he is charged. . . . Second . . . it trenches upon a defendant's right to confront his accusers.").

Tann had no involvement in his assault or the murder of Terrence Jones. Similarly, Shaunta Armstrong attested that Arnette was present at the scene of the crime but did nothing in the attack on Terrence Jones or Queen. Donald Matthews gave testimony that was very damaging to Tann (identifying him as Queen's shooter), but highly exculpatory to Arnette (indicating that he was not involved in the joint attack).

Therefore, standing alone, the admission of Cooper's convictions against Cooper would have had little impact on the other appellants.[50] However, when the trial court erred by allowing admission of the convictions for substantive purposes against Tann and Arnette, it also revitalized appellants' arguments that severance from Cooper's trial was required. Consequentially, in addition to analyzing the evidentiary error under the *Chapman* standard for harmlessness, we must simultaneously look to see whether the joinder of Tann and Arnette with Cooper resulted in "the most compelling prejudice" that would constitute reversible error.

---

[50] Even if appellants had been tried separately, Cooper's convictions still would very likely have been admitted as evidence of Alphonce Little's partial motive to kill Laquanda Johnson for both the conspiracy count and the substantive counts involving her murder. If properly handled at separate trials, the conviction simply would not have been admitted as substantive evidence against appellants other than Cooper – which is also what should (and presumably would) have occurred in this trial had the trial judge not failed to catch the constitutional error that flowed from his instruction.

*Workman v. United States*, 15 A.3d 264, 266 (D.C. 2011) (quoting *Bailey v. United States*, 10 A.3d 637, 642 (D.C. 2010)).

### 2. Harmlessness

First, the trial court's instruction limited the jury's consideration of the convictions to the overt act in the conspiracy count describing the Terrence Jones murder. The potential prejudicial effect of the error was greatly reduced, if limited to that overt act. There were thirty-three overt acts listed in the conspiracy count, many of which were easily proven by substantial evidence, and only one of which needed to have been committed by a single defendant and proven beyond a reasonable doubt in order to establish the conspiracy. *Gilliam v. United States*, 80 A.3d 192, 208 (D.C. 2013). We recognize, as we have repeatedly done in the past, that jurors are presumed to follow instructions. *See Jordan v. United States*, 18 A.3d 703, 709 (D.C. 2011).

However, the overt acts listed in the conspiracy count that pertained to the Terrence Jones-Richard Queen incident largely mirrored the substantive counts of murder, assault, and robbery with which Tann and Arnette were charged relating to the same event, and of which Cooper admitted that he had been convicted. To

pretend that there was no danger that the jury could have considered Cooper's conviction as to both the conspiracy count and the substantive counts is to ignore the reality that instructions are not always effective. *See Battle v. United States*, 630 A.2d 211, 225 (D.C. 1993) (requiring "mental gymnastics" of the jury may well be "troublesome in some circumstances"); (*Oliver*) *Clark v. United States*, 593 A.2d 186, 193 (D.C. 1991) ("Jurors are, of course, presumed to obey the court's instructions, but we have recognized that this doctrine has its limits, for no juror, no matter how conscientious, can do the impossible.") (citations omitted).

Even so, after closely examining the error in the context of the evidence presented in this case, we find that it was harmless beyond a reasonable doubt under *Chapman*. First, while the trial court's instruction was flawed in that it violated *Kirby*, it did clearly inform the jury that it was not to "consider the prior conviction as establishing the truthfulness of any of the witnesses who testified in the prior trial," which is our principal concern on appellate review, and was the appellants' worry throughout the trial (and is again on appeal) with regard to the prior convictions.

More importantly, because of the nature of the testimony of the government's witnesses who testified about the Terrence Jones-Richard Queen incident, we are convinced that Cooper's convictions had no prejudicial impact on appellants Tann or Arnette. It was clear that the witnesses who testified at both trials, while generally giving testimony very damaging *as to Cooper*, had given highly contradictory, and often favorable, testimony *as to Tann and Arnette*.[51] Therefore, we see no way that the jury could have considered Cooper's convictions in a manner harmful to Tann and Arnette, other than as proof of the overt act, even had it ignored or misunderstood the credibility portion of the trial court's instruction.

---

[51] For the same reasons, the government's case was not "overwhelming" as to Tann and Arnette on the Terrence Jones-Richard Queen related offenses. Although we have found error harmless beyond a reasonable doubt where the government's evidence was otherwise "overwhelming," *see, e.g.,* (*James*) *Hill v. United States*, 858 A.2d 435, 447 (D.C. 2004), it is not necessary that the evidence be so in every case where reversal is unwarranted, if the significance of the error is sufficiently minimal so as to satisfy the constitutional standard. *See Fields v. United States*, 952 A.2d 859, 866 (D.C. 2008) (reversing where the court could not say that the constitutional error did not "contribute" to the verdict because of the materiality of the error *and* where the evidence of the defendant's guilt was not overwhelming); *McDonald v. United States*, 904 A.2d 377, 382 (D.C. 2006) (examining both the "centrality" of the error and the "less than overwhelming strength" of the government's case when performing a *Chapman* analysis).

Further bolstering our conclusion is the fact that, despite repeatedly mentioning Cooper's prior convictions in the context of explaining its charging and prosecutorial strategy, the government never argued for the guilt of any appellant on the basis of those convictions. *Paige v. United States*, 25 A.3d 74, 84 (D.C. 2011) (weighing "the fact that the prosecution in no way advanced [the conviction] as evidence of appellant's guilt" when assessing prejudice). In light of these circumstances, and in view of the fact that the jury appears to have carefully parsed through the complicated testimonial evidence – acquitting Tann and Arnette both of the most serious first-degree felony murder charges arising out of the incident – we can say that there is no "reasonable possibility that the evidence complained of might have contributed" to Tann's and Arnette's convictions. *Chapman*, 386 U.S. at 23. Instead, we are confident that "the guilty verdict[s] actually rendered in this trial [were] surely unattributable to the error." *Ellis v. United States*, 941 A.2d 1042, 1049 (D.C. 2008) (emphasis omitted) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)). For the same reasons, we find that Tann and Arnette were not "manifestly prejudiced" by their joinder throughout this trial. *See McAdoo v. United States*, 515 A.2d 412, 420 (D.C. 1986).[52]

---

[52] Appellants Harris, Rushing, and Beaver do not raise claims related to Cooper's prior conviction. However, they were similarly situated with Tann and Arnette to the extent that they were charged with the conspiracy count that listed

(continued…)

### 3. Admission Against Cooper

Cooper argues that the trial court committed evidentiary error against him by admitting his prior judgment of conviction into evidence for the truth of the matter as an exception to the rule against hearsay. We have not yet addressed the propriety of adopting Fed. R. Evid. 803 (22).[53] Because any error as to Cooper was clearly harmless, as he was not charged with the substantive offenses

---

(…continued)
the events of the Terrence Jones-Richard Queen incident as overt acts of the conspiracy. And the trial court's instruction permitted the jury to consider Cooper's prior convictions against each of them as well as Tann and Arnette. Therefore, the evidentiary error extended to their cases, and we invoke our discretion to review the impact of that error. *See, e.g., Gilliam*, 80 A.3d at 205-06; *Walker v. United States*, 982 A.2d 723, 738 (D.C. 2009). Nevertheless, any argument about prejudice to Harris, Rushing, or Beaver by way of the admission of Cooper's prior conviction is even weaker than it is for Tann and Arnette because Harris, Rushing, and Beaver were not charged with the substantive offenses arising out of the Terrence Jones-Richard Queen incident. Consequently, the error as to those appellants was clearly harmless beyond a reasonable doubt.

[53] Many state courts have had occasion to adopt the federal rule. *See, e.g., Flood v. Southland Corp.*, 616 N.E.2d 1068, 1074 (Mass. 1993) ("Substantially more than one-half of the States have adopted rules of evidence similar to Fed. R. Evid. 803 (22)."); *State v. Scarbrough*, 181 S.W.3d 650, 660 (Tenn. 2005) ("Allowing the prosecution to use a final conviction as evidence in [a criminal] trial is consistent with [the state and federal hearsay exceptions] as well as with the reality that the conviction is final and may have probative value.") (citing *United States v. Pelullo*, 14 F.3d 881, 888 (3d Cir. 1994)).

underlying the Terrence Jones-Richard Queen incident, we need not reach that question here.

**B.      Tann's Severance Argument Unrelated to Cooper's Prior Conviction**

Appellant Tann makes the separate argument, for the first time on appeal, that severance was warranted by the size of the case and the amount of "spillover" evidence that made it impossible for the jury "not to have been influenced by the sheer volume and interrelatedness of the testimony."   The argument is rooted in Tann's claim that much of the evidence of his codefendants' "bad acts" would not have been admissible had he been tried separately.

"The general rule is that defendants charged with jointly committing a crime are to be tried together."  *McAdoo*, 515 A.2d at 420.  Our decision in *Castillo-Campos* is instructive when considering Tann's claim here.  In *Castillo-Campos*, this court concluded that because all three defendants were charged with conspiracy, they were "incorrect in arguing that evidence pertaining to their co-defendants did not pertain to them or had only an improper spillover effect."  987 A.2d at 493.  We recited the established rule that "[i]n a conspiracy case, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial

court to admit evidence which even remotely tends to establish the conspiracy charged." *Id.* (quoting (*Kevin*) *Holmes v. United States*, 580 A.2d 1259, 1268 (D.C. 1990)).

Obviously, there was extensive testimony and evidence at trial presented about the 22nd Street Crew and conspiracy count as charged in the indictment; however, much of it also directly involved Tann. The evidence showed that he was among the leaders and most active members of the 22nd Street Crew. Tann was heavily involved in the illegal drug trafficking that was the bulk of the uncharged offenses elicited by the government and directly involved in three of the four murders.

As in *Castillo-Campos*, it cannot be said that the majority of other appellants' "bad acts" did not pertain to Tann or had an improper "spillover effect" on the disposition of his case. And even assuming that some of the evidence might not have been independently admissible in a separate trial against Tann, severance would not have been required. *See Johnson v. United States*, 596 A.2d 980, 987 (D.C. 1991) ("An appellant does not suffer [manifest] prejudice merely because a significant portion of the government's evidence admitted at trial is applicable only to his codefendants.") (internal quotation marks omitted).

Likewise, Tann's claim that the evidence was too unwieldy for the jury to keep straight, or that the jury likely grouped the various codefendants' actions together in its decision-making, finds no support in the record. Before opening statements and prior to deliberations, the court instructed the jury to consider each offense separately. *See Mitchell v. United States*, 985 A.2d 1125, 1137 (D.C. 2009). In addition, the jurors deliberated at length and acquitted Tann of several charges, actions which demonstrated a careful analysis of the merits of each charge. *See Castillo-Campos*, 987 A.2d at 493 (noting that the jury acquitted defendants of several charges when finding that it was able to understand and process the evidence against each codefendant). In short, Tann has provided no evidence of "manifest prejudice" that would have required severance of his case. Accordingly, the trial court did not commit error, let alone plain error.

**C. Laquanda Johnson's Statements Admitted Under a Forfeiture-by-Wrongdoing Theory**

Appellants Cooper, Beaver, and Tann claim that the trial court erred by admitting several statements by Laquanda Johnson under a forfeiture-by-wrongdoing theory. Specifically, Laquanda made a number of statements to her sister, Shaunta Armstrong, and her mother, Karen Bolling, regarding her desire for

Kyara Johnson not to testify against Cooper out of fear of retaliation by the 22nd Street Crew. Bolling testified that Laquanda reported to her the contents of a conversation that she had with Cooper in which Cooper offered her drugs and money to keep Kyara off the stand. Further, Laquanda told her mother that Tann had approached her and made veiled threats about what would happen to her if Kyara testified. Bolling also reported that Laquanda informed her that immediately following the Terrence Jones murder, Cooper had said to Laquanda, "What's up L.J.? . . . I just did a nigger up the street."

In the course of ruling on motions to suppress, the trial court found that these statements fit within the forfeiture-by-wrongdoing theory of admissibility because (1) Laquanda Johnson was murdered, in part, because appellants' coconspirator Alphonce Little wanted to eliminate Laquanda as a future government witness, (2) her killing was within the scope and in furtherance of the conspiracy, and (3) Little's action was reasonably foreseeable to all appellants, including Cooper, despite the fact that he was in jail at the time of her murder after being convicted for killing Terrence Jones.

"Under the forfeiture-by-wrongdoing doctrine, a defendant forfeits his Sixth Amendment right to be confronted by a witness against him, as well as his objection to the introduction of hearsay, if he wrongfully procured the unavailability of that witness with the purpose of preventing the witness from testifying." *Roberson*, 961 A.2d at 1095; *Devonshire v. United States*, 691 A.2d 165, 168 (D.C. 1997). Of course, this theory is not limited to situations where the defendant personally made the witness unavailable. "[I]f the defendant conspired with another to prevent the witness from testifying, forfeiture ensues whether it was the defendant himself or another co-conspirator who made the witness unavailable so long as the actor's misconduct 'was within the scope of the conspiracy and reasonably foreseeable to the defendant.'" *Roberson*, 961 A.2d at 1095 (quoting *United States v. Carson*, 455 F.3d 336, 364 (D.C. Cir. 2006)); *see also Jenkins v. United States*, 80 A.3d 978, 994-95 (D.C. 2013). We review the court's rulings on admissibility under the forfeiture-by-wrongdoing theory for abuse of discretion. *Jenkins*, 80 A.3d at 989.

We find no abuse of discretion in the trial court's handling of this issue. The same conspiracy law principles that justified the use of *Pinkerton* liability to hold Cooper accountable for the substantive offense of Laquanda Johnson's murder

similarly validated the trial court's evidentiary finding here. The evidence showed that Laquanda was murdered by Alphonce Little during the course, and in furtherance, of the conspiracy to obstruct justice and prevent witnesses such as Laquanda from testifying against the 22nd Street Crew.

Laquanda Johnson had significant value to the government as a witness, even after Cooper had been convicted of Terrence Jones's murder in 2006. As Little testified, she had information about illegal activities on 22nd Street by the 22nd Street Crew members.[54] Furthermore, Laquanda's statements about Tann's and Cooper's efforts to obstruct justice, in order to influence her sister's testimony and therefore the outcome of Cooper's trial could have been foreseeably admitted by the government in a future trial against appellants on the conspiracy and obstruction of justice offenses, with which no appellant had yet been charged as of the time of Cooper's 2006 conviction. As a consequence, Laquanda's murder was reasonably foreseeable to appellants as part of their conspiracy to inflict violence

---

[54] On cross-examination, Cooper's defense counsel attempted to elicit from Little that "the only reason" that Laquanda was killed was in retaliation for her past cooperation with the government, as opposed to any future threat to the gang. Little disagreed with the premise of Cooper's defense counsel's questions and testified that the murder was also because "[the sisters] could have been telling on somebody [in the gang], telling on any other thing."

on persons, such as government witnesses, with interests contrary to theirs. *Collins*, 73 A.3d at 982; *Roberson*, 961 A.2d at 1096-97; *Gatlin*, 925 A.2d at 600. Therefore, we find no abuse of discretion by the trial court.[55]

## D. The Trial Court's Finding of a Predicate Conspiracy

Tann and Arnette dispute the validity of the trial court's determination that a predicate conspiracy had been established to justify admission of coconspirator

---

[55] Cooper's brief makes the related argument that another of Laquanda Johnson's statements admitted into evidence under the forfeiture-by-wrongdoing theory was inadmissible because it was double hearsay. Laquanda told her sister, Shaunta Armstrong, that 22nd Street Crew member Eric Dreher stated to Laquanda that she should "get Kyara off of 22nd Street and never come back" because Cooper had "goons out there" looking for her. Although Cooper is correct that this testimony by Shaunta was double hearsay, there were hearsay exceptions at both levels. As discussed *supra*, Laquanda's statements to Shaunta were admissible because of forfeiture-by-wrongdoing, which acts as a waiver to both Confrontation Clause and hearsay objections to admissibility. Dreher's statements to Laquanda were admissible under the coconspirator statement exception to the hearsay rule. As the trial judge found, there was sufficient independent, nonhearsay evidence presented that Dreher was a member of the 22nd Street Crew and a member of the conspiracy charged in this case. This evidence came in the form of testimony by former gang members Andre McDuffie, Donald Matthews, Devin Evans, Travis Honesty, and Alphonce Little that Dreher was a high-ranking gang member who recruited appellant Harris and others to be members of the crew, sold drugs with other 22nd Street Crew members, and was influential in the gang because of his willingness to engage in "acts of violence" on behalf of the crew. Additionally, Dreher's statements could have been reasonably viewed as furthering the conspiracy's goal of obstruction of justice by wrongfully discouraging Laquanda from testifying at Cooper's 2006 trial. *See Butler v. United States*, 481 A.2d 431, 439 (D.C. 1984).

statements in furtherance of that conspiracy. At the outset of trial, given the number of (charged and uncharged) coconspirators that the government alleged to have participated in the activities of the 22nd Street Crew and the charged conspiracy, the trial judge was concerned, with justification, about tightly controlling the admission of coconspirator statements. *See Butler*, 481 A.2d at 439 (holding the trial judge responsible for determining the admissibility of coconspirators' statements in order to avoid "the danger that the jury might convict on the basis of these statements without first dealing with the admissibility question").

In order to better monitor the showing of a predicate conspiracy, the court ordered the government to "bifurcate" its case-in-chief by opening with a "conspiracy" phase, followed by a ruling from the court as to whether the government had met its burden of establishing a predicate conspiracy and the identities of the coconspirators, before the government moved into a "substantive" phase of its case wherein coconspirator statements could be admitted as evidence. After hearing from the gang "insiders" previously discussed (Andre McDuffie, Donald Matthews, Devin Evans, and Alphonce Little), and police personnel who testified about illegal drug activity involving appellants, the court found that the

existence of a predicate conspiracy had been established for purposes of the hearsay issue.

Specifically, the trial court found:

> [There] was a conspiracy, among other things, to purchase, package and [resell] illegal narcotics, to use weapons and violence to safeguard the conspiracy and retaliate against those who are not members of the conspiracy[] and who had attempted to invade the conspiracy's turf, and to promote the reputation of the conspiracy and its members in the 22nd Street neighborhood. [56]

---

[56] The trial judge found the existence of a predicate conspiracy that was similar, but not identical to the one charged in Count 1 of the indictment, i.e., that appellants and others agreed "to obstruct justice and to assault and kill anyone whose interests were contrary to those of the defendants and their associates." Instead, the trial judge appears to have found, for purposes of the evidentiary issue, that the goals of the predicate conspiracy tracked closely with the "Objects of the Conspiracy" as listed on the second page of the superseding indictment: to "retaliate for acts of violence perpetrated against the conspiracy and its members . . . protect illicit profits generated by the involvement of the conspiracy's members and associates in acts involving . . . trafficking in controlled substances . . . and . . . protect the conspiracy and its members . . . from conviction for criminal charges, and to retaliate against anyone who assisted law enforcement officials in the investigation into and prosecution of members of the conspiracy and their associates." The trial court did not err in taking this approach to his findings. "The conspiracy that forms the basis for admitting coconspirators' statements need not be the same conspiracy for which the defendant is indicted." *United States v. Acre*, 997 F.2d 1123, 1128 (5th Cir. 1993). Indeed, statements in furtherance of a conspiracy may be admissible where there is no conspiracy charged in the indictment at all. *United States v. Ayotte*, 741 F.2d 865, 869 (6th Cir. 1984).

"The trial court's decision to admit coconspirator testimony as nonhearsay will be upheld absent an abuse of discretion." *Harrison v. United States*, 76 A.3d 826, 834 (D.C. 2013). "[A] coconspirator's out-of-court assertions may be admitted for their truth only if the judge finds it more likely than not that (1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the coconspirator made the statements during the course of and in furtherance of the conspiracy." *Jenkins*, 80 A.3d at 989-90. Appellants challenge the trial court's ruling as to the first two prongs of the coconspirator statement rule.

Because the court's ruling came before the government put on its "substantive" case, the judge did not have the benefit of the facts that went to the murder charges.[57] Nevertheless, the judge made detailed findings as to each appellant and his membership in a conspiracy that are supported by the facts and not shown by Tann or Arnette to be clearly erroneous. *Id.* at 989 (accepting the factual findings of the trial court unless they are clearly erroneous when reviewing under an abuse of discretion standard). The trial judge found that the goals of the conspirators "were accomplished through the establishment of [and] adherence to

---

[57] In our opinion, this evidence would have significantly strengthened an already well-reasoned ruling.

and enforcement of rules of the group by both threats and violence." The judge's findings sufficiently established the associational connection between the different appellants, and their joint support of the drug trafficking activities of the 22nd Street Crew, including the maintenance of its base of operations through acts of violence, such that there was no abuse of discretion in his ruling on the existence of a predicate conspiracy.

### E. Rap Lyrics and Beaver's Webpage

At trial, the government introduced the following evidence against appellants: (1) a rap CD containing songs performed by Rushing and an unindicted coconspirator, Michael Smith; (2) rap lyrics written by Tann which were found and read to the jury by his wife, Tracey; and (3) the contents of a webpage that had been created and posted by Beaver. The court ruled that the statements contained within these items were made in furtherance of a conspiracy and admissible against all appellants. Appellants now appeal that ruling.

After the court required the government to make extensive redactions to the material on the rap CD, the government played approximately twelve minutes of the Rushing-Smith songs. According to testimony, the songs were being sold and played openly on 22nd Street. The song lyrics made reference to "The Deuce,"

"Deuce Mob," and the "Young Gunz," all names affiliated with the 22nd Street Crew. The lyrics also referred to the gang nicknames of Rushing, Beaver, Cooper, and Arnette. Furthermore, the lyrics tended to glorify criminal activities that were part of the lifestyle of the 22nd Street Crew members, including drug dealing, killing government informants, and killing rivals.

The government also called Tann's wife, Tracey, to give evidence about rap lyrics that were written by Tann. According to Tracey, the lyrics were part of a rap project for which Tann had commercial aspirations. Tann's lyrics included references to the 22nd Street Crew's nickname "D.E.U.C.E.," drug dealing, and violent crime against "snitches." Tann's lyrics also arguably made specific references to the details of the Leslie Jones murder that were relied on by the government in its closing argument as evidence of his culpability.[58]

---

[58] Tann's lyrics read: "Screamin' D.E.U.C.E. Allday Southside[.] I hail from Death Valley[.] Bang my first pistol deep in dog Alley." In closing argument, the government argued that by these words Tann described the Leslie Jones murder where he murdered Jones with a gun and then ran down an alleyway near 22nd Street known as "Dog Alley." Tyrone Curry, a government witness, testified that he saw a man who looked like Tann running from the scene of the Leslie Jones shooting "toward the dog alley on 23rd Street."

Finally, the government put on evidence of a "Black Planet" webpage that was stipulated to have been created and published by Beaver. The webpage featured pictures of Beaver making hand signs affiliated with the 22nd Street Crew and a message from Beaver describing himself as "DEUCEDEUCEBANGA." Beaver implied on the webpage that he was ready to commit violence against any "dudes" that he found to be "snitchin."

Appellants attack the admission of the rap lyrics sung by Rushing and Michael Smith on several grounds: (1) there was insufficient evidence that either Smith or Rushing authored the lyrics; (2) Smith was not a proven coconspirator, and therefore his performance and singing of the song lyrics could not have reflected statements made in the course of the conspiracy; (3) the lyrics to the songs themselves were not in furtherance of the conspiracy; and (4) even if otherwise admissible, the song lyrics were unfairly prejudicial. Appellants' primary complaint about Tann's lyrics and Beaver's webpage is that the statements were not made in furtherance of the conspiracy.

### 1. Authorship of the Rap Lyrics on the CD

"A party may make an admission by adopting or acquiescing in the statement of another. Whether a party has adopted the statement of another is a

preliminary question of fact for the trial judge, which is determined by considering the context and the surrounding circumstances of the claimed adoption." *Harris v. United States*, 834 A.2d 106, 116-17 (D.C. 2003) (citations, internal quotation marks, and alterations omitted). While this rule "does not require an explicit statement of adoption," it does require "some manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements." *Bridges v. Clark*, 59 A.3d 978, 986 (D.C. 2013).

Here, the "surrounding circumstances of the claimed adoption" are that Rushing and Michael Smith sang the lyrics to rap songs for the purpose of recording a CD that was available for purchase and played publicly. There was no evidence that Smith or Rushing actually wrote or produced the lyrics to the songs.

Appellants argue that the lyrics were created solely for "artistic, entertainment purposes," and not as a truthful recitation of events on 22nd Street or the attitudes of either the producers or singers. While certainly these songs may have been a form of artistic entertainment to persons listening on 22nd Street, some entertainment is fictional and some is intended to be a retelling of true and actual events. And lyrics to any song may well be intended to relay the truth in the

eyes of the singer. As the government points out, in these songs, "the lyrics were primarily in the first-person and described individuals, places, and activities specifically related to the 22nd Street Crew." We find that these facts were sufficient foundation upon which to establish that "there was an unambiguous assent" by Michael Smith and Rushing to the statements contained in the lyrics that they sang. *See Blackson v. United States*, 979 A.2d 1, 7 (D.C. 2009).

## 2. Whether Michael Smith was a Coconspirator

Michael Smith was identified as a member of the 22nd Street Crew by a number of the government's witnesses: Donald Matthews, Devin Evans, Alphonce Little, Tracey Tann, Travis Honesty, and Darryl Travers. Honesty and Travers testified that Smith was a "hustler" who sold narcotics on 22nd Street from 2001 until 2007 or 2008. This testimony reasonably established Smith's membership in a conspiracy, at a minimum, among members of the 22nd Street Crew to sell illegal narcotics. Matthews's testimony that Smith was part of a group of men who were "coming up" in the organization, no later than 2002, with other crew members such as Beaver, also established a reasonable basis from which the trial judge could infer Smith's agreement with and support of the more violent aspects of criminal activity within the 22nd Street Crew. The testimony of the former gang members acting as government witnesses was that members increased

their influence in the organization by committing acts of violence against rivals, snitches, and other persons at odds with the interests of the organization.

Once the government showed that Michael Smith was a member of the predicate conspiracy for purposes of the hearsay exception, it was not required to show that he was still a member of the conspiracy later in time. *See United States v. (Rodney) Moore,* 651 F.3d 30, 90 (D.C. Cir. 2011) ("[O]nce a defendant becomes a member of a conspiracy, he remains a member until he affirmatively withdraws or the conspiracy ends. Therefore, once the government proves that a defendant was a member of an ongoing conspiracy, it has proven the defendant's continuous membership in that conspiracy unless and until the defendant withdraws.") (citation omitted). There was no evidence of withdrawal by Smith. Consequently, there was sufficient evidence reasonably to show that Smith sang the rap lyrics on the CD during his involvement in the predicate conspiracy.

### 3. Statements in Furtherance of the Conspiracy

Appellants' third argument is that "the lyrics purportedly authored by Beaver and Tann and those sung by Rushing and Michael Smith were inadmissible because there is no evidence that they were written or sung in furtherance of the charged conspiracy." In countering this argument, the government emphasizes

that the statements in the rap songs, in Tann's lyrics, and on Beaver's webpage, made reference to the 22nd Street Crew, the members of 22nd Street Crew who were part of the charged conspiracy, and "the structure of the conspiracy and the importance of [the] members' continued participation and loyalty." The core of the government's "in furtherance" argument is:

> [G]iven that (1) the CD was sold on 22nd Street and was listened to by conspirators and non-conspirators alike, (2) the web page was open to public view on the internet, and (3) Tann had aspired to produce a commercial rap CD with his lyrics, the statements at issue could be viewed as promoting the reputation and stature of the conspiracy in the community by spreading the conspiracy's message of violence and intolerance for those who would challenge it. [Citations and alterations omitted.]

We find this line of argument persuasive and supported by case law. In essence, one message announced by the coconspirators' statements was internal and one was external; the internal message furthered the conspiracy by boosting the morale and reputation of the coconspirators through the glorification of its activities, while the external message reduced the likelihood of interference by outsiders with the coconspirators' affairs.

We held in (*Brian*) *Williams v. United States*, 655 A.2d 310, 314 (D.C. 1995), that if a statement "can reasonably be interpreted as encouraging [another person] to advance the conspiracy or serve to enhance the person's usefulness to the conspiracy, then the statement is in furtherance of the conspiracy and may be admitted." (internal quotation marks omitted); *see also Carson*, 455 F.3d at 366-67 ("[I]f the statements can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy, then the statements further the conspiracy and are admissible. Such statements include those that . . . motivate a co[-]conspirator's continued participation.") (internal quotation marks and citations omitted). Furthermore, numerous courts have held that threats and warnings by coconspirators intending to send a message to potential witnesses that they would be penalized for cooperating with the government are admissible under the coconspirator statement rule. *See, e.g., United States v. Westmoreland*, 312 F.3d 302, 309-10 (7th Cir. 2002) (statements admissible because in making them the coconspirators intended to preserve the conspiracy by frightening potential witnesses). Similarly, we find that the statements (contained in both the internal and external message of appellants' lyrics) made by the coconspirators and introduced into evidence advanced, and were in furtherance of, the conspiracy.

## 4. Unfair Prejudice

Appellants' final contention is that the rap lyrics and songs were "substantially more prejudicial than probative" because the content was particularly shocking and violent. This court has never discussed the prejudicial effect of violent rap lyrics, though other courts have. *See, e.g.*, *United States v. Gamory*, 635 F.3d 480, 493 (11th Cir. 2011) (concluding that the playing of a rap video at trial was "heavily prejudicial" because "[t]he lyrics presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle" while "not clearly probative of [the defendant's] guilt"); *State v. Cheeseboro*, 552 S.E.2d 300, 313 (S.C. 2001) (finding that the "minimal probative value" of a document containing the defendant's rap lyrics was "far outweighed by its unfair prejudicial impact as evidence of appellant's bad character").

Keeping in mind that "rap lyrics may employ metaphor, exaggeration, and other artistic devices [] and can involve abstract representations of events or ubiquitous storylines," (*Deyundrea*) *Holmes v. State*, 306 P.3d 415, 419 (Nev.

2013) (internal quotation marks and citation omitted), we must consider the probative value of the evidence. In other jurisdictions, this question has turned on the specificity with which the lyrics describe the facts surrounding the offense(s) charged.[59] Similarly, we endeavor to determine to what extent the rap lyrics (as well as Beaver's webpage) should be considered "autobiographical statements of acts relevant to the case." *Stuckey*, 253 F. App'x at 483. This is so as to avoid the undue risk of the statements "being misunderstood or misused as criminal propensity or bad act evidence." (*Deyundrea*) *Holmes*, 306 P.3d at 418 (internal quotation marks omitted).

---

[59] *Compare id.* at 417-20 (no error where, in the defendant-authored rap lyrics at issue, the defendant described "jack[ing]" someone for their necklace in a parking lot while wearing a ski mask, and the defendant was accused of accosting two men in a parking lot and stealing one man's chain necklace while wearing a ski mask), *and United States v. Stuckey*, 253 F. App'x 468, 482-83 (6th Cir. 2007) (unpublished) (no error where the defendant rapped that he "kills 'snitches,' fills their bodies with holes, wraps them in blankets, and dumps them in the road" and the defendant was accused of shooting a man, wrapping his body in blankets, and dumping it in an alley), *with Cheeseboro*, 552 S.E.2d at 313 (error where references to leaving bodies in a pool of blood without fingerprints were "too vague in context to support the admission" of the rap lyrics because the lyrics contained "general references glorifying violence" only); *see also State v. Hanson*, 731 P.2d 1140, 1144 n.7 (Wash. Ct. App. 1987) (error where the defendant's fictional writings were not logically relevant when "[t]here was no attempt to show . . . that [the defendant] wrote about an incident so similar to the crime charged").

Here, the statements were autobiographical in that they discussed the 22nd Street Crew and its membership, living by the code required by the gang, selling drugs, killing snitches, and killing rivals. Given that appellants' conspiracy charge was hotly contested by each of them, the probative value of the content of this evidence was substantial. Considering also, with regard to the lyrics on the CD, that the trial court carefully reviewed each track of the CD to avoid an unfairly prejudicial effect (such that 45 minutes of songs were reduced by more than 30 minutes and some tracks were eliminated in their entirety), we believe that the court did not abuse its discretion when it found that the prejudicial effect of the evidence did not *substantially outweigh* its probative value.[60] *See Legette v. United States*, 69 A.3d 373, 388-89 (D.C. 2013). Therefore, we reject appellants' claims.

### F. Tann's Outburst

Appellants Harris and Arnette appeal the denial of their motions for a mistrial based on an "outburst" by appellant Tann following his verdict. Approximately two weeks after the beginning of deliberations, the jury returned

---

[60] While there is no abuse of discretion on this record, we could easily envision a case where lyrics, poetry, or other statements in a form traditionally understood to be artistic expression were not sufficiently specific to the charged crime so as to have such important probative value. Evidence that doubles as a type of art will often be a confusing mixture of truth and fabrication. Therefore, trial courts must very carefully scrutinize such materials and statements for unfair prejudice.

full verdicts against appellants Rushing and Beaver. The jury announced its full verdict against appellant Cooper the following day. Eight days later, the jury returned a partial verdict against Tann, including verdicts on his murder charges. At the same time, it announced partial verdicts against the remaining two appellants, Harris and Arnette. The jury found Harris and Arnette guilty of conspiracy and told the court that deliberations were continuing on their remaining counts.

Once Tann heard that the jury convicted him of the three murders with which he was charged, Tann stood up and exclaimed:

> I don't see how I can get found guilty, and what type of court is this? I wasn't even there. . . . [N]owhere near . . . . I get found guilty and I'm innocent. God going to challenge y'all for this. I'll see y'all in heaven. . . . I'm innocent. How the fuck I get found guilty? . . . That's fucking – that's crazy.

While Tann was making these statements, the court attempted unsuccessfully to call for order. The marshals escorted Tann out of the courtroom and into the holding cell. As the judge was dismissing the jurors, he told them that they should understand that the courtroom could be an emotional place, and they were not to let anything that had just happened impact their remaining

deliberations. Harris and Arnette immediately moved for a mistrial arguing that Tann's outburst would prejudice the jury against them, especially since the jury had already found Harris and Arnette guilty of a conspiracy rooted in obstruction of justice and violence against participants in the legal process. The trial court denied their motions.

The following day, while the jury was in deliberations, the court held a more extensive hearing on the facts surrounding Tann's outburst. The court indicated that it had observed Tann stand up, speak loudly using profanity, and untuck his shirt while loosening his tie. Prior to escorting Tann out of the courtroom, one marshal pointed his Taser at Tann but did not fire. The court found that Tann's conduct was not violent or threatening to the jury despite his reference to the afterlife. Further, the court observed no reaction from the jury that constituted significant concern. Throughout the incident, Arnette and Harris remained seated and did not react.

At the motions hearing, both Harris and Arnette reiterated their concerns about prejudice, and Harris requested that the jurors be made available for *voir dire*. Arnette specifically declined to request *voir dire*. The court denied Harris's

request reasoning that the danger of *voir dire* was that it might create more problems than it solved by triggering safety concerns in the jurors that the court did not believe that they had.

Several days later, the jury returned the remainder of its verdicts involving Tann. The jury acquitted him of several charges and convicted him of several others. In subsequent days, the jury returned separate verdicts against Harris and Arnette. Unlike Harris, Arnette was acquitted of a number of the charges against him.

In a post-trial motion for a new trial, Harris's counsel alleged that she spoke with jurors after all of the verdicts had been rendered. According to the motion, jurors stated that they believed Tann made a death threat against the jury in the course of his outburst and that they otherwise observed Tann consistently threaten witnesses throughout the course of the trial. In response, the government noted that not all of the jurors remained to speak with the attorneys and not all of those that did speak expressed the same view. While a few referred to a "death threat," the jurors were not worried – some chuckled when discussing Tann's statement and "a number of jurors" expressly stated that they were not concerned.

Furthermore, none of the jurors indicated that they associated Tann's statements with the other defendants.

This court reviews the denial of a motion for a mistrial and the trial court's investigation into jury exposure to unadmitted evidence for an abuse of discretion. *Ransom v. United States*, 932 A.2d 510, 517 (D.C. 2007); *Al-Mahdi v. United States*, 867 A.2d 1011, 1018-20 (D.C. 2005). A jury's exposure to unadmitted evidence implicates a defendant's Sixth Amendment right to an impartial jury. *See Medrano-Quiroz v. United States*, 705 A.2d 642, 649 (D.C. 1997).

"Where, as here, the impartiality of [the jury] has been plausibly called into question, it is the responsibility of the trial judge to hold a hearing to determine whether the allegation of bias has merit." *Id.* Upon such a claim, "it is the government's burden to demonstrate that the [jury's] contact with extraneous information was harmless or non-prejudicial." (*David*) *Hill v. United States*, 622 A.2d 680, 684 (D.C. 1993). "[T]he evidence of record must justify a high degree of confidence that the likelihood of juror partiality has been rebutted." *Al-Mahdi*, 867 A.2d at 1019. Otherwise, "the court is obliged to declare a mistrial" or grant other adequate relief. *Parker v. United States*, 757 A.2d 1280, 1287 (D.C. 2000).

Although a hearing is required, "the extent and type of the trial court's investigation into the improper contact are confided to the court's discretion and reviewable only for abuse." *Leeper v. United States*, 579 A.2d 695, 699 (D.C. 1990). There is "no per se rule that individual questioning of each juror is always required," and "the trial judge has broad discretion to fix the exact procedures by balancing the need to make a sufficient inquiry against the concern that the inquiry not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence." *Al-Mahdi*, 867 A.2d at 1019 n.13 (citations and alterations omitted).

Harris and Arnette argue that the jurors might have viewed Tann's statements as a threat against them and paired that statement with the government's allegations that the coconspirators had agreed to retaliate against anyone who undermined the conspiracy. In doing so, appellants argue that the jury might have considered Tann's outburst as direct evidence of their guilt of the violent offenses (associated with the Terrence Jones-Richard Queen and James Taylor-Bernard Mackey incidents) of which they had not yet been convicted. Furthermore, the jury may have feared that Harris and Arnette, if acquitted, would carry out Tann's threat against them.

Even taking the jury's disputed post-trial statements for all they are worth,[61] the trial court did not abuse its discretion in denying the motion for a mistrial without questioning the jurors. Tann's statements did not expressly implicate his codefendants in any way; the trial court gave a prompt curative instruction, even taking care to do so *sua sponte* to avoid the jury linking Tann's comments to either of his codefendants;[62] and the jury did not contact the judge about the outburst or register any sort of anxiety, even though it had previously demonstrated its willingness to reach out to the court with questions and concerns. Finally, the court properly considered the risk that further investigation would turn an insignificant matter in the jurors' minds into a significant one – a possibility that

---

[61] The rule regarding juror's post-trial statements is that "inquiry [is allowed] into the existence of conditions or the occurrence of events," but not "inquiry into the thought processes of the jurors." *Fortune v. United States*, 65 A.3d 75, 83 (D.C. 2013). Applied to this case, the *Fortune* rule means that the jurors' statements may be used to challenge the trial judge's determination that Tann's statements did not constitute a threatening or violent event, but not to show the effect Tann's statements had on the jury's deliberative process.

[62] Out of the jury's presence, the court added that it deliberately gave its instruction "in a way that didn't look like it was coming as a request from counsel, but from me."

was well within his discretion to take into account.[63]  *Al-Mahdi*, 867 A.2d at 1019 n.13.

In arguing otherwise, appellants rely on several of this court's decisions, none availing.  The cases they cite involved allegations of juror bias that turned on facts that the trial court had no way of learning about without questioning the jurors.  *See Al-Mahdi*, 867 A.2d at 1021 (juror contact with third party), *Ransom*, 932 A.2d at 515-20 (extraneous information in jury room); *Parker*, 757 A.2d at 1285-87 (juror contact with third party); *Artisst v. United States*, 554 A.2d 327, 330-32 (D.C. 1989) (juror dishonesty in pretrial *voir dire* about acquaintance with defendant).  It is crucial here, by contrast, that the trial judge actually observed Tann's outburst and viewed its effect (or lack thereof) on the jury when determining the correct course of action.  We find no abuse of discretion in his choice.

---

[63]  Notably, Arnette's counsel stated that he agreed with the trial court's decision to not *voir dire* the jury for the reasons articulated by the court in its ruling.

**IX. Pretrial and Trial Issues Unrelated to the Conspiracy or Joint Trial**

    **A.  Evidentiary Issues**

        **1.  Search of Beaver's Jail Cell**

Approximately one year before trial in this case was about to begin, Cooper and Beaver met Freddie Lee Bailey, another prison inmate, while the three were in a holding cell.  Cooper asked Bailey whether he was housed on the same floor as several of the known government cooperators in this case.  Cooper further inquired whether Bailey would be interested in assaulting the government's witnesses in various ways.   Bailey testified that he refused Cooper's solicitation.

Subsequently, because Beaver was temporarily a government cooperator, he was transferred to a part of the jail where other government cooperators, including Freddie Lee Bailey, were housed.  Beaver remained there even after his cooperation ended and proceedings in this case started.  While this trial was ongoing, Beaver sent a letter to Bailey stating that his temporary cooperation was merely for purposes of disrupting the government's case.  Bailey reported this information to prison officials, which resulted in a search of Beaver's jail cell and the seizure of a second letter from his trash can.  The second letter contained remarks about Beaver's regrets that he had not "crushed" Alphonce Little for being

a government cooperator. The government admitted portions of both letters at trial.

During a suppression hearing, the details of the search were fleshed out. Beaver's first letter to Freddie Lee Bailey had been given to a prison official, Investigator Alphonso Ashmeade. On December 23, 2008, Ashmeade talked to Detective Jeffrey Mayberry, one of the detectives working with the prosecution on this case, about the letter and other threats that had been made by Cooper and Beaver against Bailey. When the prosecution team arrived to meet Bailey the following day, Ashmeade showed Mayberry and others the first letter written by Beaver. Ashmeade told Mayberry that he would search Beaver's cell for security reasons pursuant to his authority as a prison official. Mayberry requested that if a prison cell search was to be conducted that any items taken by prison officials from Beaver or Cooper's cell be held pending application for a warrant. According to Mayberry, on the afternoon of December 24, 2008, Ashmeade informed him that he conducted a search and took various items from Beaver's cell. Mayberry reiterated that Ashmeade should hold on to the items pending a warrant. Several days later, detectives working with the prosecution team obtained a search warrant and ultimately came into possession of the letter that was in Beaver's trash can.

Beaver argued before the trial court, and does so again on appeal, that the search by prison officials resulting in the seizure of the second letter about "crushing" Alphonce Little was in violation of his Fourth Amendment rights. As a factual matter, he contends that the warrantless search occurred not on December 23rd, but on December 24th, and at the direction of the prosecution. For support, Beaver points to inconsistencies between the suppression hearing testimonies of Investigator Ashmeade and Detective Mayberry. The primary inconsistency involved the date of the search. Ashmeade testified that he conducted the "security" search on the 23rd. This timeline did not match up with the testimony of Mayberry, who believed that the search occurred on December 24th, after the first letter was brought to the attention of the prosecution. Beaver also makes much of the fact that Ashmeade stated that he conducted the search for safety purposes, but made no effort to remove Freddie Lee Bailey from his cell block where he was on the same floor as Beaver and Cooper. Based on these facts, Beaver extrapolates that Ashmeade conducted a warrantless evidentiary search after meeting with the prosecution team on December 24th and at its direction.

However, both Detective Mayberry and Investigator Ashmeade testified that the search was conducted by prison officials without any prompting by prosecution representatives. The trial court found that regardless of the date of the search, and any other inconsistencies in the testimony, there was no affirmative evidence to the contrary. Moreover, the court found that prison officials had a basis to search the cell because they had reason to believe that there was a danger to government witnesses then housed in the jail.

"Our review of a trial court's denial of a motion to suppress is limited." *Joseph v. United States*, 926 A.2d 1156, 1160 (D.C. 2007). "Our standard of review for a trial court's ruling on a motion to suppress tangible evidence requires that the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court's ruling." (*Robert*) *Howard v. United States*, 929 A.2d 839, 844 (D.C. 2006) (alteration omitted). "Essentially, our role is to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." *Kaliku v. United States*, 994 A.2d 765, 780 (D.C. 2010) (internal quotation marks omitted).

In *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984), the Supreme Court held that prisoners were not protected by the Fourth Amendment against unreasonable

searches of their prison cells. The Court concluded that "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Id.* at 526. Further, the Court determined that "society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." *Id.* at 528. However, in *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986), while acknowledging the holding in *Hudson*, the Second Circuit held that in the narrow instance where a prison cell search was initiated by the prosecution solely to obtain evidence, a pretrial detainee retained a limited Fourth Amendment right to privacy within his cell "sufficient to challenge the investigatory search ordered by the prosecutor." *Id*. at 24.

We need not decide whether to adopt *Cohen*'s reasoning because we hold that the trial court did not abuse its discretion in making the factual finding that the search of Beaver's jail cell was not conducted at the direction of the prosecution, and therefore, was necessarily not a search for purposes of the Fourth Amendment. *See United States v. Hogan*, 539 F.3d 916, 923-24 (8th Cir. 2008) ("Even if this court were to adopt [*Cohen*], it does not apply here, as the search of [the

defendant's] cell was instigated by jail officials for security reasons and was not intended solely to bolster the prosecution's case.").

As the trial court correctly noted, regardless of whether the search occurred on December 23rd or 24th, the dispositive fact is that both Detective Mayberry and Investigator Ashmeade consistently testified that the search was conducted by prison officials, without any input or prompt from the prosecution team. Ashmeade also explicitly stated that the search was conducted in response to legitimate concerns regarding Freddie Lee Bailey's safety.

On appeal, Beaver merely speculates that the inconsistencies between Detective Mayberry and Investigator Ashmeade's testimony, and the prison's failure to move Bailey from his cell, proved that the search was conducted at the prosecution's behest and that Ashmeade sought to cover up his complicity in the scheme after the fact. We will not overturn the trial court's findings based on such conjecture. The trial court was free to credit portions of either witness's testimony while discounting any inconsistencies. *See Bragdon v. United States*, 668 A.2d 403, 406 (D.C. 1995) (per curiam); *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the trier of

fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."). Accordingly, Beaver has no Fourth Amendment grounds upon which to challenge the prison search of his cell that led to the discovery of the second letter. Thus, the trial court did not err in denying his motion to suppress.

## 2. Evidence of Uncharged Misconduct, Incarceration, and Fear Testimony

### a. Testimony of Andre McDuffie

Cooper, Tann, Rushing, Harris, and Arnette make claims related to the admission of "other crimes" evidence by the government. Prior to trial, the government informed the trial court of its intent to put on evidence of criminal activity outside the time frame of the charged conspiracy in order to show the background to the conspiracy and the associational relationship among appellants and their coconspirators. The trial court, after reviewing cases from other jurisdictions, particularly *United States v. Mathis*, 216 F.3d 18 (D.C. Cir. 2000) and *United States v. Lokey*, 945 F.2d 825 (5th Cir. 1991), ruled that it would permit the government to elicit this type of evidence. Based on the government's representations, the court found that there was a relevant purpose to demonstrating

the joint criminal activities of appellants and others, with minimal risk of prejudice.

The government's vehicle for this type of evidence was several "insider" witnesses, who we have mentioned throughout this opinion, with long-standing ties to the 22nd Street Crew. Andre McDuffie was one of these witnesses and the first witness called by the government in this case. During his testimony, the government asked him whether he knew Rushing. McDuffie said that he did and that he was responsible for Rushing's training in the 1990s when Rushing was a new gang member. Then, McDuffie testified that he taught Rushing a number of gang-related skills, including "how to kill."

Several appellants objected to this "how to kill" testimony at a break in Andre McDuffie's examination and eventually moved for a mistrial. Appellants' chief objection was that the inference to be drawn from this testimony was that in order to "get in" to the 22nd Street Crew, a gang member had to kill or otherwise commit serious acts of violence. Therefore, all appellants, who had been labeled by the government as 22nd Street Crew members, must have committed killings unrelated to the charged murders. The trial court denied appellants' motions for

mistrial. However, it agreed that the testimony was unfairly prejudicial and ordered the testimony stricken. The judge then gave the following curative instruction:

> Mr. McDuffie testified that with regard to Mr. Rushing, he said he saw him every day, and then he said he sold drugs every day. This was long before this conspiracy ever began. And he also said at another point that he taught Mr. Rushing how to kill, how to survive. Now, I'm striking that testimony. When I strike testimony, that means you are told to disregard it. You can't consider it, you can't think about it as you deliberate in this case. And particularly with regard to the testimony about allegedly teaching Mr. Rushing to kill, both the government and the defense agree that they know of no evidence and they have never been aware of any evidence that this witness ever taught Mr. Rushing how to kill. So, it is extremely important that you strike it. There is no known basis for this testimony, and consequently you are not to consider it in any way, and you are not to discuss it when it comes time to deliberate in this case.

Appellants now appeal the denial of their motions for mistrial.

"We review the decision to deny a mistrial motion for abuse of discretion." (*Ronald*) *Wynn v. United States*, 80 A.3d 211, 219 (D.C. 2013). "This court will not overturn the trial court's decision [to deny a mistrial motion] unless it appears unreasonable, irrational, or unfair, or unless the situation is so extreme that the

failure to reverse would result in a miscarriage of justice." *Lee v. United States*, 562 A.2d 1202, 1204 (D.C. 1989) (citation omitted).

"In a conspiracy prosecution, the government is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" *Mathis*, 216 F.3d at 26 (quoting *United States v.* (*Zolton*) *Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000)). Moreover, "wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged." *Castillo-Campos*, 987 A.2d at 493.

Even if the evidence of other crimes is admissible for purposes of establishing the conspiracy, "the next question is whether [its] probative value is substantially outweighed by undue prejudice." *Lokey*, 945 F.2d at 835; *United States v. Morton*, 50 A.3d 476, 482 (D.C. 2012) ("[E]ven if evidence falls outside

*Drew*[64] or within a *Drew* exception and thus is otherwise admissible, it must be excluded if the trial court determines that its probative value is substantially outweighed by the danger of unfair prejudice.") (internal quotation marks and alteration omitted). The trial court, while apparently finding that Andre McDuffie's testimony may have been relevant to the legitimate prosecutorial goal of establishing the associational relationship between the members of the conspiracy, found that the probative value of the "how to kill" testimony was substantially outweighed by the danger of unfair prejudice.[65]   "[W]e owe a great deal of deference" to the trial court on such a finding.  *Jenkins*, 80 A.3d at 999.

---

[64]   *Drew v. United* States, 331 F.2d 85 (D.C. Cir. 1964) (holding that evidence of other crimes is inadmissible to prove a defendant's disposition to commit the crime charged but may be admissible for other legitimate non-disposition purposes).

[65]   We note that the prejudice to appellants seems to have been fairly significantly lessened by the context of Andre McDuffie's testimony.  First, McDuffie testified that he "taught" Rushing to kill – not that he participated in joint killings with Rushing or was aware of any evidence that Rushing practiced this part of McDuffie's teachings.  Second, the strongest inference to be drawn from McDuffie's testimony was that when the "little locs" were taught the skills of gang membership, it was the older members only that performed acts of violence. According to McDuffie, the "little locs" appear to have learned by observation:  "If we had to go make a move on somebody, so far as [to] inflict the act of violence, we would take [the little locs] with us and let them see how we do it."

We owe equally great deference to the trial court when reviewing its selection of a remedial measure responsive to such problematic testimony. *See United States v. McLendon*, 378 F.3d 1109, 1113 (D.C. Cir. 2004) ("[W]e should not lose sight of the fact that the *same* judge who initially weighed the [Fed. R. Evid. 403] balance against admission of the evidence, subsequently determined that the [evidence] did not warrant a mistrial."). "A mistrial is a severe remedy – a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Najafi v. United States*, 886 A.2d 103, 107 (D.C. 2005); *see also* (*Richard*) *Clark v. United States*, 639 A.2d 76, 78 (D.C. 1993) ("Assuming, for the sake of argument, that [the evidence] constituted 'other crimes' evidence, we conclude that [it] did not result in prejudice so great as to render the trial court's refusal to grant a mistrial an abuse of discretion.").

Here, the offending testimony was a very brief reference at the outset of an extremely lengthy trial. *Cf. Veney v. United States*, 936 A.2d 811, 828-29 (D.C. 2007) (other crimes evidence harmless, in part, because objectionable testimony heard on the first day of a three-day trial). The reference was not repeated by the government, or its witnesses, and not argued in closing. And the trial court gave a very strong, and almost immediate, curative instruction stating that there was "no

evidence" that Andre McDuffie had taught Rushing to kill. *See McLendon*, 378 F.3d at 1114 (no abuse of discretion in denying a motion for mistrial based on exposure of jury to evidence determined to violate Fed. R. Evid. 403 because of "the brevity of the offending testimony and the clarity of the district court's [curative] instructions"). Therefore, we find that the trial court did not abuse its discretion in denying the motions for mistrial.

### b. Testimony of Darryl Travers

Rushing makes a separate "other crimes" argument based on the testimony of another government witness, Darryl Travers. During direct-examination, Travers made reference to statements that Rushing had made to him about being housed in the same section of the jail as 22nd Street Crew member Stephen Gray. On cross-examination, various defendants brought out the fact that Travers himself had been released from prison in order to assist the government with its investigation. In response to this bias cross-examination, on re-direct, the government elicited from Travers that if he remained in prison he would have had safety concerns as a government cooperator. Appellants objected and moved for a mistrial on the grounds that the inference was that if Travers remained in jail, he would be harmed by one of the appellants. The trial court declined to order a

mistrial, but it sustained the objection and instructed the jury that there was no evidence that Travers would have any safety concerns had he remained in jail.

We find no abuse of discretion based on the trial judge's treatment of Darryl Travers' testimony. As to Travers' reference to the fact of Rushing's incarceration, there was minimal prejudice to Rushing because many of his jail calls were played for the jury, at which time the jurors inevitably became aware that Rushing was incarcerated during the period leading up to the trial. Moreover, neither Travers' testimony, nor any other evidence, linked Rushing's incarceration with any of the offenses of which he was charged in this case, particularly the murder of Laquanda Johnson and assault of Keisha Frost, which was the central event in the government's case against Rushing. (*David*) *Washington v. United States*, 760 A.2d 187, 196 (D.C. 2000) (prejudicial effect limited where "there was no evidence as to what crime may have resulted in appellant's supposed incarceration" as opposed to "the situation where the crime charged and the prior arrest involve the same offense") (internal quotation marks omitted). And the testimony about Travers' fear of remaining in prison, even if improper, did not require the trial court to grant the motion for a mistrial. The testimony was a brief reference in a very lengthy trial and was fully mitigated by the trial court's curative

instruction. Consequently, we grant Rushing no relief on the basis of these claims. *See Chase v. United States*, 656 A.2d 1151, 1155 n.8 (D.C. 1995) (no abuse of discretion by trial court in denying motion for mistrial where government attempted to elicit "fear" testimony because denial of motion was not "unreasonable, irrational or unfair").

### 3. Evidentiary Rulings During Cooper's Case-in-Chief

Cooper argues that the trial court's various erroneous evidentiary rulings collectively deprived him of the right to present a complete defense. *See Heath v. United States*, 26 A.3d 266, 280-81 (D.C. 2011) ("[W]hether an erroneous exclusion of defense evidence violates the defendant's constitutional right to present a defense depends upon whether there exists a reasonable probability that the omitted evidence . . . would have led the jury to entertain a reasonable doubt that did not otherwise exist.") (emphasis omitted). After examining his claims, we reject his argument.

### a. Statements by Tamika Bradshaw

Cooper argues that the trial court erred when it prevented him, during his testimony, from repeating a statement made to him by a woman named Tamika Bradshaw. Cooper denied murdering Terrence Jones and testified that he first learned about the Terrence Jones shooting from "[t]his girl name[d] Tamika."

Cooper's defense counsel then asked Cooper what Bradshaw had said to him. The government objected to the admissibility of Bradshaw's exact statement (although it did not specify the grounds). The trial court called the parties to the bench, and Cooper's defense counsel stated that Bradshaw's statement was not hearsay because it was offered to show Cooper's state of mind and relevant because "it's how [Cooper] found out about the shooting." Without explanation, the trial court sustained the objection. Cooper's defense counsel then asked Cooper where he was when he "became aware that there had been a shooting." Cooper replied that he was "[in] the parking lot . . . [a]cross from the basketball court" on 22nd Street.

Assuming that the trial court should have allowed Cooper to testify as to Bradshaw's statement under the state-of-mind exception to the rule against hearsay, her precise statement was of very minimal importance, and there was no harm because Cooper was able to present the substance of what Bradshaw conveyed to him. *See United States v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983) (error in suppressing evidence harmless where its essence was nonetheless conveyed to the jury by defense counsel).

### b. Statements by Laquanda Johnson

Cooper also claims that the court erred in not admitting statements for the truth of the matter allegedly made by Laquanda Johnson to him in the course of a conversation between Cooper and Laquanda following the Terrence Jones shooting.  The statements were, in effect, that she knew that Cooper was not involved in the shooting because she had seen him in a parking lot on 22nd Street at the time.

Cooper argued to the trial court that because the government had elicited certain statements by Laquanda Johnson to his disadvantage under a forfeiture-by-wrongdoing theory, Laquanda's statements favorable to him should also be admitted.  The government registered a hearsay objection.  The trial court agreed with the government that the forfeiture-by-wrongdoing exception to the hearsay rule was not designed to advantage the wrongdoer; therefore, the statements were not admissible for their truth and the court instructed the jury that they were admissible for state-of-mind purposes only. The court again limited the admissibility of Laquanda's statements to their effect on Cooper's state of mind when Cooper sought to repeat her statements in the context of explaining that

another individual, Patrick Williams, overheard the same conversation between Laquanda and Cooper after the Terrence Jones murder.

The trial court did not err in its treatment of this testimony. In *Sweet v. United States*, 756 A.2d 366, 379 (D.C. 2000), we held that "it is only the party who wrongfully procures a witness' absence who waives the right to object to the adverse party's introduction of the witness' prior out-of-court statements." *Id.* (alterations omitted) (quoting *United States v. Houlihan*, 92 F.3d 1271, 1283 (1st Cir. 1996)). We also explicitly stated that the forfeiture-by-wrongdoing rule "which provides for the waiver of objection by the party who causes the witness absence cannot logically strip the government of its hearsay objections." *Sweet*, 756 A.2d at 379 (internal quotation marks omitted).

### c. Statements by Cooper to Brandon Elzie

Finally, Cooper claims that the court erred by excluding his statement to a prison guard, Brandon Elzie. Cooper attempted to elicit from Elzie the fact that he had told Elzie that he could not be in the same part of the jail as Freddie Lee Bailey because Bailey was a cooperating witness, and therefore Elzie should escort him to another part of the jail. This testimony was offered by Cooper to show that

Bailey's testimony, which was that Cooper made inculpatory statements to him while they were together in a holding cell, was untrue.

The government raised a hearsay objection, arguing that Cooper's "self-serving" statement was being offered for the truth of fact that Cooper was not permitted to be in the presence of a government witness. Attempting to negotiate an acceptable middle ground, the trial court asked Cooper's defense counsel if he would be amenable to asking Elzie if Cooper informed him of "something" that caused Elzie to take Cooper away from Bailey. Although Cooper's defense counsel stated that he "just [didn't] think any of it[] [is] hearsay," he agreed to ask the question in the way proposed by the trial court.

Cooper's defense counsel then asked Elzie what he did "based upon the information that Mr. Cooper gave you." Elzie replied, "In turn, I then escorted Mr. Cooper back upstairs." Assuming *arguendo* that the trial court should have admitted the contents of Cooper's statements to Elzie to show Cooper's state of mind, any error was harmless. The trial judge's handling of Elzie's testimony allowed Cooper to rebut the substance of Bailey's statements, which was Cooper's purpose in calling Elzie to the stand. *Terry*, 702 F.2d at 314.

In sum, even assuming error in two of these evidentiary rulings, there was no violation of Cooper's constitutional right to present a complete defense. Any prejudice to Cooper was very minimal because he was permitted to elicit evidence that put the defense theories before the jury. *See* (*Maurice*) *Morris v. United States*, 622 A.2d 1116, 1128-29 (D.C. 1993) ("even if the judge erred, the defense suffered little, if any prejudice" because appellant's case was "clearly before the jury" and the excluded testimony "would not have bolstered appellant's case"). Therefore, we reject Cooper's claim based on these evidentiary rulings.

### 4. Admission of Tann's Videotaped Statement

During the prosecution's rebuttal case, the government played a portion of Tann's videotaped statement to the police on matters relevant to the Leslie Jones murder. In the videotaped statement, Tann made references to visiting Darryl Travers on the evening of the murder, which conflicted with the testimony of several of Tann's alibi witnesses who had testified that Tann was with them that evening.

The tape did not make reference to any appellant other than Tann. Nor was any appellant other than Tann charged with the Leslie Jones murder (although his murder was listed as an overt act on the conspiracy charge). Cooper, the only

appellant convicted under a vicarious liability theory – for the Laquanda Johnson murder only – now raises a claim pursuant to *Akins v. United States*, 679 A.2d 1017 (D.C. 1996) based on the admission of the videotape.

"[I]n a joint conspiracy trial where the government relies on a theory of vicarious liability, statements may not be introduced under the statements of [a] party opponent exception to the rule against hearsay . . . unless they are admissible as coconspirators' statements in furtherance of the conspiracy . . . ." *Id*. at 1031. However, Cooper was not prosecuted under a vicarious liability theory for the conspiracy count of which the murder of Leslie Jones was an overt act. Instead, Cooper was tried as a principal in the conspiracy. Because Tann's statement impacted Cooper on the overt act of the conspiracy charge only, a charge for which he was *not* prosecuted under a theory of vicarious liability, *Akins* is inapplicable and Cooper's claim is meritless.

## B.  Instructional Issues

### 1.  Obstruction of Justice Instruction

Appellants Beaver, Cooper, and Tann were charged with obstruction of justice under D.C. Code § 22-722 (a)(2)(A) and (a)(6). Appellants challenge the

trial court's obstruction of justice jury instruction and allege that it amounted to a

constructive amendment of the indictment.

The relevant counts, as listed in the indictment, were as follows:

> Between on or about April 17, 2004, and on or about April 30, 2004 . . . Cooper . . . corruptly persuaded, and endeavored to cause or induce, Laquanda Johnson, the sister of a witness in an official proceeding, to wit, the investigation into the April 17, 2004 murder of Terrence Jones and assault of Richard Queen . . . with the intent to influence, delay and prevent the truthful testimony of Kyara Johnson in that proceeding . . . in violation of [D.C. Code § 22-722 (a)(2)(A) and (a)(6) (2012 Repl.)].

> Between on or about April 30, 2004, and on or about July 11, 2006 . . . Cooper . . . Tann . . . Beaver . . . Gilliam . . . and other persons . . . corruptly persuaded, and endeavored to cause or induce, Laquanda Johnson, with the intent to persuade her to influence, delay, and prevent the truthful testimony of her sister, Kyara Johnson, a witness in an official proceeding, to wit, *United States v. Lannell Cooper* . . . in violation of [D.C. Code § 22-722 (a)(2)(A) and (a)(6) (2012 Repl.)].[66]

> Between on or about June 1, 2006, and on or about July 11, 2006 . . . Tann . . . corruptly persuaded and by threatening letter and communication, endeavored to influence, intimidate and impede Donnise Harris, a witness in an official proceeding, to wit, the case of *United States v. Saquawn Harris* . . . with the intent to

---

[66] See Section VII (D) *supra*. Count 25 has been included here again for clarity.

influence, delay, and prevent the truthful testimony of Donnise Harris in that proceeding . . . in violation of [D.C. Code § 22-722 (a)(2)(A) and (a)(6) (2012 Repl.)].

Prior to final jury instructions, the government requested that the trial court use the pattern jury instruction for the "catch-all" version of obstruction of justice under D.C. Code § 22-722 (a)(6) for Counts 24 and 25 involving the Johnson sisters. Criminal Jury Instructions for the District of Columbia, No. 6.101F (5th ed. rev. 2013). Appellants did not object, and the court agreed to do so. When the instructions on the elements of Count 24 were given, the court instructed the jury, in relevant part, as follows:

> [T]he essential elements of obstructing justice under this count . . . are, first, that the defendant corruptly, or *by means of force*, obstructed or impeded or endeavored to obstruct or impede the due administration of justice and any official proceeding in the Superior Court of the District of Columbia. [Emphasis added]

The trial court instructed the jury in accordance with the D.C. Code § 22-722 (a)(6) pattern instruction, except that the court inadvertently changed the phrase "threats of force" to "means of force" when describing one potential manner in which appellants could have obstructed justice. The trial court did so for each obstruction of justice count, including Tann's Count 41 which described Donnise Harris as the victim. These instructions went without objection. The court also

issued written instructions to the jury; however, the written instructions did not contain the "means of force" language. Instead, the written instructions used the phrase "threats of force" as authorized by the pattern jury instruction for § 22-722 (a)(6).

After the verdicts, but prior to sentencing, Cooper filed a motion for a new trial alleging that the flawed instruction amounted to a constructive amendment of the indictment. Cooper's argument was that by instructing the jury that it could convict if it found that obstruction of justice had been committed by a "means of force," the court permitted the jury to consider a theory of liability on which appellants were not indicted. Further, Cooper and other appellants pointed to evidence at trial that went toward a "force" theory of obstruction of justice, as opposed to the "persuasion" theory of obstruction of justice that was explicitly charged in the language of the indictment, thereby enhancing the likelihood of prejudice as a result of the instruction. After a post-trial hearing, the trial court denied appellants' motions.

Our first task is to determine the correct standard of review of this issue on appeal. "[P]lain error review applies to a claim that an indictment has been

constructively amended if an objection has not been made at trial level." (*Alexander*) *Smith v. United States*, 801 A.2d 958, 962 (D.C. 2002). Despite this principle, appellants allege that their claims should not be subject to plain error review because (1) they were "essentially preserved in the trial court . . . by appellants' post-verdict motions for a new trial"; (2) the government invited the error; (3) appellants "reasonably relied on the judge's [written] jury instructions which did not include [the means of force] phrase"; and (4) "there is a strong likelihood that appellants did not actually hear the precise words uttered by the judge."

Appellants' arguments about the standard of review are unpersuasive. Their argument that the claim was "essentially preserved" by way of the post-conviction motions for a new trial must fail because such post-trial motions do not amount to a "timely objection," and thus, will not save an appellant from plain error review. *See* (*Tristan*) *Smith v. United States*, 847 A.2d 1159, 1160 (D.C. 2004) (per curiam) (superseded by statute on other grounds); *United States v.* (*Chevalier*) *Thompson*, 27 F.3d 671, 673 (D.C. Cir. 1994) ("[A] post-verdict motion for a new trial is not the same as a timely objection: the delay eliminates any chance that the judge could correct the error without a duplicative trial, and according review as if

a timely objection had been raised virtually invites strategic behavior by defense counsel."). Furthermore, there is no authority for appellants' remaining arguments. The "point of the plain-error rule" is to oblige the defendant to advise the judge when a mistake occurs; therefore, the rule "requires defense counsel to be on his toes, not just the judge . . . ." *United States v. Vonn*, 535 U.S. 55, 73 (2002); *see also Davis v. United States*, 984 A.2d 1255, 1259 (D.C. 2009). Consequently, we review for a constructive amendment using the plain error standard.

The Fifth Amendment prohibits any person from being "held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. CONST amend. V. "[W]here a trial court broadens the possible grounds for conviction by adding another factual basis to those contained within the indictment, the court constructively – and impermissibly – amends the indictment." *Wooley v. United States*, 697 A.2d 777, 781 (D.C. 1997). Only a grand jury may "broaden" the charges in an indictment. *Stirone v. United States*, 361 U.S. 212, 215-16 (1960).

Here, there were essentially two possible constructive amendments that could have occurred: (1) by the addition of the phrase "threats of force" in the

written instructions and (2) by the addition of the phrase "means of force" in the oral instructions. Neither phrase was included in the language of the indictment. However, addressing each issue in turn, we find that appellants are owed no relief based on the inclusion of either phrase in the jury instructions under the plain error standard.

A claim of plain error based on the addition of the phrase "threats of force" is foreclosed by our case law that holds an appellant cannot satisfy the fourth prong of plain error when the indictment at issue includes a citation to a criminal statute from which a trial court recites when instructing a jury, even if the language of the indictment does not otherwise track the wording of the cited offense. *Bolanos v. United States*, 938 A.2d 672, 687 (D.C. 2007); (*Alexander*) *Smith*, 801 A.2d at 961-62. In *Bolanos*, one of several defendants was charged with aggravated assault while armed ("AAWA") by an indictment that alleged the offense was committed by "knowingly or purposely caus[ing] serious bodily injury" to the victim. 938 A.2d at 686. However, the *Bolanos* jury instructions included an alternative *mens rea*, proper under another subsection of the AAWA statute but not explicitly alleged in the indictment, "that is, the defendant manifested extreme indifference to human life by knowingly engaging in conduct which created a

grave risk of serious bodily injury." *Id.* In rejecting appellant's claim of plain

error based on a constructive amendment, we held:

> While the indictment failed to state both subsections of
> the aggravated assault statute, it did include a citation
> that encompassed both subsections; thus, [appellant] had
> notice he would be required to defend against both
> prongs. We find that [appellant] has failed to show that a
> miscarriage of justice occurred, in light of the notice he
> received through the citation to the aggravated assault
> statute included in the indictment.[67]

Here, while the phrase "threats of force" found in the written jury

instructions was not used in the indictment, the indictment did cite to D.C. Code

§ 22-722 (a)(6), which includes this phrase in describing the offense of obstruction

of justice. Therefore, under our precedent, appellants cannot prevail on the basis

of the inclusion of the phrase "threats of force" in the written instructions.

---

[67] *Id*. at 687. We came to the same conclusion in (*Alexander*) *Smith* where
the trial court's jury instruction added a second means of committing aggravated
assault that was not explicitly charged in the language of the indictment. There,
we held "even if we assume that the evidence and instruction plainly amended the
language of the indictment, there is no risk that the fairness, integrity or public
reputation of judicial proceedings will be affected where the indictment included a
citation that encompassed both subsections of the aggravated assault statute, and
the evidence amply supported appellant's conviction of aggravated assault." 801
A.2d at 960-62.

Appellants' argument based on the "means of force" language mistakenly read by the trial court during its oral jury instructions also falls short; this time the claim fails on the third prong of the plain error standard, which requires that appellants "demonstrate that the error affected [their] substantial rights by showing a reasonable probability that it had a prejudicial effect on the outcome of [their] trial[s]." *Comford v. United States*, 947 A.2d 1181, 1189 (D.C. 2008). First, the written instructions did not include the language "means of force." *See generally People v. Wilson*, 187 P.3d 1041, 1069-70 (Cal. 2008) ("To the extent a discrepancy exists between the written and oral version of jury instructions, the written instructions provided to the jury will control."). Although the trial court did not instruct the jury that the written instructions controlled in the event of a conflict with its oral instructions, it is doubtful in this case that the phrase "means of force" had a meaningful influence upon the jury's verdict. The trial court's words were uttered near the end of month seven of a nine-month trial and during an instructional period that lasted the better part of two court sessions and involved forty-nine counts relating to six defendants. A much more reasonable scenario is that the jurors relied upon the written instructions, which used the "threats of force" language, during their extensive deliberations.

Second, the government did not argue for appellant's guilt based on a "means of force" theory of liability.[68] *See Portillo v. United States*, 62 A.3d 1243, 1260 (D.C. 2013) (no plain error where, in a burglary case, the government argued an entry-with-intent-to-steal theory of liability as charged, as opposed to the additional entry-with-intent-to-assault theory added by trial court in jury instructions). Finally, appellants have not identified "any deficiency in the defense strategy at trial due to the discrepancy between the indictment and the jury instructions relating to the [obstruction of justice] charge[s]." *Id.* Therefore, appellants fail to meet their burden on the third prong of plain error review and we reject their claims.[69]

---

[68] When referring to the evidence on Counts 24, 25, and 41, the government recounted testimony that Tann asked Donnise Harris to testify favorably for appellant Harris; that Cooper approached Laquanda Johnson and offered her a bribe of drugs and money to influence Kyara Johnson's testimony; and that Dewey Chappell was working with Beaver, Tann, and Brian Gilliam to find the sisters to "change their testimony." While the government's argument described how some of this testimony explained efforts by the coconspirators involved the threats of force and *contemplated* the use or means of force the government's argument did not contend that any of acts underlying these obstruction of justice counts were executed by such a means or use of force.

[69] We also note that Counts 24, 25, and 41 cited to D.C. Code § 22-722 (a)(2)(A), which makes unlawful the knowing use of "physical force" to "influence, delay, or prevent the truthful testimony of [a] person in an official proceeding . . . ." This means that even if appellants' "means of force" claims survived the third prong of plain error review, our decisions in *Bolanos* and

(continued…)

**2. Lesser-Included Offense Instruction: Relationship Between Felony and Second-Degree Murder**

Appellants Tann and Arnette were charged with one count of first-degree premeditated murder while armed and two counts of first-degree felony murder related to the death of Terrence Jones. The two underlying felonies alleged were the attempted robbery of Terrence Jones and the completed robbery of Richard Queen. At the MJOA stage, the government agreed that there was insufficient evidence on the first-degree premeditation element of the premeditated murder count for both appellants. The court ruled that the count would be reduced to the lesser-included offense of second-degree murder while armed of Terrence Jones. Therefore, for the Terrence Jones murder, the jury was charged with rendering verdicts on (1) one second-degree murder count for both appellants and (2) two first-degree felony murder charges for each.

During final jury instructions, the trial court instructed the jury that it could find both appellants guilty of the lesser-included offense of second-degree murder

---

(…continued)

(*Alexander*) *Smith* would require us to deny them relief because they could not "show that a miscarriage of justice occurred, in light of the notice [they] received through the citation to [the obstruction of justice] statute included in the indictment," which put them on "notice that [they] would be required to defend against" a use-of-physical-force theory. *Bolanos*, 938 A.2d at 687.

while armed, even if it found reasonable doubt as to the first-degree felony murder charges. Ultimately, the jury found Tann and Arnette each guilty of three counts of second-degree murder while armed: the second-degree murder charge that had been reduced from first-degree premeditated murder and two counts of second-degree murder as lesser-included offenses of the first-degree felony murder charges.

Appellants now argue that the jury was improperly instructed. They contend that second-degree murder is not a lesser-included offense of first-degree felony murder under the "elements" test in *Blockburger v. United States*, 284 U.S. 299 (1932) and *Byrd v. United States*, 598 A.2d 386 (D.C. 1991). Their claim is that second-degree murder requires the element of "malice aforethought" – an element not contained in the offense of first-degree felony murder. However, appellants' argument is foreclosed by our decisions that hold second-degree murder is, in fact, a lesser-included offense of first-degree felony murder. *See Towles v. United States*, 521 A.2d 651, 656-58 (D.C. 1987) (en banc). Therefore, their claims afford them no basis for relief.

### 3. Attitude and Conduct Instruction

During final instructions, the court issued the jury an "attitude and conduct" instruction. No appellant objected. Tann, Arnette, and Harris now argue that this instruction was fundamentally similar to the instruction deemed flawed in *Jones v. United States*, 946 A.2d 970 (D.C. 2008), for unduly favoring a collective result over the individual opinions of the jurors. We find no plain error in the instruction.

Appellants are correct that the instruction contained an element found problematic in *Jones*: a statement that the "final test" of the jurors' service turned on their verdicts, not their earlier opinions. However, the instruction did not contain the "purposive" language that we have identified as underlying the *Jones* holding. *See Lampkins v. United States*, 973 A.2d 171, 173 (D.C. 2009) (flaw in *Jones* was informing the jury that its "purpose should not be to support your own opinion, but rather to ascertain and to declare the truth"); *see also Grant v. United States*, 85 A.3d 90, 99-100 (D.C. 2014) (error was in telling the *Grant* jury that its purpose was to reach a verdict thereby expressing to the jurors that consensus was preferred to genuine agreement).

Additionally, the instant instruction also (1) included language praised in *McClary v. United States*, 3 A.3d 346, 355 (D.C. 2010), explaining the purpose of jurors not pre-announcing opinions, and (2) contained wording similar to that approved by *Jones*, reminding jurors not to surrender their honestly held opinions and informing them that it was their duty to reach verdicts only if they could conscientiously do so. 946 A.2d at 974. Accordingly, we cannot say that it should have been clear or obvious to the trial court that there was error in the instruction. In any event, appellants cannot meet prong three of the plain error test because the jury clearly engaged in extensive and discerning deliberations before returning verdicts. *Id*. at 976 (lengthy deliberations informed the court's determination that Jones could not show a "reasonable probability" that the erroneous instruction changed the verdict).

## C. Closing and Rebuttal Argument

All appellants argue that the cumulative impact of several allegedly improper remarks made by the government during its closing and rebuttal arguments requires reversal. We disagree and decline to grant appellants relief.

### 1. Government's Closing Argument

Near the beginning of its closing argument, the government attempted to explain why culpability for the Laquanda Johnson murder extended beyond

Alphonce Little, the 22nd Street Crew member who shot her and Keisha Frost. The government made several statements to the effect that the government had a responsibility not to "turn [its] back[]" on the community and ignore the larger criminal problem on 22nd Street.  In the course of this explanation, the government briefly transitioned from "we" statements to a single "you" statement directed at the jury when it stated, "[We are] asking you, at this point, to do what the community requires."[70]    Several appellants objected and the court sustained their

---

[70]  The prosecutor's argument was:

> This is not a situation that you can just sum up in three lines.  It's not, Laquanda Johnson was killed; Alphonce Little was arrested; Alphonce Little pled guilty.

> There's much, much more to what happened on [the night of Laquanda Johnson's murder].

> Now, the defendants behind me would very much like that you stop right there.  And it would have been easy to just call it case closed. . . .

> But to do so would have required that we turn a blind eye to what had been happening there for years. We would have had to turn our backs on that community. We would have had to turn our backs on that entire two-block area.  We would have had to ignore the other victims.

(continued…)

objections. After returning from a break in the government's argument, the court instructed the jurors that they did not represent the community and, in essence, that they were not to follow that line of the government's argument

At the very end of its closing argument, the government referenced the testimony of one of its witnesses, Tyrone Curry. Under cross-examination about his reasons for cooperation with the government, Curry said that his sister had been killed six months earlier in the area around 22nd Street and that he had come to the conclusion that "[E]nough is enough. How many people got to die before you say something?" The government referred the jury back to Curry's testimony as it concluded its closing argument and then used Curry's quote to argue: "Ladies and gentlemen, enough is enough. You need to hold these men accountable for what they've done."[71]

---

(…continued)

> *And we're asking you, at this point, to do what that community requires.* We owed it to that community to investigate this thoroughly. [Emphasis added].

[71] The full argument was as follows:

> Like I said, [it] didn't start on July 11[;] it didn't end on July 11. The evidence has shown you the men behind me have caused too much pain and suffering to

(continued…)

## 2. Government's Rebuttal Argument

During his closing argument, Cooper made the case that what the government's evidence had shown was not a criminal conspiracy defined by specific time periods and goals, but merely an ongoing participation in a community attitude that embraced a drug culture and black market. Furthermore, Cooper argued that the government was biased against him and had allowed emotion and preconceived notions about the appellants' guilt to bias itself in favor of certain witnesses in the case. In Harris's closing, he asserted that some of the government's witnesses were motivated to lie by the prospect of relocation assistance and money from the government. He further noted that some witnesses had received thousands of dollars from the government

---

(…continued)

22nd Street. . . . And it makes me think back to the one thing Tyrone Curry said. He said it on the stand, and I want to make sure I get it right because he said it better than I could have. He was being cross-examined about why it was that he finally came forward, and he said, "My sister was killed six months ago, and I came to the conclusion that *enough is enough. How many people gotta die before you say something?*

*Ladies and gentlemen, enough is enough. You need to hold these men accountable for what they've done.* [Emphasis added].

The government responded in rebuttal that the law of conspiracy was designed in such a way that showing concrete time periods and single objectives was not required. The government further remarked that if the law was set up differently, then prosecuting criminal organizations such as the "Italian Mafia" would be too difficult.[72] The trial court overruled immediate objections and ruled against later motions for a mistrial. However, it instructed the jury that the "mafia" comment was "unfortunate." The trial court further told the jury that it should not be thinking about any particular historical group when weighing the evidence in this case, particularly groups with traditionally negative connotations.

Later in rebuttal argument, the government returned to the explanation of its charging strategy, telling the jury the purpose behind its expansive prosecution of the 22nd Street Crew was because it had "an obligation not to just look at what is

---

[72] With regard to the "Italian Mafia," the prosecutor stated:

> There's no requirement [in the law of conspiracy] that says it has to be a limited period of time. . . . There's no requirement that it has to be just one objective . . . . There's no requirement that it can only be about one [l]ittle incident. And think about it[;] it makes perfect sense. If that were the only thing the conspiracy law could prosecute, it'd never prosecute gangs[;] it'd never prosecute organized crimes. *All those Italian Mafia families, they'd never get prosecuted*. [Emphasis added].

right before us, but to dig deeper. It's just like a weed in the sidewalk, right? You can pluck off that yellow top, and a Dandelion is coming back."[73]

Finally, when concluding rebuttal, the government responded to the argument that it was biased against appellants and in favor of certain government witnesses. Attempting to exploit the use of the term "bias," the government explained that it had no "bias" against appellants, but instead was "biased" in favor of its witnesses because of the immensely difficult and dangerous task of

---

[73] With regard to the reference to pulling out the weeds, the quote was:

> We have an obligation to get to the truth. We have an obligation not to just look at what is right before us, but to dig deeper. *It's just like a weed in the sidewalk, right? You can pluck off that yellow top, and a Dandelion is coming back.* We have an obligation to get to the root of the problem, and we didn't do that with Terrence Jones[;] we didn't do that. We went forward[;] we prosecuted Lannell Cooper alone[;] we didn't prosecute [D]euce-[D]euce as a whole, and it didn't work. We can take out Alphonce Little, but there's going to be somebody else, because Alphonce Little is just the weapon in the hands. That's our obligation[;] it was to do more than just look at what was right before us[;] it was our obligation to dig deeper and find the truth, and we are firmly convinced that when you go in the back and you dig deeper, you will find the truth and when you look at all of that evidence in the back you will hold these men accountable . . . . [Emphasis added].

cooperating with the government in a case such as this one.[74]   When the defense

objected to this line of argument, the trial court stated that it believed that the

rebuttal was a fair response to appellants' closings.  Nevertheless, out of caution,

the court issued an instruction that the jury was to disregard any reference to the

personal opinions or "bias" expressed by any of the attorneys during closing

arguments.

### 3. Analysis

The standard governing our review of prosecutorial misconduct in closing or

rebuttal argument is "well-settled."  *Finch v. United States*, 867 A.2d 222, 225

(D.C. 2005).  "We start by determining whether the challenged comments were, in

fact, improper.  If they were, we must determine whether the trial judge erred or

---

[74]  With regard to the government's "bias," the prosecutor argued:

> We're not biased against Mr. Cooper or Mr.
> Rushing or Mr. Beaver or Mr. Arnette or Mr. Harris or
> Mr. Tann.  We are biased in favor of our witnesses,
> because we ask these folks to come in here and do the
> unthinkable.  We ask them to sit on that stand, look at
> you, air all of their baggage and point the finger at these
> men behind me and call them out for what they did.  And
> when that happens, they get attacked for it and that's the
> way it works. . . .
>
> *So is it personal?  Is there a bias?  Maybe there is,*
> *but it's not against [the defendants].  It's for those people*
> *who do what is asked*.  [Emphasis added].

abused his discretion in responding to them." *Id.* "[A]bsent some improper ruling or omission by the trial judge, we cannot ordinarily reverse a conviction, and our ultimate focus must therefore be on what the judge did or failed to do." *Irick v. United States*, 565 A.2d 26, 33 (D.C. 1989) (footnote omitted).

Appellants allege two types of improprieties in the government's closing and rebuttal arguments. Their first contention is that the government made several statements designed to inflame the passions of the jury or urge the jury to send a message based on policies apart from the consideration of the evidence, including: the argument to the jury about doing the community's bidding, the argument that "enough is enough," the reference to "pulling out the weeds," and the analogy to the Italian Mafia. *See McGriff v. United States*, 705 A.2d 282, 289 (D.C. 1997); *Powell v. United States*, 455 A.2d 405, 410 (D.C. 1982). The other assertion made by appellants is that the government improperly vouched for the credibility of its witnesses by openly declaring, during argument, its bias in favor of them. *See Finch*, 867 A.2d at 226.

Even assuming appellants' contentions are correct that these remarks by the government were improper, we nevertheless find no grounds for reversal. When testing for harmlessness in the context of closing and rebuttal arguments, "this

court may [] affirm the convictions [if it is] satisfied that the appellant did not suffer 'substantial prejudice' from the prosecutor's improper comments." *Finch*, 867 A.2d at 226 (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)); (*Ivery*) *Gardner v. United States*, 898 A.2d 367, 375 (D.C. 2006) ("where, as occurred here, there were multiple instances of asserted improper comments . . . we determine whether the cumulative impact of the errors substantially influenced the jury's verdict") (internal quotation marks omitted).

Factors to be considered in assessing harmlessness include "the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Irick*, 565 A.2d at 32. We first note that the government's closing and rebuttal arguments were very lengthy. Moreover, they were part of an extended period of argument by the parties (nearly two weeks) in a trial that lasted nine months from opening statements to the final verdict. In comparison, the government's alleged missteps took the form of relatively brief references amid protracted arguments about the complex and numerous facts of the case. *See* (*Vonn*) *Washington v. United States*, 884 A.2d 1080, 1089 (D.C. 2005); (*Maurice*) *Morris*, 622 A.2d at 1126 ("the

offending comment was a relatively brief reference during a lengthy closing argument") (internal quotation marks omitted).

Each time that appellants objected, the trial court gave timely and effective curative instructions. *See McGriff*, 705 A.2d at 289. We discern no abuse of discretion. Moreover, because the government's potentially improper remarks tended to follow appellants' attacks on the motives and strategies of the prosecution, many of these arguments were generally collateral and not focused on the key matters relevant to the question of appellants' guilt. *See Bates v. United States*, 766 A.2d 500, 510 (D.C. 2000) (remarking on the peripheral nature of the improper comments by the prosecutor in evaluating harm).

The most clearly improper remark – asking the jury to do what the community requires – appears to have been inadvertently made; the rest of the government's remarks are more ambiguous as to their impermissibility. *See, e.g., Irick*, 565 A.2d at 35 ("Despite decisions in the dozens, the law governing what a prosecutor may or may not say about the credibility of a [witness] is not always easy to discern or apply.") Finally, the jury's findings appeared to carefully parse through the evidence against each appellant, ultimately acquitting several

appellants of the most serious charges against them. *See Brewer v. United States*, 559 A.2d 317, 323 (D.C. 1989). Therefore, we can confidently say that appellants did not suffer substantial prejudice as a result of any improprieties, taken either individually or collectively, in the government's arguments.

### D. Discovery

Appellants make three discovery related arguments. Cooper alone brings a claim related to the government's loss of his phone calls from jail. All appellants bring *Brady*[75] claims involving the government's witnesses Dewey Chappell and Kyara Johnson.

### 1. Loss of Cooper's Jail Phone Calls

Cooper argues that the trial court erred in not giving the jury a "missing evidence" instruction as a discovery sanction for the government's loss of a number of his phone calls from jail. There was extensive evidence of jail phone calls made by multiple appellants admitted by the parties at trial. In the course of the investigation into this case, the prosecutors received a number of CDs containing calls made by Cooper from jail between June 2005 and November 2006. As it was preparing for discovery, the government sent the CDs to its

---

[75] *Brady v. Maryland*, 373 U.S. 83 (1963).

technology unit for copying. In the process, the recordings of certain calls were lost and enough time had passed that the original recordings were no longer maintained by the jail. Approximately 90 calls that Cooper made in June 2006 were estimated to have been lost.

During pretrial motions, Cooper brought the issue to the attention of the trial court and asked the judge to prepare to give the jury a "missing evidence" instruction. Cooper argued, as he does on appeal, that he would have been able to use the contents of the missing calls for the impeachment of government witnesses, or alternatively, as nonhearsay verbal acts by him.

After a motions hearing, the trial court found that the loss by the government was unintentional. The court also found that there was no evidence that any of the material would have been favorable to Cooper. Therefore, the court denied Cooper's request for a missing evidence instruction. However, the court prohibited the government from eliciting testimony from any witness about conversations that would have been on the missing calls. Additionally, parties introduced a stipulation into evidence stating, in essence, that the June 2006 calls were lost by the government and efforts to recreate them had failed.

Cooper argues that the trial court erred in refusing to give the "missing evidence" instruction, i.e., that:

> If evidence relevant to an issue in this case was only within the power of one party to produce, was not produced by that party, and its absence has not been sufficiently explained, then you may, if you deem it appropriate, infer that the evidence would have been unfavorable to the party who failed to produce it. However, you should not draw such an inference from evidence that in your judgment was equally available to both parties or which would have duplicated other evidence or that you think was unimportant.

Criminal Jury Instructions for the District of Columbia, No. 2.300 (5th ed. rev. 2013).

Superior Court Criminal Rule 16 (a)(1)(A) requires the government to disclose to the defendant any relevant written or recorded statements made by the defendant of which it has knowledge, or that it would discover in the exercise of due diligence, and to make those statements available to the defense for inspection, copying, or photographing. This court has noted that "[t]he duty to produce discoverable evidence entails the antecedent duty to preserve that evidence." *Allen v. United States*, 649 A.2d 548, 553 (D.C. 1994).

If a trial court concludes that the government's failure to preserve evidence constituted a violation of Rule 16, "[i]n fashioning the appropriate sanction, the court should weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial." (*Anthony*) *Robinson v. United States*, 825 A.2d 318, 331 (D.C. 2003). The trial court may select from the "extremely broad" range of sanctions for corrective action that is "just under the circumstances." *Tyer v. United States*, 912 A.2d 1150, 1165 (D.C. 2006). "We review the denial of a request for a missing evidence instruction for abuse of discretion," *id*. at 1164, and we "will not reverse the trial court's decision as to what sanctions, if any, to impose . . . unless there is an error which has substantially prejudiced a defendant's rights." *Allen*, 649 A.2d at 553 (emphasis omitted).

The government agrees with Cooper that the recorded jail calls were discoverable and does not dispute the trial court's characterization of the government's loss of the recordings as the result of "substantial negligence" and "real carelessness" constituting a Rule 16 violation. However, our review of the record supplies no basis for this court to disturb the trial judge's conclusion regarding the minimal importance of the missing evidence to the defense

(particularly in light of the doubts he properly expressed regarding whether Cooper would have been able to make use of any of the statements that may have been contained in the lost recordings).[76]  *Tyer*, 912 A.2d at 1166.

Because the missing evidence instruction "essentially creates evidence from non-evidence," we have said that trial courts should take care that its use does not unfairly change "the tone of the evidence" or invite the jury to "give undue weight to the presumed content of testimony *not* presented."  *Id.*; *Thomas v. United States*, 447 A.2d 52, 58 (D.C. 1982).  Any claim of prejudice that Cooper makes related to the trial court's refusal to administer a missing evidence instruction is undermined by the corrective measures that the trial court did employ, which included both a prohibition against the government eliciting any testimony regarding the contents of the missing calls, and the administration of a stipulation informing the jury that the calls had been lost while in possession of the government.  Therefore, we find no abuse of discretion in the trial court's choice of remedy.

---

[76]  Cooper, even on appeal, has not provided any specificity as to how he would have used the contents of the calls.

## 2. *Dewey Chappell*

Dewey Chappell was a government witness with ties to appellants and the 22nd Street Crew. He was arrested for unrelated criminal activity on January 23, 2009, as this trial was ongoing. Subsequently, he became a cooperating witness for the government. His testimony was focused on the efforts of Cooper and others to obstruct justice with regard to the Johnson sisters in the aftermath of the Terrence Jones murder, and Harris's flight into hiding following the James Taylor murder.

Prior to his testimony, the government made extensive disclosures related to Dewey Chappell's criminal history and other potential impeachment material. As part of these disclosures, the government informed appellants that a gun had been taken by law enforcement from Chappell's home on January 23, 2009, during his arrest. The government also disclosed that Chappell's fingerprints had been lifted from the gun.

Dewey Chappell was impeached extensively on bias by various defense counsel during his cross-examination. After the government rested its case, and during the defense cases-in-chief, the National Integrated Ballistics Network

("NIBN") made the government aware that there was a possible link between the gun that had been taken from Chappell's home and a homicide that occurred in January 2009 prior to his arrest. The government did not disclose this fact to the defense.

The government also made a conscious effort not to discuss the matter with Dewey Chappell so that he would not be aware of the link, and therefore he would not have any additional motive to curry favor with the government. About a week later, while the defense cases were still ongoing, the match was confirmed by NIBN.

However, Dewey Chappell was apparently never considered a suspect by the government in the January 2009 murder. After the merits portion of this trial ended, but before sentencing, Chappell was debriefed about the ballistic link and told investigators that he was unaware of any facts related to that homicide. He also indicated that the gun found at his home belonged to a person who previously stored it at the home of Chappell's relative. Chappell had agreed to take the weapon and store it at his house once police started "snooping around" his relative's home.

Before sentencing was conducted, the government reversed course and decided to disclose the ballistics information to appellants. However, the government argued that there was no discovery violation because the information would not have been relevant unless Dewey Chappell had known of the ballistics link at the time that he testified for the government. Therefore, he had no reason to curry favor with the government through cooperation.

All appellants argued that they were entitled to a new trial. Their argument was that by not disclosing the information, the government prevented them from (1) cross-examining Dewey Chappell on his perceived fear of prosecution for the January 2009 homicide, (2) showing that Chappell was hiding a weapon and therefore hindering the January 2009 homicide investigation, and (3) investigating the possible connection between that weapon and the murders of which appellants were convicted in this case. After a hearing, the trial court denied appellants' motions for a new trial, finding no discovery violation. Appellants now renew their claims, in essence, on appeal.

*Brady* issues are mixed questions of law and fact. *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011). While a trial court's findings of "historical

fact" are reviewed for clear error, where the court's findings "concern[] the legal consequences of historical facts," they are reviewed *de novo*. *Id.* (internal quotation marks omitted).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; (*Wesley*) *Williams*, 881 A.2d at 561. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 562 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Such material evidence may include impeachment matters. (*Michael*) *Robinson v. United States*, 50 A.3d 508, 519 (D.C. 2012).

The non-disclosure concerning Dewey Chappell was not material under *Brady*, and we find no grounds for relief. "Impeachment evidence is not material if the witness does not have knowledge of the underlying fact." *Ifelowo v. United States*, 778 A.2d 285, 295 n.13 (D.C. 2001) (quoting *Williams v. Scott*, 35 F.3d 159, 162 (5th Cir. 1994)); *Blunt v. United States*, 863 A.2d 828, 835 (D.C. 2004)

("When evaluating the possibility of bias in adverse testimony, the objective likelihood of prosecution and the subjective intent of the government to prosecute are irrelevant[.] Rather, it is the witness' belief that prosecution is possible that can produce bias.") (citations and internal quotation marks omitted). This is because, of course, a witness cannot be motivated to act in a certain way if he has no knowledge that he should be motivated to do so.

Here, there is no evidence that Dewey Chappell was aware of the NIBN finding linking the weapon found at his house to the January 2009 homicide. In fact, the government went out of its way to avoid exposing Chappell to knowledge of the ballistic link so that he would not have motive to "curry favor" and avoid prosecution. Therefore, the undisclosed evidence lacked the necessary impeaching qualities so as to be material under *Brady*.

Moreover, on this record, we see no evidence that would suggest that the ballistics information had investigatory value to appellants such that its non-disclosure would have violated the government's disclosure obligations. *Mackabee*, 29 A.3d at 961 (mere speculation that evidence might have led to discovery of exculpatory evidence insufficient to establish a *Brady* violation).

Finally, we agree with the trial court that the extensive cross-examination of Dewey Chappell on issues related to bias, including based on the weapon that was found in his home, was such that had the ballistic evidence been disclosed there was still no reasonable possibility that the results of this case would have been different. *See Fortson*, 979 A.2d at 662-63; *Watson v. United States*, 940 A.2d 182, 187-88 (D.C. 2008).

### 3. Kyara Johnson

Kyara Johnson, as an eyewitness to both the Terrence Jones and Laquanda Johnson murders, was a critical government witness. She testified in Cooper's 2006 trial about Terrence Jones's murder, and again in this trial about that murder and her sister's. In the weeks following Laquanda's murder, Kyara gave grand jury testimony about the night of Laquanda's death. Before the grand jury, Kyara testified that she saw Alphonce Little flee the scene of the crime by jumping on the back of a moped driven by another man wearing his hair in dreadlocks and carrying a gun. At trial, however, she testified on direct-examination that she heard a moped but had not seen Little driven away on one.

On cross-examination, Kyara Johnson acknowledged that she had lied in the grand jury. She also testified that she had informed the government that she had

been told the story about Alphonce Little and the moped by her friend Shaquita Long. Apparently, the fact that Kyara was told about the moped by Long was not previously known to appellants before this testimony. During a break in cross-examination, appellants made motions alleging a discovery violation. Rushing claimed that Long was an exculpatory witness because her testimony would support a version of events where Little was not escorted from the murder scene by Rushing and Beaver in Rushing's car. Beaver and Rushing, joined by Cooper, renew that claim on appeal.

The government responded that Kyara Johnson's grand jury testimony about Alphonce Little and the moped had long been available to the defense. Additionally, the government proffered, Shaquita Long told the government at the outset of the investigation into Laquanda Johnson's murder that she never saw Little drive away on a moped. Instead, Long informed the government that she saw various 22nd Street Crew members driving on 22nd Street on a moped about an hour before the shooting.

The trial court found no discovery violation, but ordered the government to make Long available to appellants for interviewing. The court also offered to

allow appellants to reopen their cases, if necessary, to the extent that Long could not be located prior to the completion of their cases (which were scheduled to begin three days after Kyara Johnson's testimony for the government finished).

We find no *Brady* violation based on these facts involving Kyara Johnson and Long. Defense counsel acknowledged that they knew of the inconsistency between Alphonce Little's and Kyara's version of events and used it to cross-examine both of them concerning the moped. Rushing went on to argue in closing that the inconsistency undermined Little's credibility.

As far as Long was concerned, the government proffer was unchallenged that she would testify that she never saw a moped. This fact renders immaterial the government's "failure" to identify her as the source of Kyara Johnson's information for her grand jury testimony. Our finding of immateriality is supported by the fact that defense counsel never made any further mention of Long. Nor did they ask for any sort of continuance in order to interview Long, or subpoena her for trial, despite the express invitation of the trial court to do so. (*Wesley*) *Williams*, 881 A.2d at 563 (importance of potentially exculpatory

witnesses decreases where no attempt is made to receive a continuance in order to investigate their testimony).

### E.  Grand Jury Claims

Appellants Tann, Arnette, and Harris bring three claims raised at trial based on the government's misuse of the grand jury:  two focused on improprieties in the pre-indictment process and a third alleged abuse of the grand jury after the superseding indictment in this case was handed down.  Pre-indictment, appellants argue that the government improperly influenced the grand jury process by summarizing testimony given to previous grand juries instead of calling live witnesses; appellants also contend that prosecutors presented incompetent evidence to the grand jury in violation of Tann's marital privilege.  Post-indictment, appellants contend that the government unlawfully used the grand jury as a discovery tool when prosecutors called a witness to the grand jury for purposes of "locking-in" his testimony after appellants had already been indicted.  We find that the trial court did not abuse its discretion in handling these matters at trial.  Therefore, appellants are entitled to no relief based on their claims.

Two grand juries were convened and issued indictments against appellants. In October 2007, a grand jury indicted all appellants except Rushing.   In February

2008, after Alphonce Little gave the government new information about Rushing's role in the Laquanda Johnson murder, a second grand jury handed down the superseding indictment upon which the government proceeded in this case. Apparently, the only new evidence presented to the second grand jury was the testimony of Detective Mayberry reciting Rushing's recently discovered involvement in Laquanda's murder. The prosecutor also summarized numerous transcripts of testimony from previous grand jury investigations, and then prosecutors left those transcripts and accompanying exhibits with the grand jury for its consideration.[77]

During the testimony of Tracey Tann, the issue of marital privilege was raised. The Tanns were married in April 2004 – approximately one year after the Leslie Jones murder. Prior to their marriage, Tann told Tracey that he killed a man named "Bone" (Leslie Jones's nickname) on 22nd Street. On cross-examination, Tann's defense counsel elicited the discrepancy between the location where Tracey testified that Tann told her the murder was committed (22nd Street), and the location where it actually occurred (Shipley Market), in an attempt to undermine

---

[77] The government represented that the reason summaries were provided was that the transcripts, which referenced exhibits, would not make sense to the reviewing grand jury without explanation.

her testimony. In response, the prosecution sought to introduce, on re-direct, Tracey's grand jury testimony to the effect that after their marriage Tann told her (in confidence) that he had actually committed the murder at Shipley Market.

The trial court recognized the marital privilege issue and noted that Tracey could not testify to that fact at trial. Moreover, after reviewing her grand jury testimony, the court found that Tracey should not have testified about that privileged statement before the grand jury. At trial, Tann and Harris, now joined by Arnette on appeal, argued for dismissal of the indictment based on Tracey's incompetent testimony and the prosecutor's summarizing of evidence to the grand jury. The trial judge, relying primarily on *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), rejected both of appellants' pre-indictment claims.

The final grand jury issue was raised during discussions about the anticipated testimony of a government witness, Willie Jones. The government intended to call Willie Jones to describe a conversation that he had with Tann, after the Terrence Jones murder, in which Tann told him that Tann had approached a different government witness in a threatening manner. Tann objected, essentially, on grounds that the proffered testimony was vague and irrelevant. After

reviewing Willie Jones's grand jury testimony in the course of ruling on the objection, the trial court noticed that his testimony was given after the date of the superseding indictment in this case.

*Sua sponte*, the court raised the issue that it was improper to call witnesses to participate in grand jury investigations in order to obtain evidence on already indicted cases. The government represented that Willie Jones was subpoenaed to give evidence on other unindicted murders still under investigation by the grand jury. The government further proffered that it had learned that Willie Jones had facts relevant to the instant case during a pre-grand jury interview. According to the government, Willie Jones then testified about the facts of this case incidental to his testimony about other unindicted matters.

The court disagreed with the government's representations and found that Willie Jones's testimony about the already indicted offenses in this case was the dominant purpose of his grand jury appearance. However, after a series of pleadings and hearings, the court found that it would be inappropriate to prohibit Willie Jones from testifying because the government properly uncovered the information underlying his testimony during a pre-grand jury interview pursuant to

a lawfully issued subpoena. Instead, the court ruled that the proper remedy would be to prohibit the government from using Willie Jones's grand jury testimony in any way during trial.

### 1. Pre-indictment

"[A]s a general matter, a [federal] court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia*, 487 U.S. at 254; (*Phillip*) *Williams v. United States*, 757 A.2d 100, 105 (D.C. 2000) (adopting the same standard for District of Columbia courts). Except for cases involving "fundamental" errors "in which the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair," dismissal of the indictment is appropriate only "if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." (*Phillip*) *Williams*, 757 A.2d at 105 (internal quotation marks omitted) (quoting *Bank of Nova Scotia*, 487 U.S. at 256-57).

Here, the record clearly reflects that the trial court applied and quoted the correct standard from *Bank of Nova Scotia* in deciding whether to dismiss the

indictment despite the improper exposure of privileged marital testimony to the grand jury.[78] Similar to the record in (*Phillip*) *Williams*, the record in this case shows that the grand jury had compelling evidence before it other than the testimony admitted in error. Specifically, the grand jury heard *premarital* testimony from Tracey describing how Tann killed a man named "Bone," who was related to one of his rivals. Therefore, Tracey's incompetent post-marital testimony was largely cumulative with her testimony that was properly before the grand jury. Furthermore, the grand jury had powerful testimony from two eyewitnesses describing Leslie Jones's murder: Alphonce Little, testifying that he saw Tann shoot Leslie Jones, and Tyrone Curry, describing how he heard gunshots and observed Tann run from the scene of the shooting immediately thereafter.

Consequently, the trial court correctly concluded that the premarital statements, and other evidence going to Tann's murder of Leslie Jones, were

---

[78] *See* D.C. Code § 14-306 (b) (2012 Repl.) ("In civil and criminal proceedings, a spouse or domestic partner is not competent to testify as to any confidential communications made by one to the other during the marriage or the domestic partnership."); (*Cotey*) *Wynn v. United States*, 48 A.3d 181, 189 (D.C. 2012) ("[t]he word 'proceeding' may comfortably be used to describe investigations by a grand jury"); *In re Grand Jury Investigation*, 431 F. Supp. 2d 584, 592 (E.D. Va. 2006) ("[I]t is . . . well-established that the marital privilege may be invoked during grand jury testimony.") (citing *United States v. (Thomas) Morris*, 988 F.2d 1335, 1337 (4th Cir. 1993)).

"compelling evidence" for the grand jury to find probable cause even setting aside the privileged post-marital testimony. We find that the problematic testimony did not "raise a substantial question, much less a grave doubt, as to whether [it] had a substantial effect on the grand jury's decision to charge." *Bank of Nova Scotia*, 487 U.S. at 263.

Appellants' argument about the way in which testimony was presented to the grand jury which issued the superseding indictment amounts to the type of reliability challenge which, on these facts, also does not establish prejudice under the *Bank of Nova Scotia* standard. *See id*. at 262-63 (determining that dismissal of indictment not warranted on the basis of a reliability challenge to the accuracy of IRS agents' tandem reading of transcripts before the grand jury given no showing of prejudice). Regarding the use of transcripts in the grand jury generally, we note that this court has "sanctioned the prosecutor's use of a transcript of a witness' prior sworn grand jury testimony in a later, separate grand jury proceeding." *Miles v. United States*, 483 A.2d 649, 654 (D.C. 1984); *see also United States v. Calandra*, 414 U.S. 338, 344-45 (1974) ("The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered.")

As to the prosecutor's summaries of the testimony contained in the transcripts that were presented to the grand jury, we find that the record does not reflect "any attempt by the prosecutor to deceive the grand jury." *Miles*, 483 A.2d at 654. The prosecutor represented, without contradiction, that she accurately summarized the testimony in the transcripts and left the transcripts with the grand jury for its review. Indeed, the prosecutor also stated that the second grand jury was correctly alerted that Alphonce Little had perjured himself before the prior grand jury. Where there is no indication that the grand jury was in any way misled based on the manner of the government's presentation of the evidence, we have no basis to find that the trial court abused its discretion in refusing to dismiss the indictment.

### 2. Post-Indictment

Finally, with regard to the trial court's fashioning of an appropriate remedy for the government's improper elicitation from Willie Jones before the grand jury of information concerning already indicted matters, we again review for an abuse of discretion, and find none. *See United States v. Breitkreutz*, 977 F.2d 214, 217 (6th Cir. 1992) (reviewing for abuse of discretion the trial court's denial of the defendant's motion to grant appropriate relief based on allegations of post-indictment government misuse of the grand jury to "'lock-in' incriminating

testimony"). "While a grand jury wields broad investigatory powers prior to returning an indictment, courts uniformly have held that, once a targeted individual has been indicted, the government must cease its use of the grand jury in preparing its case for trial." *See Resolution Trust Corp. v. Thornton*, 41 F.3d 1539, 1546 (D.C. Cir. 1994) (internal quotation marks and alterations omitted); *see also Beverly v. United States*, 468 F.2d 732, 743 (5th Cir. 1972) ("It is a misuse of the grand jury to use it as a substitute for discovery.").

However, in fashioning an appropriate remedy where a post-indictment violation of the grand jury process has occurred, federal courts impose one that "fit[s] the circumstances of the particular case." *See, e.g., United States v. Kovaleski*, 406 F. Supp. 267, 271 (E.D. Mich. 1976). We believe this is the rational and proper standard for trial courts to apply.

Here, the trial court's decision to bar the government from using Willie Jones's grand jury testimony at trial put the government in exactly the same position it would have been in absent its misuse of the grand jury. The government learned relevant information from Willie Jones during a proper pre-grand jury interview and could have subpoenaed him directly as a trial witness, rather than

having him testify at the grand jury on already indicted matters. It is unchallenged that the government had a legitimate purpose in originally subpoenaing Willie Jones to the grand jury; namely, to learn about unindicted matters under investigation.

Accordingly, given these facts, the trial court's choice of remedy – to permit the government to call Willie Jones as a witness but to prohibit it from using his grand jury testimony in any way – seems fitting and not in error. *Cf. id.* at 271 (precluding the government from calling the witness at trial was "the only effective remedy" on the facts of that case). Therefore, appellants' grand jury claims are denied.

## X. Merger

Appellant Tann argues for merger of the following convictions: (1) his three convictions for second-degree murder of Terrence Jones, (2) his three PFCV convictions arising out of the Terrence Jones murder, (3) his two PFCV convictions arising out of the James Taylor-Bernard Mackey incident, (4) his two PFCV convictions arising out of the armed robbery and AWIKWA of Richard Queen, and (5) his PFCV convictions arising out of the Queen facts with his PFCV convictions arising out of the Terrence Jones facts.

Appellant Arnette joins Tann as to arguments (1) and (2). The government concedes arguments (1), (2), and (3), but contends that Tann's two PFCV convictions for the armed robbery and AWIKWA of Richard Queen do not merge with each other or with his remaining PFCV conviction for the Terrence Jones murder. This court reviews merger issues *de novo*. *Nero v. United States*, 73 A.3d 153, 159 (D.C. 2013).

The Double Jeopardy Clause protects defendants against multiple punishments for the same offense, but does not prohibit multiple punishments for "separate criminal acts." *Owens v. United States*, 497 A.2d 1086, 1094-95 (D.C. 1985). "[A]s a general rule, where two predicate armed offenses do not merge, a defendant may be convicted of separate counts of PFCV relating to each offense . . . ." *Stevenson v. United States*, 760 A.2d 1034, 1035 (D.C. 2000). The rule, however, is susceptible to a limited exception: "multiple PFCV convictions will merge, even if the predicate felony offenses do not merge, if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence." *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006); *see also Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999) (applying the rule of lenity

and holding that three PFCV convictions merged into one where the defendant fired several times into a car containing multiple victims).

In determining whether multiple PFCV convictions are based on a single act or distinct acts of violence, we apply the so-called "fork-in-the-road" or "fresh impulse" test. *Matthews*, 892 A.2d at 1106; *Stevenson*, 760 A.2d at 1037 ("If at the scene of the crime the defendant can be said to have realized that he has come to a fork in the road, and nevertheless decides to invade a different interest, then his successive intentions make him subject to cumulative punishment . . . .").

Under that test, Tann's PFCV convictions related to the robbery and shooting of Richard Queen do not merge. Donald Matthews testified that Tann and other men pinned Queen against a car, beat him, and went through his pockets, that Queen tried to run away, and that Tann picked up a gun that had fallen to the ground and shot Queen in the back. Tann reached a "fork-in-the-road" and had the opportunity for a "fresh impulse" when Queen began to run and Tann picked up the gun and made the decision to shoot. *See Baker*, 867 A.2d at 1010; *Sanders v. United States*, 809 A.2d 584, 604 (D.C. 2002); *Stevenson*, 760 A.2d at 1037-38.

Similarly, Tann's Richard Queen-related PFCV convictions do not merge with his PFCV conviction for aiding and abetting Cooper's murder of Terrence Jones. Tann argues that the convictions should merge because the Terrence Jones-Richard Queen incident "was a rapidly developing, short-lived assaultive event." However, in *Harrison*, 76 A.3d at 826, we concluded that two defendants' convictions for AWIKWA and first-degree felony murder did not merge on facts showing that one defendant shot one victim at nearly the same time as the other defendant shot a second victim. *Id.* at 831-32. We also held that the defendants' resulting PFCV convictions did not merge because the "separate shootings arose from fresh impulses and targeted different victims." *Id.* at 844; *see also Wages v. United States*, 952 A.2d 952, 964 (D.C. 2008) (PFCV convictions for the shooting of different victims merge only when "there was a single shooting incident, that is, one assaultive act that resulted in multiple victims"). In the same way, Tann's PFCV associated with his robbery and shooting of Richard Queen does not merge with his PFCV related to Cooper's shooting of Terrence Jones because the two PFCV offenses involved "separate assaulting acts." *Harrison*, 76 A.3d at 844. Therefore, we leave unmerged his PFCV convictions arising out of the armed robbery and AWIKWA of Richard Queen.

## XI. Conclusion

In the final analysis, we reverse the judgment at trial as to the following: Beaver's CPWL judgment of conviction, Arnette's PFCV judgment of conviction related to the armed robbery of Richard Queen, and Arnette's judgment of conviction for armed robbery. We remand the case to the trial court with the following instructions: (1) to enter a judgment of conviction against Arnette for the lesser-included offense of robbery[79] and (2) to merge the following judgments of conviction – Tann's three judgments of conviction for second-degree murder of Terrence Jones, Arnette's three judgments of conviction for second-degree murder of Terrence Jones, Tann's three PFCV judgments of conviction associated with his convictions for the murder of Terrence Jones, Arnette's two remaining PFCV judgments of conviction arising out of the murder of Terrence Jones, and Tann's two PFCV judgments of conviction arising out of the James Taylor-Bernard Mackey incident. In all other respects, the judgments of conviction are affirmed.

*So ordered*.

---

[79] *See* (*Leon*) *Robinson*, No. 11-CF-1443, slip op. at 37-38; *Jackson*, 940 A.2d at 996.

GLICKMAN, *Associate Judge*, concurring in part and dissenting in part: For the most part, I join the per curiam opinion disposing of the appeals in these several cases. I cannot join Section VII.C, however. In that section, my colleagues hold that appellants Harris and Tann could be liable for aiding and abetting Robert Foreman's shooting of James Taylor and Bernard Mackey even if Harris and Tann were unaware of Foreman's presence or actions and did not intend to assist or encourage Foreman in his criminal activity. I believe my colleagues in the majority base that holding on an erroneous theory of accomplice liability—a novel theory of their own devising, and one not relied on at trial or argued on appeal.

As the per curiam opinion explains in more detail, the shootings occurred on May 4, 2006, at a playground on 22nd Street Southeast. According to the government's proof at trial, after Omar Harrison verbally abused and slapped Ashley Tyndle, several members of the 22nd Street Crew, including Harris and Tann, rushed to Tyndle's defense. Harris and Tann fired several shots at Harrison. Foreman, another member of the Crew, arrived on the scene a few moments later and, unbeknownst to Harris and Tann, independently decided to join in the shooting. Foreman missed Harrison but the evidence supported a finding that he hit, and killed, Taylor. He also may have fired the shot that injured Mackey. Over appellants' objections, the trial court instructed the jury that Harris and Tann could

be found guilty for these two shootings as aiders and abettors based on their participation in "the crime" (i.e., their own shooting at Harrison) even if they did not knowingly or intentionally assist or encourage the principal assailant (i.e., Foreman). The jury found Harris and Tann guilty of first-degree murder while armed for Taylor's death and of assault with intent to kill while armed for the wounding of Mackey.

The fundamental issue on which I differ with my colleagues is whether a person can be found guilty as an aider and abettor under the law of the District of Columbia without proof that he intended to assist or encourage the principal offender. I think not. Sitting *en banc*, we declared in *Wilson-Bey* that it is a "requirement [for aiding and abetting liability] that the accomplice be shown to have intended that the principal succeed in committing the charged offense."[1] We elaborated, in a subsequent decision, that this court has "adopted the doctrine that 'in order for a person to be held accountable for the specific intent of another under an aiding and abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the

---

[1] *Wilson-Bey v. United States*, 903 A.2d 818, 831 (D.C. 2006) (en banc).

charged crime.'"[2] This core requirement has a long history, which is reviewed in Judge Learned Hand's influential opinion defining accomplice liability under federal law in *United States v. Peoni*.[3] The Supreme Court endorsed Hand's definition in *Nye & Nissen v. United States*,[4] and it now is well settled that "the specific intent to facilitate the commission of a crime by another" is an essential element of aiding or abetting under the general federal aiding and abetting statute, 18 U.S.C. § 2.[5] "The intent necessary to support a conviction for aiding and abetting goes beyond the mere knowledge that the defendant's action would tend to advance some nefarious purpose of the principal. Rather, the defendant must act

[2] *Little v. United States*, 989 A.2d 1096, 1102 (D.C. 2010) (quoting *Wilson-Bey*, 903 A.2d at 834).

[3] 100 F.2d 401, 402 (2d Cir. 1938) (explaining that "all these definitions [of an "accessory"] have nothing whatever to do with the probability that the forbidden result [the crime committed by the principal offender] would follow upon the accessory's conduct; and that they all demand that he in some sort associate himself with the [principal's] venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed").

[4] 336 U.S. 613, 619 (1949).

[5] *United States v. Washington*, 106 F.3d 983, 1004 (D.C. Cir. 1997) (quoting *United States v. Raper*, 676 F.2d 841, 849 (D.C. Cir. 1982)); *see also, e.g.*, *Rosemond v. United States*, 134 S.Ct. 1240, 1245 (2014) ("[U]nder §2 'those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime.'") (quoting *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 181 (1994)).

with the specific intent of facilitating or advancing the principal's commission of the underlying crime."[6]  Because "our aiding and abetting statute does not differ substantially from its federal counterpart," we "look to the federal courts' interpretation of the federal statute in construing our own."[7]

Thus, contrary to the position espoused by the government and implemented by the trial court in this case,[8] for a defendant to be liable as an aider or abettor, "it is not sufficient that he intentionally engaged in acts which, as it turned out, did give assistance or encouragement to the principal"; in addition, "the accomplice

---

[6] *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004).

[7] *Wilson-Bey*, 903 A.2d at 831 (internal quotation marks and brackets omitted).

[8] The government's position, at trial and on appeal, is that "it is an accomplice's intentional participation in a crime, not his association with a principal, that gives rise to aiding and abetting liability."  Br. for Appellee at 204.  The government thus argues that Harris and Tann were aiders and abettors if, by shooting at Harrison, they "incited" Foreman to join in the attack, even if they did so unknowingly and unintentionally.  The trial court instructed the jury in accordance with this theory.  But the government has cited no authority supporting its claim that unintentional incitement can constitute aiding and abetting.  *Cf.* BLACK'S LAW DICTIONARY 880 (10th ed. 2014) (defining "incitement" in the field of criminal law as "[t]he act of persuading another person to commit a crime").  Nor has the government been able to find any case, from any jurisdiction, holding a defendant liable as an aider and abettor for the independent criminal act of another that the defendant did not intentionally encourage or assist in some way.

must have intended to give the aid or encouragement" to the principal.[9]  For the same reason, it is not sufficient that the defendant merely had the same *mens rea* as the principal.[10]  There is "a dual mental state requirement" for accomplice liability: the accomplice not only must have "the culpable mental state required for the underlying crime committed by the principal"; he also must "assist[] or encourage[] the commission of the crime committed by the principal with the intent to promote or facilitate such commission."[11]

This does not mean the accomplice always must know the *identity* of the principal offender.  It almost always is the case, of course, that an accomplice does know whom he is intentionally assisting or encouraging to commit an offense, because they are co-participants in the venture (even if the accomplice may not

---

[9] Wayne R. LaFave, CRIMINAL LAW § 13.2 (c) at 713-14 (5th ed. 2010) (citing, *inter alia*, *Bogdanov v. State*, 941 P.2d 247 (Colo. 1997) (en banc)).

[10] We have held that "where a specific *mens rea* is an element of a criminal offense, a defendant must have had that *mens rea* himself to be guilty of that offense, whether he is charged as a principal or as an aider and abettor." *Perry v. United States*, 36 A.3d 799, 808 (D.C. 2011) (quoting *Kitt v. United States*, 904 A.2d 348, 356 (D.C. 2006)).  This is a necessary, but not a sufficient, condition for accomplice liability.

[11] *Bogdanov*, 941 P.2d at 250-51 (internal citation and quotation marks omitted); *see also* LaFave, supra n.9, § 13.2 (b) at 713 ("Generally, it may be said that accomplice liability exists when the accomplice intentionally encourages or assists, in the sense that his purpose is to encourage or assist another in the commission of a crime as to which the accomplice has the requisite mental state.").

know the principal's name). But it is possible in some circumstances to be an aider and abettor – to help or induce another person to commit a crime, and to do so knowingly and intentionally – without knowing who that other person is. A typical example is the person who knowingly attaches himself to a large group, such as a lynch mob, a criminal gang, or a vigilante body, that is engaged in or bent on breaking the law. Such a person may intentionally assist or encourage others in the group to commit illegal acts, and thereby be liable for their offenses as an aider and abettor, even though (given the size of the group, the chaos of the action, or other circumstances) he may not know who is in the group or who the principal offenders in it are.[12] But one cannot be liable as an aider and abettor without having the intent to assist or encourage a principal actor at all. One cannot be an inadvertent accomplice.

The trial court therefore erred in allowing the jury to find Harris and Tann guilty on the government's novel theory that they aided and abetted Foreman if, by shooting at Omar Harrison themselves, they unknowingly and unintentionally "incited" Foreman to join in the attack. It is beside the point that Foreman

---

[12] As I discuss below, two of the cases relied upon by the majority, *State v. Ochoa*, 72 P.2d 609 (N.M. 1937), and *State v. Kukis*, 237 P. 476 (Utah 1925), are cases of this sort.

intended to aid and abet Harris and Tann; that has things backwards. Accomplice liability depends on whether the accomplice intended to encourage or assist the principal, not on whether the principal intended to encourage or assist the accomplice.

My colleagues *agree* that the trial court erred by instructing the jury in accordance with the government's theory of aiding and abetting. Yet in spite of their agreement on this point, they affirm appellants' convictions on the basis of a novel theory of their own devising that suffers from the same defects as the government's theory. Under this theory, Harris and Tann are liable as Foreman's accomplices even if they did not intend to encourage or assist Foreman, because (1) they shared a "community of purpose" with Foreman and (2) it was reasonably foreseeable that their actions would inspire someone who shared their community of purpose to commit the crime.[13]

To evaluate this theory of aiding and abetting liability without intentional support for the principal, it is important to understand two things about its central concepts. First, the term "community of purpose" does not imply concerted

---

[13] *See ante* at 74.

activity on the part of the principal and putative accomplice. According to my colleagues, the requisite "community of purpose" may exist in the absence of any agreement, understanding, or cooperation between them with respect to the crime in question; indeed, they may be unaware of each other and acting independently, albeit to the same criminal end.[14] Second, and most critically, my colleagues' theory of accomplice liability treats reasonable foreseeability as the legal equivalent of intentionality.[15]

This represents a considerable expansion of the doctrine of accomplice liability, for, as discussed above, it is a basic requirement in American criminal law that an accomplice actually "must intend that his acts have the effect of assisting or encouraging" the principal.[16] That the putative accomplice reasonably should have foreseen the principal's actions (and, for that matter, that he would have approved

---

[14] *Ante* at 77 n.28; *see also ante* at 75 n.27 ("[A] 'community of purpose' necessarily implies that there exists some tacit, if not always explicit, agreement or understanding between all involved (such as a code of conduct), even if there is no agreement to commit a *specific* crime." (majority's emphasis)).

[15] *Ante* at 75 and n.26; *see also ante* at 81 n.32 ("[W]e rely on the principle that Harris and Tann could be found to have intended the reasonably foreseeable consequences of their acts."). The jury in this case, of course, was not required to make a finding that Foreman's intervention was reasonably foreseeable to Harris and Tann, let alone that the two defendants intended their actions to assist anyone.

[16] LaFave, *supra* n.9, § 13.2 (c) at 714.

of them had he foreseen them) is not enough. Reasonable foreseeability is not the legal equivalent of intentionality; as this court explained in *Wilson-Bey*, to equate the two concepts is to confuse intentionality with the mental state on which mere negligence is based.[17] Often enough, people do not intend the reasonably foreseeable consequences of their actions. While a trier of fact is permitted to infer that a defendant did intend the reasonably foreseeable consequences of his acts, a trier of fact is not and cannot be required to do so, and cannot be presumed to have done so.[18]

My colleagues' theory of accomplice liability for the principal actor's reasonably foreseeable acts seems to be patterned on the doctrine of *Pinkerton* conspiracy liability. To establish *Pinkerton* liability, however, the government

---

[17] *See Wilson-Bey*, 903 A.2d at 836-37; *see also, e.g.*, *Robinson v. United States*, 100 A.3d 95, 106 (D.C. 2014) ("*Wilson-Bey* rejected the proposition (and any jury instruction incorporating it) that a defendant may be held liable as an aider and abettor based on a merely negligent state of mind—i.e., for acts of confederates that were merely 'reasonably foreseeable' to the defendant or the 'natural and probable consequences' of the criminal venture in which the defendant intentionally participated—when a degree of mens rea higher than negligence was required to convict the principal actor for those acts.").

[18] *Wilson Bey*, 903 A.2d at 835 n.38; *see also Sandstrom v. Montana*, 442 U.S. 510, 522-24 (1979) (instruction in a criminal case that the "law presumes that person intends the ordinary consequences of his voluntary acts" *held* to unconstitutionally shift the burden of persuasion).

must prove "that an agreement existed, that a substantive crime was committed by a co-conspirator in furtherance of that agreement, and that the substantive crime was a reasonably foreseeable consequence of the agreement between the conspirators."[19] My colleagues' theory substitutes "community of purpose" for the conspiratorial agreement that is the *sine qua non* of *Pinkerton*. But this is no small difference, because *Pinkerton* liability for the reasonably foreseeable acts of co-conspirators is based on the existence of an agency relationship between the conspirators. Such a relationship is created by their agreement but not by their mere "community of purpose" as my colleagues use that term.[20]

In essence, I think it fair to say that my colleagues' "community of purpose" theory of unintentional aiding and abetting is what this court warned against in *Wilson-Bey*: a hybrid that, without adequate justification, "conflat[es] the two doctrines [of conspiracy and aiding and abetting] into one omnibus and sprawling theory of vicarious criminal liability."[21] It is telling that the majority opinion cites the "broader conspiracy to kill 'outsiders' among the 22nd Street Crew members"

---

[19] *Collins v. United States*, 73 A.3d 974, 982 (D.C. 2013) (quoting *Wilson-Bey*, 903 A.2d at 840).

[20] *See Wilson-Bey*, 903 A.2d at 842.

[21] *Id.* at 841.

as constituting both the evidence of "the community of purpose that, as a factual matter, was shared between Tann, Harris, and Foreman at the time of the shooting," and the reason it was "foreseeable to Harris and Tann that other 22nd Street Crew members in the area—including, unbeknownst to them, Foreman— would respond by joining in the effort to shoot Omar Harrison."[22]  The effect is to uphold Harris and Tann's convictions on a theory that they were Foreman's co-conspirators rather than a theory that they were his aiders and abettors.  But the government has not relied on the doctrine of *Pinkerton* liability here.  Harris and Tann were not charged with the Taylor/Mackey shootings under *Pinkerton*, and the government contended in the trial court that it "was not required to show a prior association between Harris [or Tann] and the third shooter . . . . [as] [s]uch an association, while relevant under a vicarious-liability theory, was not, in the government's view, necessary for aiding and abetting."[23]  Perhaps the government misjudged its trial strategy, but if so, it is not the job of this court to remedy the government's mistake.

---

[22] *Ante* at 77 n.28.

[23] Br. for Appellee at 193.

In lieu of providing a sound rationale for their hybrid theory of aiding and abetting, my colleagues claim it is grounded in the common law. In support of that claim, they cite five cases. None of them is from this jurisdiction, or from Maryland (whence our common law derives[24]), and none is from a court adhering to the *Peoni* doctrine. Four of the five cases were decided before *Peoni*, and the fifth was decided not under common law, but under a statutory amalgamation of aiding and abetting with conspiracy principles that has no counterpart in the law of our jurisdiction. None of the five cited cases approves the theory of aiding and abetting that my colleagues espouse; nor, I believe, would the courts in those cases find Harris and Tann liable as Foreman's accomplices on such a theory.

In the two Kentucky cases, *Whitt v. Commonwealth*[25] and *Landrum v. Commonwealth*,[26] the appellate court held that the defendant could not be convicted of aiding and abetting a homicide in the absence of proof that he shared the intent or purpose of the principal, who had intervened, independently and without the defendant's knowledge, in the defendant's altercation with the

---

[24] *Woods v. United States*, 65 A.3d 667, 671 n.8 (D.C. 2013); *see In re Estate of Parnell*, 275 F. Supp. 609, 610 (D.D.C. 1967).

[25] 298 S.W. 1101 (Ky. 1927).

[26] 96 S.W. 587 (Ky. 1906).

decedent. My colleagues infer that the result would have been different had there been evidence that the principal and the putative aider and abettor shared the same purpose.[27] That inference is belied, however, by the subsequent decision of Kentucky's highest court in *Haynes v. Commonwealth*.[28]

The *Haynes* decision is rather on point. "Upon receiving word that his two sons, the appellants John Robert and Tounsel [Ray] Haynes, were engaged in what might be called a 'shoot-out' with William Caudill, the appellant Joe Haynes armed himself with a rifle, went to the scene of the affray, and shot and killed Caudill."[29] All three appellants were convicted of manslaughter, and they appealed. With respect to the two sons, who were tried as aiders and abettors of their father's homicide, the Court of Appeals of Kentucky said "[t]he question is, under what circumstances does a person engaged in an affray become an aider and

---

[27] *But cf. id.* at 588 ("If two or more acting independently assault another, and one of them inflicts a mortal wound, the other is not guilty as an aider and abettor.").

[28] 515 S.W.2d 240 (Ky. 1974).

[29] *Id.* at 240-41.

abettor of another who intervenes uninvited, *even assuming that they 'share the criminal intent or purpose '''*?[30]

Contrary to my colleagues' theory of aiding and abetting, the court reversed the two sons' convictions for lack of evidence that they sought their father's intervention or did anything to provide "assistance or encouragement" to him, regardless of any shared criminal intent or purpose they and their father had in shooting at Caudill.[31]  Nothing in *Haynes* supports my colleagues' notion that the

---

[30] *Id.* at 241 (quoting *Whitt*, 298 S.W. at 1103; emphasis added).

[31] *Id.*  Specifically, the court said,

> There is no evidence from which it may be reasonably inferred, as distinguished from speculation, that either of the sons sent for the father.  There is no evidence even that John Robert knew he had arrived until after the killing.  The clear weight of the evidence is that John Robert had stopped shooting before the father appeared and that Tounsel Ray never fired a shot during the entire proceeding.  All that Tounsel Ray could have done that he did not do, as he lay in his place of protection behind a rock and saw his father's approach, was to ask him to stay back, but that omission would not itself amount to assistance or encouragement.  Nor, of course, does the fact that Tounsel may have provoked the encounter.  On balance, bearing in mind the great principle of

(continued…)

outcome would have been different had there been evidence that Joe Haynes's intervention was foreseeable to his sons. On the contrary, there was such evidence in the case—as the court expressly acknowledged, Tounsel Haynes (who may have provoked the gun battle) saw his father coming to their aid and did not ask him to "stay back"—and the court held that it did *not* "amount to assistance or encouragement."[32]

The cases from New Mexico and Utah, *State v. Ochoa*[33] and *State v. Kukis*,[34] likewise do not support the thesis that a defendant may be convicted as an aider and abettor without proof that he intentionally encouraged or assisted the principal. The two cases merely illustrate that a member of a criminal mob who intentionally helped other members commit a crime may be found guilty of aiding and abetting them even if he does not know which particular member of the mob actually

(…continued)

> reasonable doubt, we think the evidence here will not justify conviction of the sons as participants in the father's act.

*Id.*

[32] See footnote 31, *supra*.

[33] 72 P.2d 609 (N.M. 1937).

[34] 237 P. 476 (Utah 1925).

perpetrated the offense.[35] Neither *Ochoa* nor *Kukis* suggests that a defendant could be found guilty as an accomplice if he lacked the intent to aid or abet others in the mob to break the law.[36] Rather, as the Supreme Court of New Mexico said in a subsequent case, "a jury cannot convict a defendant on accessory liability for a crime unless the defendant intended the principal's acts."[37]

Lastly, the Illinois intermediate appellate court's decision in *People v. Cooks*[38] is similar to *Ochoa* and *Kukis* except that the defendant was a member of a criminal gang rather than a mob, and the case involves the application of a hybrid

---

[35] That proposition does not apply to sustain the convictions of Harris and Tann in this case. They were not prosecuted for the offenses against Taylor and Mackey on the theory that they had intentionally encouraged or assisted an attack on Omar Harrison by a group (i.e., the 22nd Street Crew) that happened to include Foreman. Had such a theory been properly presented to the jury and resulted in conviction, my opinion on appeal might be different. *See Rosemond v. United States*, 134 S.Ct. 1240, 1245, 1248-50 (2014). But that is not the situation with which we are confronted.

[36] It should be noted, however, that the Utah court accepted the doctrine, which we rejected in *Wilson-Bey*, of accomplice liability for criminal acts that are the "probable and natural consequences" of the common design, even if those consequences were not part of the accomplice's original intent. *Id.* at 481.

[37] *State v. Carrasco*, 946 P.2d 1075, 1079 (N.M. 1997). *Cf. Ochoa*, 72 P.2d at 616 ("The accused may not be held for the independent act of another even though the same person be the victim of an assault by both.").

[38] 625 N.E.2d 365 (Ill. App. 1993).

state statute (rather than common law) providing, *inter alia*, that a person is "legally accountable" for the conduct of another person in furtherance of their "common criminal design or agreement."[39] The defendant in *Cooks* was convicted under this provision for a murder committed by an unidentified gunman based on circumstantial evidence that the two were fellow gang members retaliating in a "joint action" against members of a rival gang.[40] Although the identity of the second gunman was not established at trial, nothing in the court's opinion suggests

---

[39] Ill. Rev. Stat. 1985, ch. 38, par. 5-2(c), which provided that a person is "legally accountable" for the conduct of another when

> (c) either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.

> When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability.

The statute appears to combine conspiracy and aiding and abetting principles, including the natural and probable consequences doctrine that *Wilson-Bey* rejected.

[40] *Cooks*, 625 N.E. 2d at 370.

that the defendant's conviction would have been upheld absent evidence that he and the unknown gunman were acting together and in concert with each other. The Illinois Supreme Court has made clear that, even under the state's common design rule, a defendant must have "the intent to promote or facilitate [the principal's] commission" of an offense.[41]

In sum, I submit that my colleagues have crafted an unprecedented and unsound rationale for upholding Harris and Tann's convictions—a rationale that is irreconcilable with *Wilson-Bey* and other binding decisions of this court. I am compelled to add that this exercise in judicial creativity is all the more objectionable because it is done *sua sponte* and without the benefit of any briefing or other input by the parties on the merits of the "community of purpose/foreseeability" theory of accomplice liability or its application in this case. I think it ill-advised, unfair to the parties, and contrary to this court's norms for the majority to develop and rely on this unforeseeable reshaping of a major doctrine in

---

[41] *People v. Perez*, 725 N.E.2d 1258, 1266 (Ill. 2000). "Accountability" under Illinois law, the court explained, "focuses on the degree of culpability of the offender and seeks to deter persons from *intentionally* aiding or encouraging the commission of offenses. Thus, unless the accomplice *intends* to aid the commission of a crime, no guilt will attach." *Id.* at 1265-66 (emphasis in the original; internal quotation marks and citation omitted).

the criminal law without affording the parties the opportunity to address it in supplemental briefing.[42] In the past, when this court has considered deciding an appeal on a basis "the parties failed to identify and brief"—a discretionary departure from the general rule that points not urged on appeal are deemed to be waived—we have taken care to "ensure procedural fairness, both to the government and to the defense, by providing each party with the opportunity to brief" the issue.[43] This is so even when the issue injected by the court involves settled legal principles. There is no reason to deviate from that rule of basic fairness here.

---

[42] By the same token, I think it unfair and inappropriate for the majority to find that the trial court's "erroneous" failure to instruct the jury on the "community of purpose" theory of liability was harmless without affording Harris and Tann an opportunity to address that question. (Parenthetically, for myself, I am not persuaded to find harmless the trial court's erroneous rulings and instructions rejecting the requirement that an accomplice must intend to encourage or assist the principal.)

[43] *Randolph v. United States*, 882 A.2d 210, 226-27 (D.C. 2005); *see also id.* at 226 ("[N]o matter whose ox is gored, this court has frequently requested post-argument briefing of issues not adequately raised by counsel, to the end that, after both parties have been fully heard, the court is in the best position to render a sound decision.").

For the foregoing reasons, I respectfully dissent from Section VII.C of the per curium opinion and would reverse the convictions of Harris and Tann arising from the shootings of Taylor and Mackey.